UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------

United States of America,

    -vs-                                       17 Cr 500 (LAK)

Oliver Sohngen,

               Defendant.
--------------------------------------------------------

# Sentencing Memorandum
# on behalf of
# Defendant
# Oliver Sohngen

December 5, 2017
New York, New York

Susan J.Walsh
Vladeck Raskin & Clark, PC
565 Fifth Ave., 9th Floor
New York, New York 10017

Frank Balsamello, AUSA

VLADECK, RASKIN & CLARK, P.C.

SUSAN J. WALSH
212-403-7300
SWALSH@VLADECK.COM

December 5, 2017

**By ECF**

Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:    *United States v. Oliver Sohngen*,  17 Cr. 500 (LAK)

Dear Judge Kaplan:

On December 19, 2017 at 11:00 a.m., Oliver Sohngen will stand in judgment before this Court having admitted to two instances of commercial sexual conduct with female minors, ages 15 and 17, in 2013.  At age 53,  he faces a mandatory minimum sentence of ten years and a sentencing guideline range of 135 – 168 months.

## CONTEXT

Oliver Sohngen immediately realized the extraordinary agony and anger his crimes caused to each life he has touched across every spectrum and across the globe.  The day after his arrest, he publicly and permanently resigned to disassociate himself from the beloved and popular music school he founded and directed in an effort to mitigate the taint of his association for his colleagues and students.  Shortly thereafter, he waived his right to grand jury indictment and agreed to enter a guilty plea to an information, also sparing his victims, his children and community the additional pain and humiliation of a public trial.  And, when he entered his guilty plea admitting publicly to sexual crimes involving minors, Oliver stated:

> **I am so sorry for the hurt and misery my actions have caused the victims. I am also sorry for the shock and pain I have brought to my community and my family. I'm ashamed and sorry.**

> Plea Transcript of August 10, 2017 at p 16 ln 16.

Since his incarceration Oliver has reflected on the horror his worst impulses have caused, acknowledged the ruin he has brought to his victims and his loved ones and confronted his demons both privately and publicly to commit himself to total and complete rehabilitation.



Honorable Lewis A. Kaplan
December 5, 2017
Page 2

> **I am acutely aware that the crimes I have committed are ones of the most heinous nature that an adult can commit against the most innocent. Every day I think about my previous actions and I feel remorse. I am furthermore repulsed by my deeds and thoughts that led to these unspeakable offenses. I sincerely hope that the victims and their families can recover in time from the consequences of my actions...When I look at the written details of my allegations I am filled with disgust at the fact to have ever engaged in even the thoughts of committing such crimes...I hope that a comprehensive treatment program will assist me in strengthening my resolve for urges to never reoccur...It is my sincere hope that I can redeem myself for the despicable acts I have committed and through forgiveness and rehabilitation can spend my remaining years reestablishing a role as a positive contributor in society.**

Exhibit A, Letter from Oliver Sohngen

As the annexed letters attest, Oliver Sohngen has tremendous gifts and talents and has touched many lives positively. He has led an imperfect but productive life carrying an enormous shame-filled burden. By most measures he has carried a sickness: a secret and guilt-ridden one where there are scant few places to turn for help without risking what he now experiences: ostracization and prison based on mandatory reporting requirements.

To be sure, there are many lives beyond the victims' and Oliver's, himself once a victim of abuse, whose lives will be permanently and possibly irreparably damaged because of Oliver's conduct, including his  loving eleven-year-old daughter, his stepson who is barely eighteen, their mother and his adult son in Germany. There are also those whom society feels need protection from the risk of his recidivism through the criminal justice system. But the affliction that has plagued Oliver, which he acted upon, should not be the only measure of this man's worth. Indeed, his prospects for rehabilitation appear quite hopeful as his risk of reoffending is low. Moreover, the fundamentally positive contributions he has made in his 53 years and his potential to again do good should not be discarded because of a visceral disgust for his recent acts. "[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F.Supp.2d 506, 513-514 (S.D.N.Y 2006).

It is in this context I respectfully ask on Oliver Sohngen's behalf that the Court exercise its awesome mercy dispensing powers together with the statutorily mandated ones in reaching judgment over his future.

## Legal Standard

Since *Booke*r, some modicum of discretion previously entrusted to federal sentencing courts prior to the imposition of the mandatory guidelines regime has been restored. *United States v. Booker*, 543 U.S. 220, 244 (2005). By now, the legal standard this Court must employ at sentencing is well known. While the courts must consult the Guidelines, they are no longer

Honorable Lewis A. Kaplan
December 5, 2017
Page 3

binding, and in determining what sentence to impose, judges must consider <u>all</u> of the factors outlined in 18 U.S.C. § 3553(a) to "guide its discretion at sentencing." *Peugh v. United States*, 569 U.S. 530, (2013) *citing Booker*, 543 U.S. at 259-260.

The Supreme Court has made it clear that courts can again impose sentences at variance with the guidelines even in "the mine run cases." *See, Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States,* 552 U.S. 39 (2007); *Kimbrough v United States*, 552 U.S. 85 (2007). The court "may in appropriate cases impose a non-guidelines sentence based on disagreement with the Commission's views," *Peugh, quoting Pepper v. United States*, 562 U.S. 476 (2011), *citing Kimbrough v. United States*, 552 U.S. 85 (2007). Courts have been instructed to impose "a sentence *sufficient, but not greater than necessary"* to meet the objectives of sentencing. *See* 18 U.S.C. § 3553(a) (emphasis added).

## 18 U.S.C. 3553(a)

In determining an appropriate sentence, this Court must consider all of the factors enumerated in 18 U.S.C. 3553(a) and reach a sentence in its discretion sufficient to comply with the purposes enumerated under 18 U.S.C. 3553(a).[1] Oliver's 53-year history as a productive member of society, his diagnosis and prognosis, his lack of criminal history, his education and resources, the collateral consequences and the deportation he will suffer and the statutory punishment this Court is mandated to impose, all militate towards a sentence on the lowest end of the spectrum.

---

[1] The court, in determining the particular sentence to be imposed, shall consider –
   (1) The nature and circumstances of the offense and the history and characteristics of the defendant;
   (2) The need for the sentence imposed –
       (A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
       (B) To afford adequate deterrence to criminal conduct;
       (C) To protect the public from further crimes of the defendant; and
       (D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
   (3) The kinds of sentences available;
   (4) The kinds of sentence and the sentencing range established for – ….
   (5) Any pertinent policy statement –
   (6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
   (7) The need to provide restitution to any victims of the offense.
                                                                      18 U.S.C 3553

Honorable Lewis A. Kaplan
December 5, 2017
Page 4

## No abuse of position of trust

The day Oliver Sohngen was arrested, the news of Long Island Academy of Music "school teacher's" arrest rocketed around the internet and in local papers. The shock, shame, anger and fear reached across the Atlantic Ocean to his hometown in Germany; via Facebook it reached all of his contacts, students, teachers, friends, family and children. His eleven-year-old daughter was not spared some of the vitriol and ugliness of the internet and quite naturally many of the parents of the children Oliver taught were stunned and frightened.

### Oliver's Immediate Family

To be sure, there is no evidence that Oliver ever exploited his positions as the founder of a music school, teacher or parent to abuse his own children or a single student under his care or supervision. Oliver Sohngen emphatically denies any suggestion of it; professional evaluators have found no evidence of it and, in fact, former students and parents of students, colleagues and fellow teachers report no sign or suggestion of it.

Out of dutiful and appropriate concern for their own daughter's well being Oliver's life partner had their daughter immediately evaluated after Oliver's arrest and continues to have her seek therapeutic treatment to cope with the ongoing stress of her Dad's incarceration and the sudden and long-term separation. (Exhibit B, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆) Having treated the child since May 2017, Oliver's daughter's treatment providers report that although she is suffering "great loss" as a result of their separation, it appears she "was not a victim of her father's allegations." *Id*. Moreover, they note that she appears to have benefitted from her recent interaction with him and recommend she continues to be in contact with him through letters, emails and visitation to help foster the relationship. *Id*. There is simply no suggestion or evidence that Oliver abused his own children or children close to him.

### Former Students, their Parents and Colleagues

In his letter to the Court, Oliver acknowledges and hopes to assuage any fears or lingering angst the parents of his former students may harbor, writing that he "never intended, plotted or viewed any child [he] has ever taught in any sexual manner, neither in thoughts or deeds." (Exhibit A) Instead, he "took on students for the sole purpose of bringing out the best in this person and leading them on a path to success." *Id*. Students and parents of students who were taught by Oliver since as young as 5, 10 and 11 years of age write not only in support of his selfless generosity and gift as a music teacher, but to attest that nothing even approaching inappropriate ever occurred during the time they or their children were entrusted to Oliver's care

Honorable Lewis A. Kaplan
December 5, 2017
Page 5

as a teacher and educator.  One father who has known Oliver for ten years and who entrusted his
daughter to him since she was five years old writes,

> My daughter has been trained at home to report inappropriate actions.  She did so
> against a family relative when she was 9.  She says that NOTHING of this sort
> was ever present with Oliver.  And she was his student for 10 years…were he
> released today I'd have no problem with him living next to me or teaching my
> child.

>                                         (Exhibit C, Letter from Christopher Lynn, Esq.)

Another woman, a former student who has known, been taught by and interacted with
Oliver for fifteen years since the age of ten, writes "to share her story and to share that in all the
years [she] has known him, [she] never experienced or witnessed anything improper or
inappropriate."  (Exhibit D, Letter from Stella Papatheodorou)  Now aged 25 and a music
teacher, Ms. Papatheodrou studied voice and music with Oliver for most of her life and credits
him with her musical education  and success from elementary school through Mannes for her
undergraduate and Masters degrees to her professional career today.  Ms. Papatheodorou and
her parents welcomed Oliver into her home as she grew up, acknowledges that he has admitted
some of the allegations, but "would like to stress, that after that initial period of getting to know
him, never again did [she] feel uncomfortable around him, at the age of 10 and all the years I
have known him." *Id.*

Her mother, who has known Oliver for 22 years, reiterates her daughter's sentiment and
describes her family relationship and experience with Oliver as a teacher and friend.  (Exhibit E,
Letter form Helen Samartizis-Papetheodorou)  She notes that over the years Oliver not only
taught her daughter, but they "welcomed Oliver and his family to our home for years. He
attended our celebrations and birthdays….[and] During all the years that [she has] known him
[she] never saw any inappropriate behavior." *Id.*   She particularly notes that she "has girls so
[is] always watching their friends and people who they hang around with."  *Id.*

Two other parents of former students similarly write in support of Oliver despite the
shock and pain they have felt since his arrest.  One single mother entrusted  her eight-year-old
daughter for five years at Oliver's music school almost every day after school and who
eventually spent weekends there, and frequently shared dinner with Oliver and their children,
describes Oliver as "a wonderful friend of mine, beloved teacher to [her daughter ] for five
years"  and reports no inappropriate behavior but instead seeks "some mercy" for the man who
"has given us and many others  a precious gift of music, to love music, to desire music, and
ability to make music." (Exhibit F, Letter from Jinney Yoo) Dalia Stoniene, whose 11 year old

Honorable Lewis A. Kaplan
December 5, 2017
Page 6

daughter was a student of Oliver's, candidly acknowledges that a decision to publicly support Oliver in this process was not an easy one, but considers it "the right one because of our experiences" with Oliver whom she found to have been "a good man, a caring father, a dedicated teacher and an inspiration to many people around him." (Exhibit G)

A fellow teacher who hired Oliver to teach 3-9 year-olds piano classes for three years and who eventually taught at Oliver's academy, writes that he never observed anything untoward or abnormal about Oliver during that period from 2009 - 2011. Claude Diallo, a Swiss citizen whose native language is German, writes in English that from 2009-2011 he could "not assert any special issues or problems with Oliver and felt that he was a normal human being doing what he knows best and trying to help other people by sharing his knowledge of music and live a normal life." (Exhibit DD, Letter from Claude Diallo) The two had been neighbors and friends since 2009 as Mr. Diallo lived next door to Oliver and his family for years. He acknowledges that there needs to be punishment for Oliver's crime, but also asks for leniency for "where there is hope, there should be mercy." *Id.*

These letters, among others, underscore that Oliver's criminal behavior did not creep into his personal family or professional life but, in fact, appears to have been very compartmentalized and indeed, commercial. That is not to denigrate the seriousness of the offense or undermine the value of the minor girls whom he did victimize by paying for sexual contact. Instead, these letters corroborate Oliver Sohngen's denials and highlight that despite a lay person's instinct, commentary on the internet or salacious headlines, there is nothing to suggest that Oliver abused his position of trust, groomed or abused minors who were close to him for his own gratification. On the contrary, this evidence indicates that Oliver was able to disassociate his personal and professional responsibilities from any paraphelic sexual urge and is consistent with the findings of the report in his Psychiatric and Risk Assessment which generally rates him at low to average risk for sexual recidivism; an excellent candidate for sex offender specific therapy and his future risk to society as remote. (*See generally*, Exhibit H, Report of Dr. Richard B. Krueger, M.D.)

## Oliver's Early Life

Oliver Sohngen is the only child born in a tiny rural town in Germany in 1964 to parents born during World War II. He describes a lonely and isolated childhood despite best efforts by parents, whom he loves and who love and support him notwithstanding their heartbreak over his conviction. (Exhibit I, Letter from Ludwig Sohngen and Hiltrude Brienza)[2] His parents' marriage was characterized by infidelity and an extreme phobia of germs and preoccupation

---

[2] This letter was provided in German and translated by a certified federal translator pursuant to CJA. Neither of Oliver's parents speak any English.

Honorable Lewis A. Kaplan
December 5, 2017
Page 7

with physical cleanliness/decontamination which burdened and undoubtedly damaged Oliver as a child.  *See*, PSR at 66, and Exhibits H , I and Exhibit J; Report by Eric Mercer, L,C.S.W.)  In particular, his mother's conduct which eventually led to the break-up of her first marriage, involved highly sexualized and attention seeking behavior that she exhibited in front of her son from a very young age.  *Id.*  Oliver's childhood friends, teachers and half-sister all report that his parents' relationship and eventual dissolution of their marriage impacted Oliver greatly, as did his isolation from a peer group at an early age.  (Exhibits K, Letter from Half-Sister Gloria Brienza[3]; Exhibit L, Letter from Gotthard Hugle, childhood friend; Exhibit M, Letter from teacher Peter Bauer); *see also* PSR at ¶¶ 63 – 66.

His mother eventually left his father to marry the landlord who lived with his family in the same building, an Italian man with whom she moved away from their hometown for a period.  *Id.*,  She had two children with him, Oliver's half-sisters, one who has suffered tremendously with frequent hospitalizations.  According to her sister Gloria, Oliver's youngest half-sister has been medicated for mental illness since she was a teenager.  (Exhibit K).  Oliver shares a very close relationship despite their seventeen year age difference with his other half-sister, Gloria, who is heartbroken over his incarceration.  Gloria acknowledges that Oliver's childhood was not easy and he also suffered from his parents' separation.  *Id.*, *See also*, PSR at 64).[4]  As a child, Oliver was often completely unsupervised and suffered sexual abuse both by an adult stranger and by older boys with whom he boarded for a brief period in a boarding school during his early adolescence.  (PSR at ¶ 67, Exhibit H and J)  He reported the instance of stranger abuse to his father but to both of their knowledge nothing came of the police report or investigation and Oliver was never treated for the trauma.  *Id.*

As Mr. Mercer's psycho-social report also suggests and the psychiatric evaluation also corroborates "[c]hild abuse and neglect appear to influence the course of development by altering many elements of biological, cognitive, psychosocial and behavioral development; in other words, child abuse and neglect "get under the skin" to have a profound and often lasting impact on development."  Institute of Medicine & National Research Council, New Direction sin Child Abuse and Neglect Research 154 (Anne Peterson et al.ed.sm 2012).  In addition, Oliver also appears to have suffered some disrupted sexual development as a child and

---

[3] Oliver's sister Gloria and her husband's letters were translated from German to English by a federal court certified translator paid pursuant to CJA.

[4] Oliver's mother and her second husband returned to Konstanz, Germany when Oliver was already living in the United States.  Eventually Oliver's parents reconciled at some point when Oliver was an adult an in the U.S. They live and work together in a modest bistro/pub about 10 miles outside of the city of Konstanz in a small housing cluster in the rural outskirts of the town. Both are in their seventies and neither has ever visited Oliver in the United States since he first came here close to 27 years ago.

Honorable Lewis A. Kaplan
December 5, 2017
Page 8

adolescent that mitigates but also may after treatment and therapy expose the root of some of his hypersexualized behavior. (Exhibit J., at p 10 *citing* Mark F. Schwartz Sc.D. (1996) *Reenactments related to bonding and hypersexuality, Sexual Addiction & Compulsivity*, 3:3, 195-212 and Homes, W.C., Slap, G.B., *Sexual Abuse of Boys: Definition, Prevalence, Correlates, Sequelae, and Management*, JAMA , December 2, 1988. VO. 280, No. 21.)

It was after his mother left the home and Oliver lived alone with his father that he really discovered his love of music, theater and, finally, found a peer group. He met his first wife at "gymnasium" (the German equivalent of college preparatory high school), and they married quite young after dating on and off for six years when Oliver was just 21-years-old and she became pregnant. Their young marriage did not last although they had a son together, they split up less than two years later when, among other things, Oliver then a college student became infatuated with a much younger woman in the orchestra. (Exhibits, H, J, K, L & M) His first wife raised their child in Germany and later remarried until she died at age 44 of ovarian cancer. Oliver returned to pay his respects to the mother of his son at her funeral. Oliver's eldest son now age 31, had remained in contact with his father. He visited New York and communicated regularly with his father. His grandparents report that he appears to have inherited his father's musical and creative talents. However, since Oliver's arrest, his eldest son has had no contact with him and at present does not appear to want any contact. Oliver recognizes the damaging reverberations his crime has had even in Europe.

> **It saddens me that the lives of my three children will be forever impacted and tainted. My eleven year old has already received bullying messages from her peers and my adult son's professional reputation in Germany has been impacted due to clients recognizing his family association.**

(Exhibit A, Letter from Oliver Sohngen)

### The Musician

In high school Oliver discovered his passion and his talent for what he hopes will someday be restored to be his true life legacy: music. His former teacher in Germany, Peter Bauer, chronicles in his letter to the Court the beginnings of Oliver's musical education; his development "particularly in his musical activities...a maturity far beyond his age and a keen interest for a musical education;" and his "quest, both artistically, professionally and personally for a secure hold and his own way to achieve this." ( Exhibit M)[5] His high school friend also

---

[5] Peter Bauer's letter was translated from German to English by a federal court certified translator paid pursuant to CJA.

867303 v1

Honorable Lewis A. Kaplan
December 5, 2017
Page 9

recounts Oliver's early musical achievements before he immigrated to the US as a double bass player and a vocalist in Konstanz, Germany. (Exhibit L). Taken aback by the publicity surrounding the accusations against Oliver before he was adjudicated guilty, which is not lawful in Germany and elsewhere in Europe, Gotthart Hugle, now a full-time high school teacher, writes in English that he is aware Oliver has pleaded guilty and still supports the "sensitive artist" he recalls from childhood and remains "confident in his rehabilitation." *Id.*

In 1990, Oliver's musical talents landed him a full scholarship to study music in the United States at Cleveland State University in Ohio which he parlayed into a full scholarship to the Cleveland Institute of Music achieving both a Bachelor's and Master's degree. (Exhibit N, Degrees). In Cleveland Oliver flourished garnering awards and recognitions that helped him secure an "E" Visa for Aliens with Extraordinary Ability in early 2000. (PSR ¶ 69) His application for an "E" visa which boasts more than 48 exhibits documenting the accolades of Oliver's work, talent and abilities summarizing that he "is equally masterful and sought after as a classically trained tenor singer, a scenic designer, a musical composer, a graphic designer, a music director, producer and teacher." (Exhibit J, at p. 7). The former Executive and Artistic Director of the Cleveland Public Theater describes Oliver in his letter to the Court as

> a highly developed artist, unique in his sophisticated skills in both the visual arts (terrific set designer) and audio (very accomplished music director and composer). He contributed award-winning artistic support of many of the CPT's most acclaimed productions throughout the 1990's.

> (Exhibit O, Letter from James Levin, Esq.)

Mr. Levin not only praises Oliver's artistic abilities but also notes their friendship during the decade in Cleveland when Oliver rented an efficiency apartment in his building. According to Levin, during those years he had no "compunction leaving Oliver" to "house-sit, pet-sit and occasionally baby-sit" as Oliver "always conducted himself with honor and integrity, both professionally and personally." *Id.* Oliver's other friends and colleagues in Cleveland are distressed and saddened greatly "to see such a creative light be snuffed out." (Exhibit P, Letter from Keith A. Joseph). Mr. Joseph, a former theater critic in Cleveland, describes Oliver's work as "amazingly creative and inventive" and the person as a "kind, thoughtful, creative individual," who was "rather a workaholic." *Id.* Oliver's friend Jan Bruml, with whom he collaborated for award winning set design (Oliver also sang the tenor role), on an Opera, describes Oliver as "exceptionally creative." Eventually, in around 2000, Oliver heeded the advice of his friend and theater critic Keith Joseph, who "told him what we in Cleveland tell all our young talent, "you ought to go to New York."" (Exhibit J at p 6)

Honorable Lewis A. Kaplan
December 5, 2017
Page 10

During his early years in New York after 2000, there is little doubt that Oliver was a hard-working productive wage-earning contributor. He waited tables at a restaurant Serafina full time for years (Exhibit R, submitted in support of visa application), while he also taught voice lessons at Queens New York School of Music in Flushing (Exhibit S, in support of visa), and sang whenever and wherever he could. (*See* e.g.: Exhibit T, Letters from Church of the Resurrection, Rye New York and from Grace Church in New York City (in support of visa). But, professionally Oliver found his calling when he opened a school to teach and share "a precious gift of music, to love music, to desire music, and ability to make music." ( Exhibit F, Letter from Jinney Yoo) In 2010, Oliver founded the Long Island City Academy of Music. PSR at ¶ 88.

## Long Island City Academy of Music ("LICAM")

As the annexed letters attest, in 2000, Oliver began what would develop into far more than a music academy. "LICAM" was a school for all ages and incomes in voice, piano, guitar, violin, cello, bass, harp, woodwinds and drums and it was a community. Before Oliver was arrested it had two dozen teachers and nine rooms for instruction. A community of all ages and abilities, that included Oliver's own children, who were brought together by who many describe as a unique and selfless individual who many credit for their artistic success. Oliver's academy was "a community of fantastic musicians who have interesting musical careers…[and] are musical role models. " See, March 2017, Huffington Post [6] Oliver took pride in the growth of the school, his students' success and love of music, but also his ability "to help his music teachers with a source of income." (Exhibit F, Letter from Jinney Yoo) Several former students studied music at LICAM as well as taught there. Justin Pieper was an LICAM staff member and a student of Oliver's, said that Oliver, "championed everyone at the school – teachers and student. He was consistently super supportive of all of us. He gave students amazing opportunities without a concern about financial compensation." (Exhibit J, at 7)

Among those who attended or taught at the school regularly it was Oliver's generosity of both spirit and deed that was well known. He often taught longer than the paid session, without fees, at a discount and remained supportive and "on call" for audition preparations, a pep talk or as a friendly face in the audience for his current and even former students. A parent of a former student and teacher writes how she "was pleasantly surprised to find out that music and the success of his students were more important to him then money, his time and effort. He gave it all to his students for them to succeed." (Exhibit E) Former LICAM student and staff member Demetrios Tsinopoulos is quick to remark on Oliver's musical talents but shares his impression that;

---

[6] www.huffingtonpost.com/entry/astoria-characters-the-voice-teacher_us_58bbf68ae4b02eac8876cfb6.

Honorable Lewis A. Kaplan
December 5, 2017
Page 11

> The trait that [Oliver] carries which is equally if not more so extraordinary, definitely is his generosity… time and time again, [he] let me pay at a later date, or sometimes not pay at all. He knew of my financial struggles and always told me to come and learn, money comes later. He was more interested in my success than his own financial benefit… He was a teacher first, an educator and then an owner.

> (Exhibit U, Demetrios Johan Tsinopoulos)

Oliver hardly profited financially from the school. His partner attests that he "literally built" physically as well as in reputation. He "literally built the walls and installed the doors and almost everything else by himself." (Exhibit V, Letter from Amanda Andries) The PSR reflects a modest adjusted gross joint income of a little more than $26,000 annually in 2014 and 2015 and liabilities in excess of $16,000. (PSR at ¶¶ 93 – 94)

"Selfless" is a word used by several of those who know Oliver to describe him. Oliver "has a genuine interest in discovering and developing people's vocal talents… I always thought Oliver was one of the most selfless individuals I knew. Whenever I had a chance to spend some time with him, he went on and on about the achievements of this or that student, and the pride and joy he got out of it was palpable and a beautiful think to watch." (Exhibit W, Letter from Rosa Rodriguez).

> Oliver is one of the most selfless people I have ever met. His energetic motivation for others to succeed in the arts was a sight to see. He would motivate and charge a person to follow their dreams with his kind words and compliments.

> (Exhibit X, Letter from Patrick Avella)

Jinney Yoo, whose daughter attended LICAM, worked part time on weekends to help Oliver get organized, lamented that Oliver was a great musician but not a good businessman. She also describes him as a "truly a selfless person and completely engrossed in his love for music and giving what he knows to others, teaching music, sharing music, giving knowledge, giving ability, giving something to add to one's being." (Exhibit F, Jinney Yoo) And his former student and former LICAM instructor, Stella Papatheodorou, shares "…when Oliver saw a musical talent, he committed to helping that student in any way possible. This is what I truly admire the most about him because, from what I have seen so far in my life, I think these days it is so difficult to find a person who is willing to help another to that degree without receiving anything in return." (Exhibit D).

Honorable Lewis A. Kaplan
December 5, 2017
Page 12

And Oliver's inspiration and generosity reached across the spectrum of music lovers and performers of all ages and abilities. One former student, a retired school teacher aged 74, Judy Parcels, discovered Oliver in her sixties. As a life-long professional educator herself, Ms. Parcels was devastated to learn of Oliver's arrest and the school's closing.

> Oliver was the first person in my entire life who gave me support and encouragement….He inspired and encouraged me, letting me know that my voice was not only good but something outstanding…He didn't show any discrimination towards me concerning my age, as is often the case where senior citizens are concerned. He treated me on an equal basis with all of the younger people at the school…Oliver gave his heart and soul to his work. He is an extremely talented man. He gives to the world not only his own wonderful voice and talent, but his wholehearted and unique dedication to his students. Oliver is an outstanding teacher and I can attest to this, having been in the field of Education myself."

> (Exhibit Y, Letter from Judy Parcels)

In addition to earning his living in music, Oliver donated his time and talent to those who could not afford it. "Oliver was teaching chorus at PS 112 where my daughter attended primary school. When the funds ran out he continued his work there for free… " (Exhibit C, Christopher Lynn) Lynn and other parents and former students credit Oliver with their and their children's creative, musical success and development. "My daughter was accepted to the High School of Performing Arts at LaGuardia due to [Oliver's] work and dedication, at all hours and last minutes. They accept only one out of 1,500 applicants." *Id.* Greg Couba, an accountant who finally pursued his passion in his thirties, was also a former student of Oliver's "had other teachers before, but no one like Oliver. He was my biggest cheerleader. He told me my voice was great and he believed in me – it is hard to overstate how important that was. I have a great debt of gratitude to him." (Exhibit J at p 14). Student's and parents of students appear to have universally described the positive impact Oliver has had on all of their lives particularly since he founded LICAM. (See generally, Exhibit J, at p. 14)

> "We are grateful to [Oliver] for our daughter's musical and artistic development, which helped her get into a highly competitive school of her dreams. I also know that she is one of many students who grew, flourished and discovered new artistic expressions under Oliver's tutelage. Through him, we met a great musical community and forged lasting friendships with other parents and teachers."

> (Exhibit G, Letter from Dalia Stoniene)

Honorable Lewis A. Kaplan
December 5, 2017
Page 13

The success of his former students professionally and academically is something that Oliver counts as his proudest and most gratifying achievements. (Exhibit A)  His decision to immediately, publicly and permanently resign and promise to sever all affiliations with the school in written correspondence to his office manager the day after his arrest in order to salvage the school, save jobs and spare his community in the wake of his public arrest, is in keeping with the attestations above as to what lies at the core of this man.    (Exhibit Z, resignation letter of May 17, 2017)  It shows immediate insight into the severity of his wrongdoing, selfless dedication to his former students and their teachers.

While it is undisputed that Oliver's crime has caused lasting harm to his victims, it is also true that in his 53 years Oliver has brought enormous joy to this world through his talents, his work and his teaching. Hopefully in time, that joy will prove to be more exponential than the pain that so many are suffering as a consequence of his conduct.    His public acknowledgement of wrongdoing and his request for treatment in conjunction with punishment are the first step in that direction.    To be sure, it is Oliver's goal to "redeem himself for the despicable acts " he has committed and "spend his remaining years reestablishing a role as a positive contributor in society." (Exhibit A).

## Oliver's Immediate Family

Having failed in his first marriage to a high school sweetheart and absent for most of his eldest's son's childhood after he emigrated to the US, Oliver doubly committed himself to what he had hoped would be a lasting amorous partnership when he fell in love with Amanda Andries over 15 years ago. (Exhibit, Letter from Amanda Andries).  The two never legally married and although their relationship has been tumultuous, their commitment to their children and to co-parenting them has never waivered even today. (See PSR ¶¶ 71 -74) Amanda describes Oliver as an emotionally and financially generous partner who encouraged her to finish her college degree, to secure her citizenship and convinced her that she "was worthy and capable." *Id.* Amanda acknowledges that in their personal relationship "neither Oliver or I were perfect people." But, having known him intimately at his best and worst, Amanda describes Oliver as her "constant source of strength;"

As a friend he was reliable, honest and encouraging.
As a provider he was capable and dependable.
As a human I've found him to be kind, giving, sensitive and considerate.

(Exhibit V, Letter from Amanda Andries)

867303 v1

Honorable Lewis A. Kaplan
December 5, 2017
Page 14

Amanda is a Guyanese immigrant and suffered the separation from her own first born child when she first came to the United States. Eventually the two were reunited when her son Aaron was seven and they are naturalized U.S. citizens today. Both Amanda and Aaron credit Oliver for his loving support throughout their effort to reunite and after. Amanda describes Oliver as "a father to her son" Aaron whom Oliver "has supported in every possible way." *Id.* Aaron, now aged 18 and having faced enormous challenges in his own life already, describes Oliver as his "Dad." (Exhibit AA, Letter from Aaron Savoury)

Aaron describes a stepfather who immediately embraced him as his own, welcomed him into his home and life at the age of seven and devoted himself to raising him as his own alongside his own biological daughter. *Id.* Aaron describes a childhood with Oliver that was full of singing, music, piano and drum lessons, road trips and rescue dogs with his Dad, Oliver. It was Oliver who took Aaron to grade school and picked him up each day, who even after he separated from Aaron's mother, opened his home to him again when he had trouble as a teen and who visited and encouraged him through a difficult rehabilitation period as a teenager. *Id.*

Amanda and Oliver also have an eleven-year-old daughter for whom Oliver "has been ever-present and involved in her life from the very beginning." (Exhibit V) Oliver has described her as "the most precious thing in his life" and according to Amanda, they have a very special bond and relationship. She too is "a great singer, instrumentalist, performer and artist because of her Dad's support." And Oliver enjoys the devotion of both their children because "he has been kind, generous, loving and patient with them." *Id.* Oliver continued to co-parent his children even after he separated from Amanda, some times spending the night to help with homework, rehearse lines for the school play or just baby-sit while Mom had a night out. He sometimes spent the night on the couch and it was on one such occasion that he was arrested in the very early morning of May 16, 2017 at Amanda's apartment.

The sudden and permanent separation from her beloved father has had an enormous impact on Oliver's daughter. Not only has she lost her Dad but the music academy which was the hub of her community also disappeared overnight. (Exhibit B, ███████████████) Oliver's incarceration for the remainder of her childhood will be an enormous loss for both of them and the threat of their permanent separation when he is deported back to Germany is an extraordinary penalty that will be felt by the entire family.

Oliver Sohngen has acknowledged the profound impact his disgrace has and will continue to have on those precious innocents he holds most dear. Whatever his demons, by entering a plea of guilty Oliver anticipates being held accountable for his decisions and for breaking the law. He laments that his children will pay such a high price for his wrongdoing. He has faced his humiliation and his shame before this Court, the public and most poignantly, before those who have known, loved and respected him.

Honorable Lewis A. Kaplan
December 5, 2017
Page 15

## The Expert Evaluation by Dr. Richard Krueger

Oliver was evaluated by Dr. Richard Krueger, a Harvard educated medical doctor who is an expert in the field of sexual offenders.  (Exhibit BB, C.V. of Dr. R. Krueger).  Dr. Krueger is an internationally recognized and highly-regarded professional who consults with law enforcement, lawmakers, the defense bar, the New York State Health Departments Office of Professional Medical Conduct, and the New Jersey State Board of Medicine among others. Dr. Krueger is a board certified psychiatrist and neurologist with added board certifications in forensic and addiction psychiatry.  In addition, Dr. Krueger has expertise in sexual offenders, professional sexual misconduct and the psychopharmacological and behavioral treatment of paraphilias and sexual disorders.[7]  Since 2011, Dr. Krueger has served as a Member of the Sexual Health and Disorders Committee of the World Health Organization which is composed of international authorities and is making recommendations for revision of the sexual disorders section of the ICD-11 (The International Classification of Diseases -11th Edition).

Dr. Krueger conducted an evaluation of Oliver Sohngen at the MDC, reviewed the discovery materials provided by the Government and administered  psychological tests to assess deviant and non-deviant sexual behavior; to screen for other psychiatric syndromes and administered five risk assessment instruments. (Exhibit H, Report of Dr. R. Krueger at pp 8 – 11)  In summary, Dr. Krueger notes that Oliver did not meet the criteria for pedophilia. ████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

---

[7] Dr. Krueger is also an Associate Clinical Professor of Psychiatry at Columbia University, College of Physicians and Surgeons, the Medical Director of the Sexual Behavior Clinic of the New York Psychiatric Institute and an Attending Psychiatrist at New York Presbyterian Hospital. Among other professional organizations and affiliations, Dr. Krueger is a member of the Association for the Treatment of Sexual Abusers, the International Academy of Sex Research, the International Association of Forensic Mental Health Services and The Society for the Advancement of Sexual Health.  Dr. Krueger is an expert reviewer for the Journal of Sex Research, the Journal of Sexual Medicine and has published more than two dozen peer reviewed articles.

867303 v1

Honorable Lewis A. Kaplan
December 5, 2017
Page 16



Dr. Krueger concludes that "his risk of sexual recidivism according to 4 instruments used to assess such risk [ ] is low and according to one instrument, the Static-99R, is average." And, "given his recent arrest and the educative effect of it, and given ongoing participation in sex offender specific therapy and monitoring, his risk would be remote if he were allowed to continue to be in the community under conditions of monitoring and treatment. His overall risk to society would be further reduced if he were allowed to return to Germany which has an extensive system of treatment for sexual offenders and where he would have a stable living situation and could more readily find employment. " *Id.* at p. 12.

**The Crime**

The details of this crime and associated conduct have been described in the complaint, magnified by the media, on the internet and reiterated in the PSR. Without in any way denigrating the seriousness of the crime and the costs to these young girls or society, it is important to underscore that Oliver Sohngen suffers a medically recognized diagnosis and that he himself recognizes his need for and is desirous of treatment to eliminate any future impulse.

Discovery provided by the Government suggests that he was under investigation by the Bronx DA and later the federal government from on or about 2014 until his arrest in May this year. According to the Government's search warrant application, a border search conducted of Oliver's electronics when he entered the country in summer 2016 when he returned from a music festival in Europe and later a search of all his electronic devices from his home and the school after his arrest found no child pornography on any of the devices. [8]

_____

[8] Special harms associated with possession and distribution of child pornography such as "a permanent record of the child's participation" or because the "'acts are reduced to a recording, the pornography may haunt the child in future years long after the original misdeed'" are generally cited by the Government and the courts in support of enhanced penalties for possession and distribution of child pornography. *United States v. Aumais*, 656 F.3d 147, 152 (2d. Cir. 2011) *quoting New York v. Ferber*, 458 U.S. 747, 759 (1982)). Two searches of

Honorable Lewis A. Kaplan
December 5, 2017
Page 17

Oliver's crime was not a crime of opportunity perpetrated against girls he knew, groomed or enticed but was a commercial transaction, exploitive as that may be, conducted through a pimp who advertised electronically on "backpage.com;" a pimp who also affirmatively reached out to Oliver electronically at all hours of the day and night, enticing and attempting to profit from Oliver's weakness and worst impulses.[9]    Moreover, the charged conduct occurred under the emotional stress of when Oliver's relationship with Amanda was deteriorating and the two were separating.

According to the discovery produced by the Government, the pimp who sold and advertised commercial sex with young women and girls for prostitution online, also forced himself sexually on some of them at gun point.[10]    Accordingly, while Oliver acknowledges and takes full responsibility for the injuries he has caused,  I would be remiss as his advocate were I not to point out that the victim impact statement that probation characterizes as "powerful and raw" from a former teen prostitute reflects more trauma in her life than that which Oliver alone should be held accountable.

It is the internet and electronic communication that ratchets up the 24/7 temptation that often overcomes individuals  who suffer from such disorders like Oliver's.  It is the internet and electronic communications that, upon information and belief, likely ensnared these teenagers into this prostitution ring. And undoubtedly it is the internet and electronics that has ratcheted up the penalty that Oliver Sohngen faces in federal court as a result of his conduct.

## The New York Penal Law Penalty

Even assuming without conceding that all of the proffered facts by the Government at the time the plea was entered are true, had Oliver been prosecuted under New York State law he would be guilty of an E felony – the lowest level felony in the New York penal code.  N.Y. P.L § 130.30 criminalizes sexual intercourse by anyone over 21 with anyone under seventeen with

---

Defendants electronics over the course of a year, before and after his arrest found no child pornography.

[9] U.S.S.G. 2G1.3(b)(1) makes the absence of such a special relationship between Oliver and the victims here particularly relevant and the salacious headlines and internet comments about the "perv music teacher" particularly destructive.  2G1.3 adjusts the base offense level upward by two levels if the defendant is a parent, relative or legal guardian or if the defendant exercised supervisory control of a victim.  In fact, the absence of any such allegations bodes well for Oliver's potential for rehabilitation as does his disgust and shame concerning his own conduct.

[10] Upon information and belief, according to court records, the pimp who contacted Oliver repeatedly in text messages reflected in the complaint was arrested and charged in the Bronx with Attempted Rape in the First Degree by Forcible Compulsion – a C Felony.  Upon information and belief according to the court records he was released on the state charges which are still pending.

867303 v1

Honorable Lewis A. Kaplan
December 5, 2017
Page 18

the crime of Rape in the Third degree. P.L. § 130.25; P.L. §130.40 (Criminal Sexual Act in the Third Degree). An "E felony carries an indeterminate sentence of 1-1/3 years jail and no more than 4 years. According to New York P.L. § 70.40, a person who is sentenced to one or more indeterminate sentences may be paroled after serving the minimum period of indeterminate sentence. In this case, Oliver could be eligible for parole after 1-1/3 years (16 months) had he been prosecuted in the state.

Moreover, the state statute affords the state court judge discretion in sentencing for an "E" felony. N.Y.P.L. § 70.00 (4) titled "Alternative Definite Sentence for Class D and E Felonies, which states in full: "When a person, other than a second or persistent felony offender, is sentenced for a class D or class E felony, and the court, having regard to the nature and circumstances of the crime and to the history and character of the defendant, is of the opinion that a sentence of imprisonment is necessary but that it would be unduly harsh to impose an indeterminate or determinate sentence, the court may impose a definite sentence of imprisonment and fix a term of one year or less. "

As this Court is aware, since Oliver's case was charged in the federal system, this Court has no discretion to sentence below the 10-year mandatory minimum term of imprisonment.

<u>**The Guidelines**</u>

The Guidelines in this case are calculated pursuant to the November 2016 Guidelines Manual which are "not only *not mandatory* on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 130 S. Ct. 657 (Jan 26, 2009) (emphasis in the original). s*ee also Spears v. United States*, 129 S.Ct. 840 (Jan 21, 2009) (per curium) (District courts are entitled to reject and vary categorically from guidelines based on policy disagreement with those guidelines); *see also United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir 2010).

Pursuant to U.S.S.G. § 2G1.3(b)(2)(B) the base offense level is                30

A two-level increase is warranted because a participant otherwise unduly influenced a minor to engage in prohibited sexual conduct, pursuant to § 2G1.3(b)(2)(B)

                                                                                                              +2

A two-level increase is warranted because the offense involved the commission of a sex act or sexual contact, pursuant to U.S.S.G. § 2G1.3(b)(4)(A)

                                                                                                              <u>+2</u>

The Adjusted Offense Level (Subtotal for each Offense) is                34

Because there are two counts treated as separate offenses pursuant to

Honorable Lewis A. Kaplan
December 5, 2017
Page 19

U.S.S.G. § 3D1.2 and Count One is increased by tow levels because it is the counts of conviction constitute two total units pursuant to U.S.S.G. § 3D1,4                    +2

Accordingly, the combined applicable offense level for Counts One and Two is    <u>36</u>

Finally, a 3 level increase decrease should be applied for Mr. Sohngen's acceptance of responsibility pursuant to U.S.S.G. §3 E1.1(b);                    <u>-3</u>
                                                                                33

A first time offender, Mr. Sohngen has no criminal history points and is therefore a **Criminal History Category I**. Accordingly, he faces a total sentencing **range of 135 – 168 months.** Probation recommends a sentence of 135 months, the bottom of the Guideline Range, to run concurrently on each count. P.S.R. at p. 27.


## What Sentence to Impose

*Booker* requires the District Court to tailor sentences to reflect an application of the 21 U.S.C. § 3553(a) factors with the expectation that post-*Booker* sentences will achieve more "individualized justice." *See United States v. Crosby*, 397 F.3d 103, 114 (2nd Cir. 2005).

The conduct in this case occurred while Oliver was fifty years old. He will be 63 years old by the time he has served the mandatory minimum sentence required in this case. Studies indicate that rates of recidivism, "the age-crime curve," across all offense types declines with age.[11] Sexual criminal behavior declines with age "among male sex offenders, decreased rates of sexual offending maybe a result of reduced sexual drive related to age-related disease and decreases in testosterone….As well, low self-control impulsivity are related to risk of sexual and other types of criminal recidivism, and as individuals age, self-control increases and impulsivity decreases." Michael Lasher & Robert McGrath, *Desistance from Sexual and Other Violent Offending Among Child Sexual Abusers,* 20 Crim Justice & Behav. 1 (2016). Indeed, Oliver's age as well as his employment history, educational attainment, marital history, his race and his lack of criminal history or substance abuse history are all factors that support his low risk of recidivism. *See* U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines 8.* [12]

---

[11] See e.g.: Melissa Kearney et al., The Hamilton Project Ten Economic Facts about Crime and Incarceration in the United States (2014)
http://www.brookings.edu/~/media/research/files/papers/2014/05/01%20crime%20facts/v8_thp-10crimefacts.pdf

[12] Available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications /research-publications/2004/200405_Recidivism_Criminal_History.pdf.

Honorable Lewis A. Kaplan
December 5, 2017
Page 20

As our understanding of human behavior and the human psyche evolves so too must our understanding of the efficacy and wisdom of our approach to criminal justice – in particular the reform and rehabilitative functions of our federal penal policy.  Statutorily we are good at isolating and punishing; both legitimate goals of sentencing.  Whether the penal system can reach the core contributor to the deviance in a case like Oliver's which cries out for specific targeted mental health therapy is far less certain.  The Office of the Inspector General found that "recruitment of medical professionals is one of the BOP's greatest challenges," U.S. Dept. of Justice Office of the Inspector General, Review of the Federal Bureau of Prison's Medical Staffing Challenges (2016).[13]  Moreover, regarding sex offenders "[t]he research indicates that treatment in the community is more effective than treatment in institutions.  Although there may be obstacles to changing existing exclusionary policies; evidence demonstrates that sex offenders, both adolescent and adult, can be treated successfully in community settings." Bitna Kim et al,. *Sex Offender Recidivism Revisited: Review of Recent Meta-analyses on the Effects of Sex Offender Treatment*, 17 trauma, Violence and Abuse 1, 11 (2016); *See also*, (Exhibit H1, Nunes et al,. *Incarcerationand Recidivism among Sexual Offenders* Law Hum Behav 31:305-318 (2007)("Sentencing sexual offenders to terms of incarceration appears to have little, if any, impact on sexual and violent recidivism following release).

Attached to this submission are multiple testaments to Oliver's character as a selfless loving and devoted father, friend and a gifted musician and the primary financial provider for his family.  To the last, his closest community expressed shock and heartbreak to learn of the burden of Oliver's secret demons and his tremendous fall from grace.  Oliver has unequivocally accepted full responsibility for becoming entangled in this crisis without the wherewithal to cure himself of his worst impulses.  He recognizes that he has not only failed the victims but failed his parents, his children, his community and his host country of opportunity:  the United States.  He seeks "forgiveness and rehabilitation" and now asks the Court's mercy.  (Exhibit A) Oliver has busied himself in pre-trial detention as constructively as he can, without a single disciplinary infractions, reading, reflecting and participating in Suicide Watch of inmates at risk.  Recently, he has begun to use his creative skills:  drawing and teaching other pre-trial inmates about music and voice while at the MDC.

Whatever jail term this Court imposes, Oliver has already forfeited his most precious, intangible life assets which can never be restored to what they once were:  the respect and admiration of his community; his image as a  hard-working, gifted and creative musical genius who overcame the odds to find his fortune in New York; the joy of helping a child discover and develop their own gifts musically; his image in the eyes of his own children and possibly forever; the company of his aging parents as they enter their most tender years in Europe without the hope of seeing him again for at least a decade.  Oliver certainly will be deported back to his native Germany at the end of his sentence.  His American daughter, who will have known him for the majority of her life from behind bars, will be age 22.

---

[13]  Available at https://oig.justice.gov/reports/2016/e1602.pdf.

Honorable Lewis A. Kaplan
December 5, 2017
Page 21

## Conclusion

Promotion of respect for the law does not only come from our readiness to dole out harsh punishment or seek retribution for crimes against the most vulnerable in society. Indeed, the exercise of awesome, mercy-dispensing powers at sentencing to bestow leniency upon ill and damaged men who fall from grace and seek treatment, may in fact be the most powerful of this Court's tools in the promotion of respect for the law and justice.

In the end, I recognize and respect that to whatever limited extent the evolution of our law permits the Court's discretion to fashion an individualized sentence, such a decision is probably the most difficult one a Judge confronts. Contemplating the life before the Court, the many lives the Court's judgment will impact and the relative culpability between a sick and damaged man and one who exploits that illness and minors for profit is surely no easy task. Accordingly, I ask simply that in making that decision the Court weigh all the circumstances surrounding the facts of this case; the age and life path of this 53-year-old father and the stigma of this conviction that he will carry for the remainder of his years; his desire to get well; and the very real prospect that he can overcome his compulsions and again be a contributor to society to reach a sentence sufficient but not greater than necessary to satisfy the goals of punishment.

On behalf of Oliver Sohngen and his family, thank you for your time, your consideration and your mercy.

Respectfully submitted,

Susan J. Walsh
Attorney for Oliver Sohngen

cc:    Frank Balsemello, AUSA

867303 v1