# EXHIBIT A

The Honorable Judge Kaplan
Judge of the Superior Court
County of Manhattan
State of New York

Tuesday, November 21, 2017

Oliver Söhngen
# 79089-054
Metropolitan Detention Center
Brooklyn, New York 11232

Dear Judge Kaplan,

I am writing today in order to request leniency.
I am acutely aware that the crimes I have committed are ones of the most heinous nature that an adult can commit against the most innocent. Every day I think about my previous actions and I feel remorse. I am furthermore repulsed by my deeds and thoughts that led to these unspeakable offenses. I sincerely hope that the victims and their families can recover in time from the consequences of my actions.
I also want to take the opportunity to shed some light on the despicable things that have emerged about my life that has been met with great puzzlement, shock and outright disgust by the community of people that has been dear to my life. It would seem conclusive that a person with a condition such as mine would deliberately set up his work around teaching children in order to have unlimited

access to potential victims. I took on students for the sole purpose of bringing out the best in this person and leading them on a path to success. I want to address especially the many parents that had entrusted me and my school with the education of their children. I have never intended, plotted or viewed any child I have ever taught in any sexual manner, neither in thoughts or deeds. I do however understand that my offenses have affected the students and their parents severely, as well as the teachers who worked for me, whose resumé's might be forever tainted by association.

There have been allegations of me trying to arrange meetings with children much younger than 15 and 17. I never pursued these atrocities because my conscience told me to refrain. When I look at the written details of my allegations I am filled with disgust at the fact to have ever engaged in even the thoughts of committing such crimes.

I have made attempts to fight my underlying psychological issues. My father, who has evidently cured himself from alcoholism, being my role model in dealing with issues mostly on my own. My attempt of receiving professional help did not yield much of the help I expected. I hope that a comprehensive treatment program will assist me in strengthening my resolve for urges to never reoccur.

These last six months in prison have shown me the importance of things that really matter in life such as my loving family and friends. I am thankful for the simple gifts of life such as a letter from a dear friend or hearing the voice of my

daughter. As a result of my arrest, all financial support that I had provided through the proceeds of my music school to my family have vanished. I am feeling guilty for not being able to continue providing for them while being incarcerated. I also miss raising my children.

Both my daughter and my wife are in therapy for dealing with the issues due to the shame brought unto my family due to my actions. It saddens me that the lives of my three children will be forever impacted and tainted. My eleven year old daughter has already received bullying messages from her peers and my adult son's professional reputation in Germany has been impacted due to clients recognizing his family association.

My time in prison is spent by reading extensively, maintaining correspondence with friends and family, drawing portraits of inmates and their families, attending religious services and directing a choir in my unit. At the MCC I also had been working on Suicide Watch as an Inmate Companion. I am spending much time thinking about my crimes and treatment.

As a founder of a respected music school I had provided low cost music programs in public schools with under-privileged children. I was chosen to promote Major Bloomberg's "My Blank" volunteer program city wide as a result of my volunteer work in public schools.

As a direct result of my teaching, five children in 2017 alone and dozens over the years, gained entrance to

prestigious Performing Arts Schools and Conservatories. I had made it my goal to provide especially low income students with opportunities they would not have had otherwise.

Being aware that I will never be allowed to teach children again, I truly hope that I will be able to teach adult singing students. My former colleagues have assured me that I might be able to reestablish my work as faculty member and scenic designer of opera programs in Europe. I also have a loving support system of family and friends in Germany as well as my loved ones here in the U.S., who would rejoin me at the time of my release.

It is my sincere hope that I can redeem myself for the despicable acts I have committed and through forgiveness and rehabilitation can spend my remaining years reestablishing a role as a positive contributor in society.

I am thankful to you for taking the time reading my letter and grateful for any consideration you may give to my request for leniency.

Respectfully,

Oliver Föhringen

# EXHIBIT B

REDACTED

# EXHIBIT C

# Christopher Lynn Attorney at Law

Long Island City, New York, New York 11101

October 22, 2017

Hon. Lewis Kaplan,

United States District Court

Southern District of New York

Foley Square

New York, New York

RE: USA v. Oliver Sohngen

Dear Judge Kaplan:

Please accept this brief letter in support of the accused, whom I've known for the past 10 years and with whom I've entrusted my daughter from the age of 5.

My daughter was a student of Oliver's from age 5. Oliver was teaching chorus at PS 112, where my daughter attended primary school. When the funds ran out he continued his work there for free. Later we attended lessons where he taught at the Astoria Music School on Crescent Street. Oliver was able through hard work and skill to build a successful enterprise serving Long Island City. My daughter was accepted to the High School of Performing Arts at LaGuardia due to his work and dedication, at all hours and last minutes. They accept only one out of 1,500 applicants.

My daughter has been trained at home to report inappropriate actions. She did so against a family relative when she was 9. She says that NOTHING of this sort was ever present with Oliver. And she was his student for 10 years. She did say that he is a demanding teacher and pushes students to achieve. I've always found him to be professional and totally interested in my child's shills and her abilities. Accordingly were he released today I'd have no problem with him living next to me or teaching my child.

For whatever has occurred Oliver has the discipline and intelligence to totally eradicate that from his behavior. He has suffered immensely in the loss of family, profession and community standing.

I have no idea what the guidelines are suggesting or what The Government is asking. I have no problem with asking this Court to depart downwards.

Thank you,

Sincerely,

Christopher Lynn

CC:

# EXHIBIT D

Dear Honorable Judge Kaplan:

My name is Stella Papatheodorou, and I have known Oliver for 15 years. He was my very first private lesson voice teacher at a music school near my house in Queens. I was 10 when I met him and now I am 25. But he never really left my life because I was one of his shining students, and when Oliver saw a musical talent, he committed to helping that student in any way possible. This is what I truly admire the most about him because, from what I have seen so far in my life, I think these days it is so difficult to find a person who is willing to help another to that degree without receiving anything in return.

When I was 10, singing was just a hobby, but I really loved it as well as performing on stage at my elementary school. I was already taking piano lessons for some years, but then I decided I wanted to try private voice lessons, which was something my parents had never thought of. Luckily, this kind of instruction was offered at the music school I was attending at the time and the director introduced us to Oliver. I remember feeling a bit uncomfortable at first having a male teacher, but after just a few lessons I realized it really didn't make a difference and I was really having fun in my lessons. He was very friendly, and honestly he has always been like that. I would like to stress, that after that initial period of getting to know him, never again did I feel uncomfortable around him, at the age of 10 and all the years I have known him. Oliver saw a big talent in me and he admired my musical commitment and focus at such a young age. And so he motivated me and taught me everything he knew about singing. I studied with him through elementary school, and then he suggested to my parents that I audition for a performing arts high school. So he helped me prepare for my very first audition. I auditioned at Frank Sinatra School of the Arts high school and passed with flying colors. Right after my audition they told me they really wanted me to come to their school, and choosing them was one of the best decisions I have made so far in my life. Throughout my 4 years there, I studied music in school but continued my private lessons with Oliver. We had lots of shows going on at school, and he helped prepare me for each and every one of them. Those were the years he first introduced me into opera, which has essentially become the core of my singing life. My parents were paying for one hour lessons at my original music school, but Oliver always wanted to cover more material, and so I continued to work with him privately at his home or he would come to my home and we would work for hours at my living room piano, with my parents doing things around the house and listening with pleasure. He didn't care for the money. His sole purpose was to deliver the music and help me be the best I could be. If it wasn't for him, I could have never felt so prepared for the lead roles I was given at Frank Sinatra. And of course he came to every show congratulating me at the end. He was so proud of me every time and admired my presence on stage as a performer. Honestly, if it wasn't for him, I probably would have never decided to pursue music and my singing professionally.

At this point, Oliver had become like family. My parents had invited him and his family to our home for a number of holidays such as Thanksgiving dinner and Easter, or the occasional summer barbeque. He was quite a hit at our parties because no matter who you were, he would teach you about singing and the voice. It was so funny for me to witness. He would get into these deep conversations with some family friends of ours who knew nothing about singing, and then all of a sudden you would hear Oliver singing to demonstrate something to them. It was hilarious. He would listen to people's speaking voices, determine if they had a great singing voice and then open up a whole conversation about it.

As my high school years came to an end, he began to discuss with me my plans for university. I had no idea at the time, as most students that age, but he suggested I apply to some music conservatories in addition to the universities with music programs that I had already looked into. After discussing all this with my parents as well, we decided to give it a shot and I applied to some music conservatories here in the city because I didn't want to go far. One of these was Mannes, and Oliver had recently been studying voice with the head teacher from this conservatory. He helped set up a trial lesson with this teacher so she could evaluate me vocally. Oliver helped me make my very first recordings which was part of the application process. He really was guiding my parents and I every step of the way, because we had no clue. This was all so new for all of us. He helped me prepare for the live auditions that I got and after all that, I got my acceptance letter to Mannes as well as other schools. I chose Mannes in the end for my undergrad. He was so proud of me. Yet again, this was a time in my life when I had to make one of the scariest decisions ever, and looking back I don't regret it at all. It was like he knew this was going to be a good safe place for me and he helped me make it a reality.

Once I started at the conservatory, I stopped lessons with Oliver because I now had a new teacher at the school that I was seeing every week. Naturally, I wasn't seeing him very often and we were communicating much less. I was so stressed about school and the new environment, so my focus had really changed. He gave me my space but he still checked in with me on occasion to see how things were going with the new teacher. And of course he would still come to all of my performances at the conservatory when he could make it. I think those were the years he opened his music school in Long Island City, so that new project was keeping him busy. If I ever was confused about something technically I knew I could just give him a call to ask, and of course it would turn into a 3 hour conversation about the voice because he couldn't help himself. But I always listened and absorbed what I could to try to sort things out in my head between what he had already taught me and what I was learning now at the conservatory. He was someone I knew I could count on and trust. And it didn't matter if I hadn't seen him in months. When I finished undergrad, I decided I wanted to continue for a Masters degree also in vocal performance at a conservatory. This time around I knew a lot more, so I prepared my application materials myself and rehearsed my pieces for recordings and auditions. When it came time for me to make my new recordings, I was very nervous. It was a very stressful time. I had booked an excellent recording studio which was not cheap and I had something like 2 hours to get 8 songs, if I remember correctly, just the way I wanted them. I had asked my current teacher at the conservatory if she could come to my recording session to guide me in what sounded the best after each take, but she told me she couldn't do this for all her students. I didn't know what to do. I felt like I needed some musical support and ears to let me know if what was coming out of my mouth was my best. My dad was going to come with me, but he would not be able to give me any musical criticism. So of course Oliver popped into my head. I probably hadn't seen him in maybe a year. I called him and asked him if he could come, and without a question he said give me the place and I'll be there. I was thrilled and shocked. He really guided me that time, even though he had no clue what my voice sounded like now. He was happy to hear it was moving in the right direction and progressing. He guided me during that session immensely. I sang a few takes, we listened back, he told me what he thought, and either I tried it again or we moved on. It really was a team effort and at the time my ears were not trained enough to hear a lot of the differences. It was quite an evening, and after I remember Oliver, my dad, and I went for dinner together to celebrate. I was so relieved.

Long story short, I ended up staying at Mannes for my masters. Another 2 difficult years. I no longer was happy with my original teacher at Mannes and was looking for someone else on the faculty. My graduating year, they took on new teachers, one of which I had heard of before. I had one trial lesson with her and I immediately knew this is the teacher for me and she is my teacher to this day. The crazy thing is, a couple months after I started working with her, I recalled hearing her name before somewhere. And one day it dawned on me that believe it or not, Oliver had once told me about her. He had sent me a youtube link of her singing (she had a huge international operatic career) and had told me to listen to her because her singing was just perfect. Of course when I updated him that I know was studying with her he was overjoyed. My current teacher, Diana, has a very busy teaching schedule because of her popularity and status. So when it came for my graduation recital at Mannes, she told me she was unable to come to my stage rehearsal and performance, which made me pretty disappointed. This was another very stressful time in my life and I was trying to think who I could turn to for the guidance and support I was craving to do my best in all that pressure. Again Oliver popped into my head. I was nervous to call him to ask if he could come to my stage rehearsal to listen from the audience and give me pointers. I hadn't seen him in a while, but yet again without hesitation he said yes I'll get there when I can, give me the address. Another memorable moment of surprise and such gratitude. It was in that moment that I realized Oliver had become my musical mentor. I felt so fortunate to have someone like him on my team helping me make my dreams come true. He helped me through that rehearsal, boosted my confidence, and he was there for the performance and after party. Another turning point in my life.

After graduation, I had new fears to face. I still wanted to pursue a performing career but while I was working on that still, I knew I needed to start making a living somehow. So after trying a bunch of stuff that mostly lead to dead ends, my mom and I remembered that Oliver had started his own music school. So I called him up and told him my frustrations and how I was struggling. I didn't even have a place I felt like I could go and comfortably practice at. He opened his school to me with open arms and told me I'm welcome to come whenever I want to practice if there was a room and piano available. I started just going there to observe. I had never even been there before because school had kept me so busy and I was pleasantly surprised. It was a cute little school with just the bare minimum that you need, messy with books and instruments everywhere (Oliver is not the most organized person), and just bustling with parents and students. I was so proud of him to see what he had created. He had shared with me years before about his vision for a school, but to see it now was really cool. I slowly became a regular visitor at the school. I would practice and watch Oliver teach his students voice because I decided I was going to start teaching voice to children as well, but I had no idea where to start. So I sat there with all the time I had now and observed taking notes. It was really fun because now we were almost like colleagues rather than teacher student relationship. I often ran into his daughter ▓▓▓ there who would be hanging around doing homework or taking lessons. It was crazy to see her so grown up. The last time I had seen her she was a baby. I soon started teaching beginner piano to private students and when Oliver heard this he gave me a position as a piano teacher at a partnering public school in East Elmhurst. Then he also hired me to be his assistant at this partner school for the chorus class he was teaching there. So now I was part of his teaching staff at the school. He soon started some excellent classes at his school for singers like me with wonderful coaches and directors. I participated in those classes, paying my share, and I made great connections with these experienced teachers in the business and learned a lot. I met some wonderful friends and colleagues at the school, most of

which I still work with right now. Oliver had really fostered a musical learning family with his school and I think that is what I will miss the most about it. It was a safe place we could all come to with questions and ideas, and we would learn from each other all the time.

If I could describe Oliver in one word, I would say he is a voice. He lives and breathes music and singing, and as a teacher, he would inspire all of his students in this way, motivating them every chance he got to be better. I experienced this first hand, but I also saw it everywhere in his school. His passion for it is just something I've never seen in another person. Yet another funny example: after teaching together at the East Elmhurst school, we were taking the subway together and got into a conversation about vocal technique because I was confused with something my teacher had said, and all of a sudden he starts singing on a packed train to try to explain something to me. And I'm there looking around embarrassed telling him to be quite because there are people around us. He just can't help himself. It's part of his identity.

After reading all of this, I don't think it is a surprise to share with you that I was deeply hurt and shocked when I heard of Oliver's arrest and reasons for it. I always described him as the kind of person who wouldn't hurt a fly because I would just see how people around him would take advantage of his heart of gold (as I knew him). But I am here to share my story and to share that in all the years I've known him, I never experienced or witnessed anything improper or inappropriate. I understand that he has admitted to some of the accusations, but with this letter I want to share with the court the Oliver I know. He has done many good things in his life from my perspective, and so I am happy to honor that side of him and share it with you.

Thank you very much for reading my letter.
Stella Papatheodorou

# EXHIBIT E

Susan Walsh

| | |
|---|---|
| From: | |
| Sent: | Friday, December 01, 2017 10:58 AM |
| To: | Susan Walsh |
| Subject: | Letter for Oliver from Helen Samartzis |

Dear Honorable Judge Kaplan:

My name is Helen Samartzis-Papatheodorou and Oliver was  my daughter's voice teacher since she was 8 years old.
I work as a accounting supervisor at Genco Shipping and Trading.I am married and have two daughters;Stella who was Oliver's student and Mary-Grace.
I have known Oliver for 22 years. I used to see him every week when I was taking my daughter to the lesson and picking her up. Slowly I got to know him better and was pleasantly surprised to find out that music and the success of his students were more important to him then money , his time and effort. He gave it all to his students for them to succeed and become better. He is the reason my daughter pursued classical music. He helped her chose the college that was suitable for her and after she finished he helped her start teaching and growing and encouraged her to continue pursuing her dream.
We welcomed Oliver and his family to our home for years. He attended our celebrations and birthdays .I watched him being a loving and caring father and husband.Our friends embraced him and enjoyed his company very much.
 His knowledge and love for music led him to open a very successful music school and we were all proud of him. Even Huffington Post wrote about his school.
We were  all so devastated and surprised to hear that Oliver was arrested. During all the years that I have known him I never saw any inappropriate behavior. I have girls so I am always watching their friends and people who they hang around with..
Honorable Judge Kaplan, please take in consideration all the good elements Oliver has in his personality and all the good he has offered to his students,his friends and family.

Thank you for your consideration.

Helen Samartzis-Papatheodorou

1

# EXHIBIT F

November 29th, 2017

To the Honorable Judge Kaplan:

My name is Jinney Yoo and I am the Client Service Manager at a luxury retail store. I am a single mom with daughter████, 13 years of age. Back in 2012, when ████ was 8 years old, we found Oliver Sohngen's music school and she began voice lessons with him and violin lessons (with another instructor). I immediately was in favor to Oliver's lessons and appreciated his expertise and passion for teaching. Oliver always put his heart into teaching ████ and always forgot to keep track of time. I really felt what a gem in finding Oliver. Soon ████'s participation increased and fell this in to include childrens' opera choir, broadway class, and saxophone. ████ was going to the music school every day after school. It was a great place for learning skills and enjoying time with her teachers and other pupils. Then in a few years, I offered to help Oliver with some organizational administrative duties. I went to pick up ████ after work on weekdays, and also we went to the music school on the weekends for lessons and for me to help Oliver with the music school.

The reason why I wanted to help Oliver was because he earnestly gave his interest to teach ████ and he genuinely wanted to give his knowledge to her. I could observe and fell this in ████ lessons. I didn't mind to give my time and (office) skills to this person, who was a truly a gift, for ████ and I, to have met upon. The school needed much organization help, Oliver was a great musician but not a good businessman. He often didn't collect fees, often taught over the time allotment, and discounted the fee to anyone who asked (or sometimes to even those who didn't even ask). As I worked with Oliver, I got to know him well, and often we had our dinners together, along with ████ and Oliver's son and daughter. Oliver is truly a selfless person and completely engrossed in his love for music and giving what he knows to others, teaching music, sharing music, giving knowledge, giving ability, giving something to add to one's being. In addition, Oliver is immensely talented, and so he had so much to give. I knew Oliver was a rare breed, you don't find many of his type, lacking in desire for self-gain. Oliver also prided himself to be able to help his music teachers with a source of income. ████ life has completely changed now. Oliver had given her the capability to have so vocal, violin, saxophone, and guitar lessons. Oliver actually taught ████ how to play guitar in a few minutes of his spare time between clients. Nora received lessons for my weekend work at the school. There would have been no way for us to afford so many musical experiences otherwise. Oliver is a wonderful friend of mine, beloved teacher to ████ for 5 years, who gave her a loud strong singing voice that never needs a microphone. Oliver has given us and many others (I know other students, parents, and teachers) a precious gift of music, to love music, to desire music, and ability to make music.

Thank you for reading my letter. I hope that some mercy can be granted to Oliver.

Sincerely,

Jinney Yoo

EXHIBIT G

To the Honorable Judge Kaplan:

My name is Dalia Stoniene. I work as a publicist and have recently founded my own company specializing in art and design. I live in Astoria with my husband, Audrius Stonys, and our two children; we have lived in the neighborhood for over 15 years. Our 11-year-old daughter was a student at Long Island City Academy of Music and took personal voice lessons from Oliver.

We met Oliver in the fall of 2013 when our daughter joined Long Island City School of Ballet, which shared a floor with Oliver's music school. A few weeks into September, Audrius and Oliver struck a conversation in the hallway about the music school and Oliver's approach to building voices. Soon after, we signed our daughter up for private voice lessons.

We liked Oliver immediately. His dedication to his craft and his students was evident. He set high standards and demanded hard work and serious attitude from his students. He also had a gift for spotting and nurturing each child's specific strengths. All of us, including our daughter, appreciated that. In the beginning, it was just one class a week but gradually, we got involved with the school more and more when she joined several group classes. She became one of Oliver's star students, participating in most of the school's productions and concerts. She respected Oliver and was very fond of him. In fourth grade, she had a school assignment to write about her "hero," a person who inspires her and is a role model. She chose to write about Oliver.

Over the past three years, I would see Oliver several times a week as I brought my daughter to music or ballet classes. We became friendly, often chatting before or after classes about music, politics or our families. We traded favors – I offered my expertise in branding and public relations and helped Oliver update the school's website. In exchange, Oliver gave our daughter a free semester of music classes. I remember one day both Audrius and I were stuck at work and could not make other arrangements to bring our daughter to a group class. Oliver offered to pick her up from school as he was picking up his daughter and take them both to class.

We knew Oliver to be a good man, a caring father, a dedicated teacher and an inspiration to many people around him. We are grateful to him for our daughter's musical and artistic development, which helped her get into a highly competitive school of her dreams. I also know that she is one of many students

that grew, flourished and discovered new artistic expressions under Oliver's tutelage. Through him, we met a great musical community and forged lasting friendships with other parents and teachers.

Learning about Oliver's arrest and the charges against him was devastating. We spent a good couple of months in shock and disbelief, and had many difficult conversations with our friends, teachers and other parents, not to mention our daughter. Supporting Oliver in this process was not an easy decision but it's the right one because of our experiences described above.

Thank you for reading this letter. I appreciate your time and consideration.

With best regards,

Dalia Stoniene  |  11/07/2017

# EXHIBIT H

REDACTED

# EXHIBIT H1

Law Hum Behav (2007) 31:305–318
DOI 10.1007/s10979-006-9065-5

ORIGINAL ARTICLE

# Incarceration and Recidivism among Sexual Offenders

Kevin L. Nunes · Philip Firestone · Audrey F. Wexler ·
Tamara L. Jensen · John M. Bradford

Published online: 4 January 2007
© American Psychology-Law Society/Division 41 of the American Psychological Association 2007

**Abstract**   The relationship between incarceration and recidivism was investigated in a sample
of 627 adult male sexual offenders. Incarceration for the index offense was unrelated to sexual
or violent recidivism. This was the case whether incarceration was examined as a dichoto-
mous variable (incarceration vs. community sentence) or as a continuous variable (length of
incarceration). Risk for sexual recidivism was assessed with a modified version of the Rapid
Risk Assessment for Sexual Offense Recidivism. There was no evidence that the relationship
between incarceration and recidivism was confounded or moderated by risk or that length of
incarceration and recidivism were non-linearly associated. Sentencing sexual offenders to terms

This research was facilitated by a Social Sciences and Humanities Research Council of Canada Doctoral Fellowship
and Ontario Graduate Scholarships (OGS) awarded to the first author. We would like to thank Anne Trinneer,
Kelley Blanchette, and Kelly Taylor for reviewing an earlier draft of this manuscript.

K. L. Nunes · A. F. Wexler · T. L. Jensen
School of Psychology, University of Ottawa,
Ottawa, Canada

P. Firestone
School of Psychology and Department of Psychiatry,
University of Ottawa, Ottawa, Canada

J. M. Bradford
Department of Psychiatry, University of Ottawa
Sexual Behaviours Clinic, Royal Ottawa Hospital,
Ottawa, Canada

K. L. Nunes (✉) · T. L. Jensen
Present address: Department of Psychology, Carleton University, Loeb Building,
1125 Colonel By Drive, Ottawa, Ontario, Canada K1S 5B6
e-mail: Kevin_Nunes@carleton.ca

A. F. Wexler
Present address: Department of Psychology,
B.C. Children's Hospital, Vancouver, B.C., Canada

🖄 Springer

Law Hum Behav (2007) 31:305–318

of incarceration appears to have little, if any, impact on sexual and violent recidivism following release.

**Keywords**  Incarceration · Risk · Sexual offenders · Recidivism

Although the incarceration rate in Canada is considerably lower than that of the United States, it is still higher than in many other western countries (Public Safety and Emergency Preparedness Portfolio Corrections Statistics Committee, 2004). The cost associated with incarcerating offenders is substantial. The average annual cost of incarcerating one inmate in a federal penitentiary in Canada was over $80,000 in 2002–2003 (Public Safety and Emergency Preparedness, 2004). In contrast, the average annual cost of supervising an offender in the community was approximately $20,000 (Public Safety and Emergency Preparedness Portfolio Corrections Statistics Committee, 2004). Given that more money spent on incarcerating offenders leaves less money for other public services, such as education and health care, it is important to examine the effectiveness of incarceration for the management of criminal behavior and protection of the public.

Sentencing individuals convicted of criminal offenses to terms of imprisonment has a variety of purposes, such as specific deterrence, incapacitation, and retribution (Canadian Criminal Code, s. 718; Cullen, Lutze, Link, & Wolfe, 1989; Cullen, Latessa, Burton, Jr., & Lombardo, 1993). Specific deterrence refers to the reduction of reoffending achieved through fear of receiving a similar sentence should another crime be committed. For example, if an offender commits a sexual offense and is sentenced to a period of incarceration rather than some form of community supervision, that offender will be less likely to commit sexual offenses in the future because he or she now knows that a return to prison is a possible consequence. It seems reasonable to expect that taking away an offender's freedom by sentencing him or her to a prison term would (a) be sufficiently aversive to deter him or her from committing further crime (specific deterrence), (b) prevent harm to the community during the period of incarceration (incapacitation), and (c) cause the offender to suffer (retribution), which would provide victims and the larger community with a sense that justice has been done.

Although incarceration does incapacitate offenders and may provide some small comfort to victims and the community, the evidence for its deterrent effect is unimpressive (Gendreau, Goggin, & Cullen, 1999; Smith, Goggin, & Gendreau, 2002). Counterintuitively, some offenders may actually experience incarceration as *less* aversive than some alternative sanctions (Wood & Grasmick, 1999). Despite the lack of empirical support, however, almost 70% of judges rated specific deterrence as an important goal of sentencing in a recent Canadian survey (Bonta, Bourgon, Jesseman, & Yessine, 2005).

Gendreau and colleagues (Gendreau et al., 1999; Smith et al., 2002) have conducted meta-analytic reviews of research on the association between incarceration and recidivism. Gendreau et al. organized theorists and researchers' views on the relationship between incarceration and recidivism into three general schools of thought. From one perspective, incarceration is expected to deter further crime. In contrast, a second perspective conceptualizes prisons as schools of crime where offenders become further entrenched in a criminal lifestyle, thereby increasing recidivism. A third position is that prison has little effect on recidivism. It is also possible that the impact of incarceration on recidivism may be moderated by risk (for recidivism) or that recidivism rates may be distributed in a non-linear pattern across varying sentence lengths, such that effects consistent with any one of the three schools of thought may be observed depending on the offender's risk level and duration of incarceration (e.g., Dejong, 1997; Orsagh & Chen, 1988).

 Springer

In the most recent of Gendreau and colleagues' meta-analyses, Smith et al. (2002) found that incarceration was only very weakly associated with recidivism. The same results were obtained whether incarceration was compared to non-incarceration (e.g., probation) or longer periods of incarceration were compared to shorter periods. Similar results were found when effects were examined by risk level. In all cases, the differences were extremely small and more often than not suggested that incarceration may be associated with very slight *increases* in recidivism. Finally, there was no evidence of a U-shaped distribution of recidivism rates across sentence lengths. These results suggest that the relationship between incarceration and general recidivism is minimal and it is not confounded or moderated by risk nor does there appear to be some optimal mid-length duration of incarceration that is most effective in reducing general recidivism.

To a lesser extent, the relationship between sentence length and recidivism in sexual offenders has also been examined (Hanson & Bussière, 1998). In their meta-analysis, Hanson and Bussière found results consistent with those of Gendreau and colleagues. Specifically, sentence length was unrelated to sexual, non-sexually violent, or general recidivism in sexual offenders. In the individual studies in the meta-analysis, however, the risk level of the offender was not taken into account in the examination of the relationship between incarceration and recidivism. Risk level may be an important consideration. Hypothetically, incarceration may deter sex offenders from committing further crimes but this effect could be masked if higher risk sexual offenders were more likely to be incarcerated for their offenses than lower risk sexual offenders. In other words, the relationship between incarceration and recidivism may be confounded with risk in sex offenders.

It is also conceivable that risk may interact with incarceration, such that the impact of incarceration depends on an offender's risk for recidivism. For example, it is possible that sexual recidivism is reduced by incarceration for low risk sexual offenders but not for high risk offenders or vice versa. Low-risk offenders may be more easily deterred by the experience of incarceration than high-risk offenders because they are not as entrenched in and committed to sexual offending. Alternately, incarceration may increase the likelihood of recidivism among low-risk offenders by exposing them to more deviant sexual offenders, whereas it may have little impact on recidivism among high-risk offenders. Finally, a non-linear relationship may exist between incarceration and recidivism in sex offenders. It is possible that medium-length periods of incarceration (e.g., 1 year) may reduce sexual recidivism, whereas shorter and longer periods have no effect on sexual recidivism.

It seems reasonable to speculate that sentencing could be related to risk (c.f., Andenaes, 1968) and there is some evidence that higher risk sexual offenders are more likely to receive more severe sentences (Berliner, Schram, Miller, & Milloy, 1995; Fitch, 1962; McCormick, Maric, Seto, & Barbaree, 1998). Although Gendreau and colleagues have convincingly demonstrated that incarceration has little effect on general recidivism, this remains to be thoroughly examined in sexual offenders. The primary purpose of the present study was (a) to examine the association between incarceration and sexual and violent recidivism while controlling for risk, (b) to consider whether incarceration interacts with risk, and (c) to address the possibility that there is a non-linear relationship between incarceration and recidivism in sex offenders.

## Method

### Participants

All participants were assessed at the Royal Ottawa Hospital, Sexual Behaviours Clinic, between 1983 and 1995. Follow-up data were available for 627 male offenders. Included in the current

 Springer

study were offenders who were 18 years of age or older at the time of their index hands-on sexual offense against an adult or a child (i.e., under the age of 16 at the time of the offense), for which they were convicted. Mean age at time of assessment was 38.67 years (SD = 12.16) and ranged from 18 to 78. The total sample consisted of 288 incest offenders, 199 extrafamilial child molesters, 79 rapists, and 61 mixed offenders (i.e., falling into two or more of the above categories). The majority of the participants were assessed just prior to or just after their court appearance or sentencing.

This sample has been previously examined by Firestone et al. (1998, 1999), Firestone, Bradford, McCoy, et al. (2000), Firestone, Bradford, Greenberg, and Serran (2000), Firestone, Dixon, Nunes, and Bradford (2005), Firestone, Nunes, Moulden, Broom, and Bradford (2005), Greenberg, Bradford, Firestone, and Curry (2000), Greenberg, Firestone, Nunes, Bradford, and Curry (2005), Nunes, Firestone, Bradford, and Broom (2002), and Wexler, Firestone, Nunes, and Bradford (2005). The follow-up period has been extended by Wexler (2005; Wexler, Firestone, Nunes, & Bradford, 2005) since some of the earlier studies and it was this updated database that was used in the current research.

## Procedure

Offenders were assessed at a forensic psychiatric unit regarding their index sexual offenses. Data were gathered at the time of assessment through file reviews, interviews, questionnaires, and physiological testing. Only a portion of the data collected in these assessments is examined here.

The Rapid Risk Assessment for Sexual Offense Recidivism (RRASOR; Hanson, 1997) was scored by the current authors from the information collected at the time of assessment and from criminal record data. The RRASOR consists of four items: (1) prior sexual offenses, (2) age at release, (3) victim gender, and (4) relationship to victim. The *prior sex offenses* item is coded from prior sexual convictions and charges. Convictions are weighted more heavily than charges and the higher of the two values is taken as the score for this item. RRASOR scores can range from 0 to 6, with higher scores reflecting greater risk. Hanson (1997) selected these four items from a larger pool of variables through multivariate statistical procedures. In their meta-analysis, Hanson and Morton-Bourgon (2004) found a medium association between the RRASOR and sexual recidivism (mean $d = .59$) and a small to medium association with violent (including sexual) recidivism (mean $d = .34$). In addition, good inter-rater reliability has been found with the RRASOR (Barbaree, Seto, Langton, & Peacock, 2001).

Scoring of the RRASOR generally followed the coding rules outlined in Hanson (1997). There were, however, some deviations from the rules. In our database, a distinction was not made between formal charges that did and did not result in conviction. Prior sex offenses, therefore, were scored using only the weighting for charges; that is, 1 to 2 charges or convictions received a score of 1, 3 to 5 charges or convictions received a score of 2, and 6 or more charges or convictions received a score of 3. Victim gender and relationship to victim were coded from information pertaining only to the index offense. Due to these deviations from the scoring procedure (Hanson), the instrument would be most accurately described as a *modified* RRASOR (RRASOR-M).[1]

Offense (i.e., prior and index offenses) and incarceration information was gathered from Canadian Police Information Centre (CPIC) records at the Ottawa Police Station, a national database of criminal arrests and convictions including INTERPOL reports from the Royal

---

[1] It was not possible to determine inter-rater reliability of the RRASOR-M in the current study because scores were computed from pre-existing variables in our database.

Law Hum Behav (2007) 31:305–318                                                                309

Canadian Mounted Police. For offenders who received a term of incarceration for their index offenses, the length of this term was coded by subtracting the index sentencing date from the date of release to the community. When a release date was not available, length of incarceration was coded as two thirds of the aggregate sentence.[2] In Canada, offenders are generally granted some form of conditional release upon serving two thirds or less of their sentence (Part II of the Corrections and Conditional Release Act). Only in exceptional cases are offenders detained past two thirds of their sentence.

Recidivism information was also gathered from the CPIC records. In the current study, recidivism data were coded for the first new charge or conviction after the index offense conviction or, if the offender was incarcerated for the index offense, after release to the community. We focused on only the first reoffense because it was expected to be most sensitive to any impact incarceration for the index offense might have. If the new charge or conviction was sexual, the offender was identified as a sexual recidivist. If the new offense was either non-sexually violent or sexual, the offender was identified as a violent recidivist.

## Results

### Data screening

The RRASOR-M and length of incarceration were both positively skewed. Logarithmic transformations were performed on these variables to correct this violation of normality. The analyses below were conducted with both the transformed and untransformed variables. The results were virtually identical in terms of statistical significance and effect size. Thus, only the untransformed results are reported here.

### Description of the sample

Three hundred and ninety-nine (63.6%) offenders were sentenced to a period of incarceration for their index sexual offenses; the remainder were sentenced to some form of community supervision, such as probation. Among the offenders who were incarcerated, the mean sentence was 21.24 months ($SD = 19.91$), with the shortest sentence being 1 month and the longest 120 months. The unadjusted recidivism rates for the entire sample were as follows: 80 (12.8%) offenders sexually recidivated and 129 (20.6%) violently recidivated. Sexual and violent recidivism were highly intercorrelated, $r(627) = .75$. Average time of opportunity to reoffend was 8.11 years ($SD = 4.86$). All items of the RRASOR-M could be scored for 606 offenders; the mean was 1.24 ($SD = 1.23$) and the median was 1.

### Relationship between incarceration and recidivism

We first examined the univariate relationship between recidivism, incarceration, length of incarceration, and the RRASOR-M. For the dichotomous incarceration variable, incarceration was coded as one and non-incarceration as zero. Similarly, recidivism was coded as one and non-recidivism as zero. These coding formats were used in all analyses. To examine the magnitude of the differences between recidivists and non-recidivists, Cohen's $d$s were calculated. By convention, $d$s of around 0.20, 0.50, and 0.80 are respectively considered small, medium, and large

---

[2] It was not possible to determine the proportion of offenders in the sample for whom the release date was estimated because a distinction had not been made in the database between reported and estimated release dates.

Springer

**Table 1** Sexual recidivism, incarceration for index offense, and risk

| Variable | Sexual recidivism | | | | | 95% CI | |
|---|---|---|---|---|---|---|---|
| | No | | Yes | | | | |
| | $n$ | % or $M$ (SD) | $n$ | % or $M$ (SD) | $d$ | Lower | Upper |
| Incarcerated | 547 | 63.1% | 80 | 67.5% | 0.09 | −0.14 | 0.33 |
| Length of incarceration (months) | 345 | 20.94 (20.10) | 54 | 23.15 (18.77) | 0.11 | −0.18 | 0.39 |
| RRASOR-M | 529 | 1.15 (1.16) | 77 | 1.86 (1.46) | 0.59 | 0.35 | 0.83 |

*Note.* CI: Confidence Interval.

effect sizes (Cohen, 1992). The 95% confidence interval around $d$ is also reported to provide an indication of the range of values for $d$ that would be expected in 95% of other samples from the same population of sex offenders. In addition, statistical significance of $d$ can be determined from the confidence interval. If the 95% confidence interval does not contain zero, the effect size is significantly different than zero ($p < .05$).

As shown in Table 1, sexual recidivism was not significantly associated with incarceration for the index offense and the effect size was very small. In addition to considering the association between sexual recidivism and the dichotomous incarceration variable, analyses were performed to examine the relationship between sexual recidivism and length of incarceration. These analyses were conducted only on the subsample of offenders who were sentenced to a term of incarceration. As shown in Table 1, sexual recidivism was not significantly associated with length of incarceration and again the effect size was very small. As expected, the RRASOR-M was significantly associated with greater likelihood of sexual recidivism (medium effect size). Somewhat surprisingly, however, the RRASOR-M was not significantly correlated with incarceration or with length of incarceration, $r(606) = .03, p > .05$ and $r(387) = .04, p > .05$, respectively.

A set of analyses parallel to those above was conducted to examine the relationship between violent (including sexual) recidivism, incarceration, length of incarceration, and the RRASOR-M. The results were virtually identical to those found for sexual recidivism. As shown in Table 2, violent recidivism was not significantly associated with whether or not offenders had been incarcerated for their index offenses or with length of incarceration. The RRASOR-M, however, was significantly associated with greater likelihood of violent recidivism.

Controlling for risk

One of the principal goals of the present paper was to examine the relationship between incarceration and recidivism once individual differences in risk level were taken into account.[3] Differences in risk level could conceal or inflate the relationship between incarceration and recidivism; that is, the relationship between incarceration and recidivism may be confounded by risk. Given the almost nonexistent association between incarceration and the RRASOR, however, we did not expect the results to change when risk was considered. Nevertheless, the association between incarceration and recidivism was again examined, but this time risk level was statistically controlled.

A series of logistic regressions were performed to examine the association between incarceration or length of incarceration and recidivism while controlling for risk. RRASOR-M was

---

[3] We also ran all the multivariate analyses with modified versions of the Static-99 and the Sex Offender Risk Appraisal Guide (SORAG) that were available for 216 of the offenders in the current study. The results were very similar to those found with the RRASOR-M. Thus, even when these more comprehensive measures of risk were used as control and moderator variables, there was still no indication that incarceration was related to recidivism.

Law Hum Behav (2007) 31:305–318

311

**Table 2** Violent recidivism, incarceration for index offense, and risk

| Variable | Violent recidivism | | | | | 95% CI | |
| | No | | Yes | | | | |
| | n | % or M (SD) | n | % or M (SD) | d | Lower | Upper |
|---|---|---|---|---|---|---|---|
| Incarcerated | 498 | 62.9% | 129 | 66.7% | 0.08 | −0.11 | 0.27 |
| Length of incarceration (months) | 313 | 20.83 (20.39) | 86 | 22.76 (18.11) | 0.10 | −0.14 | 0.34 |
| RRRASOR-M | 483 | 1.12 (1.13) | 123 | 1.71 (1.45) | 0.49 | 0.29 | 0.69 |

*Note.* CI: Confidence Interval.

entered in the first block and incarceration or length of incarceration was entered in the second block. Odds ratios were reported. The odds ratio can be interpreted as the increase in the odds of recidivism that corresponded to an increase of one point in the predictor or, in the case of a dichotomous predictor, as the odds of recidivism in one group compared to the other (i.e., incarcerated vs. not incarcerated). For example, in Table 3 the odds ratio of 1.50 indicates that for every one-point increase on the RRASOR-M, the odds of sexual recidivism increased by 50%. An odds ratio of 1.00 would reflect no relationship between the predictor and the outcome. If the odds ratio associated with the RRASOR-M had been 1.00, the odds of recidivism would be equal at all values of the RRASOR-M. The confidence interval around the odds ratio provides an estimate of the range of values within which the odds ratio among other samples of the population of offenders would be expected to fall 95% of the time. For example, the odds ratio for the RRASOR-M was 1.50 but it would be expected that if the population from which this sample was drawn were sampled 100 times, in 95 of those samples the odds ratio would fall between 1.26 and 1.78. If the 95% confidence interval does not include 1.00, the odds ratio is statistically significant at the .05 level.

As shown in Table 3, the RRASOR-M was significantly associated with sexual recidivism. The addition of the dichotomous incarceration variable, however, did not significantly increase the association with sexual recidivism that was found with the RRASOR-M alone, $\chi^2(1, N = 606) = 0.07, p > .05$. The odds of sexual recidivism were 7% higher for offenders who were incarcerated for their index offenses than for those who were not incarcerated. This association between incarceration and sexual recidivism was not statistically significant. The same pattern

**Table 3** Sequential logistic regression predicting sexual recidivism from RRASOR-M and incarceration

| Scale | B | SE B | Wald | Odds ratio | 95% CI |
|---|---|---|---|---|---|
| Block 1 | | | | | |
| RRASOR-M | 0.40 | 0.09 | 20.60* | 1.50 | 1.26–1.78 |
| Block 2 | | | | | |
| RRASOR-M | 0.40 | 0.09 | 20.42* | 1.50 | 1.26–1.78 |
| Incarcerated (yes/no) | 0.07 | 0.26 | 0.07 | 1.07 | 0.64–1.79 |
| Block 3 | | | | | |
| RRASOR-M | 0.41 | 0.16 | 6.23* | 1.51 | 1.09–2.08 |
| Incarcerated | 0.09 | 0.42 | 0.04 | 1.09 | 0.48–2.46 |
| RRASOR-M by incarcerated | −0.01 | 0.20 | 0.00 | 0.99 | 0.67–1.45 |

*Note.* $\chi^2(1, N = 606) = 19.81$ for Block 1 ($p < .05$). $\chi^2(1, N = 606) = 0.07$ for Block 2 ($p > .05$). $\chi^2(1, N = 606) = 0.00$ for Block 3 ($p > .05$). SE: Standard Error. CI: Confidence Interval.
*$p < .05$.

Law Hum Behav (2007) 31:305–318

**Table 4**  Sequential logistic regression predicting sexual recidivism from RRASOR-M and length of incarceration

| Scale | $B$ | SE $B$ | Wald | Odds ratio | 95% CI |
|---|---|---|---|---|---|
| Block 1 | | | | | |
| RRASOR-M | 0.40 | 0.11 | 14.19* | 1.49 | 1.21–1.83 |
| Block 2 | | | | | |
| RRASOR-M | 0.40 | 0.11 | 14.09* | 1.49 | 1.21–1.83 |
| Length of incarceration (months) | 0.00 | 0.01 | 0.15 | 1.00 | 0.99–1.02 |
| Block 3 | | | | | |
| RRASOR-M | 0.29 | 0.18 | 2.68 | 1.34 | 0.94–1.90 |
| Length of incarceration | 0.00 | 0.01 | 0.11 | 1.00 | 0.97–1.02 |
| RRASOR-M by Length of incarceration | 0.01 | 0.01 | 0.52 | 1.01 | 0.99–1.02 |

Note. $\chi^2(1, N = 387) = 13.66$ for Block 1 ($p < .05$). $\chi^2(1, N = 387) = 0.15$ for Block 2 ($p > .05$). $\chi^2(1, N = 387) = 0.53$ for Block 3 ($p > .05$). SE: Standard Error. CI: Confidence Interval.
*$p < .05$.

of results was found for the continuous length of incarceration variable and sexual recidivism (Table 4) as well as for both incarceration and length of incarceration and violent recidivism (Tables 5 and 6). These results indicate that even after controlling for risk, incarceration was not significantly associated with recidivism.

Interaction of risk and incarceration

To address the possibility that the relationship between incarceration and recidivism is moderated by risk in sexual offenders, the interaction term (i.e., RRASOR-M by incarceration or RRASOR-M by length of incarceration) was entered on the third block of the logistic regressions reported in Tables 3–6. In all analyses, the interaction between risk and incarceration or length of

**Table 5**  Sequential logistic regression predicting violent (including sexual) recidivism from RRASOR-M and incarceration

| Scale | $B$ | SE $B$ | Wald | Odds ratio | 95% CI |
|---|---|---|---|---|---|
| Block 1 | | | | | |
| RRASOR-M | 0.36 | 0.08 | 20.86* | 1.43 | 1.22–1.66 |
| Block 2 | | | | | |
| RRASOR-M | 0.35 | 0.08 | 20.69* | 1.42 | 1.22–1.66 |
| Incarcerated (yes/no) | 0.07 | 0.22 | 0.11 | 1.07 | 0.70–1.64 |
| Block 3 | | | | | |
| RRASOR-M | 0.32 | 0.14 | 4.95* | 1.37 | 1.04–1.81 |
| Incarcerated | −0.01 | 0.33 | 0.00 | 0.99 | 0.52–1.89 |
| RRASOR-M by Incarcerated | 0.06 | 0.17 | 0.11 | 1.06 | 0.76–1.47 |

Note. $\chi^2(1, N = 606) = 20.69$ for Block 1 ($p < .05$). $\chi^2(1, N = 606) = 0.11$ for Block 2 ($p > .05$). $\chi^2(1, N = 606) = 0.11$ for Block 3 ($p > .05$). SE: Standard Error. CI: Confidence Interval.
*$p < .05$.

Law Hum Behav (2007) 31:305–318

**Table 6**  Sequential logistic regression predicting violent (including sexual) recidivism from RRASOR-M and length of incarceration

| Scale | B | SE B | Wald | Odds ratio | 95% CI |
|---|---|---|---|---|---|
| Block 1 | | | | | |
| RRASOR-M | 0.37 | 0.09 | 15.81* | 1.45 | 1.21–1.74 |
| Block 2 | | | | | |
| RRASOR-M | 0.37 | 0.09 | 15.66* | 1.45 | 1.21–1.74 |
| Length of incarceration (months) | 0.00 | 0.01 | 0.32 | 1.00 | 0.99–1.02 |
| Block 3 | | | | | |
| RRASOR-M | 0.31 | 0.16 | 3.80 | 1.36 | 1.00–1.85 |
| Length of incarceration | 0.00 | 0.01 | 0.00 | 1.00 | 0.98–1.02 |
| RRASOR-M by length of incarceration | 0.00 | 0.01 | 0.25 | 1.00 | 0.99–1.01 |

*Note.* $\chi^2(1, N = 387) = 15.77$ for Block 1 ($p < .05$). $\chi^2(1, N = 387) = 0.32$ for Block 2 ($p > .05$). $\chi^2 (1, N = 387) = 0.26$ for Block 3 ($p > .05$). SE : Standard Error. CI Confidence Interval.

*$p < .05$.

incarceration was not statistically significant and did not add significantly to the previous block. Thus, there was no evidence that incarceration or length of incarceration was associated with recidivism differently depending on risk, as measured by the RRASOR-M.

Controlling for time at risk

Not surprisingly, opportunity to reoffend was significantly shorter among the offenders who were incarcerated for their index offenses compared to those who were not, $M = 7.34$ years ($SD = 4.58$) versus $M = 9.46$ years ($SD = 5.05$); $t(625) = 5.36$, $p < .05$. To control for time at risk, a series of sequential Cox regressions paralleling the logistic regressions reported above was performed. The results of the Cox regressions were virtually identical to those of the logistic regressions. To avoid redundancy, the results of the Cox regressions are not reported here. In all cases, the addition of incarceration or length of incarceration to the RRASOR-M did not significantly increase the association with recidivism found for the RRASOR-M alone and neither incarceration nor length of incarceration were significantly associated with sexual or violent recidivism. Similarly, none of the interaction terms were significantly associated with sexual or violent recidivism. These findings show that even after taking into account time at risk, incarceration was still not significantly associated with recidivism.

Non-linear relationship between length of incarceration and recidivism

Although the analyses above indicate that length of incarceration was not linearly associated with recidivism, it is possible that a non-linear relationship exists. For example, medium-length sentences may have an influence on recidivism more so than shorter or longer sentences. To address this possibility, the logistic and Cox regressions above were re-run with the quadratic (length of incarceration squared) and cubic (length of incarceration cubed) terms for length of incarceration added to the equation. In all cases, neither squared nor cubed length of incarceration was significantly associated with sexual or violent recidivism. Given that the result of the logistic regressions and Cox regression were very similar, only the odds ratios for the quadratic and cubic terms from the final block of each logistic regression are reported here. Squared length of incarceration was not significantly associated with sexual recidivism

 Springer

(odds ratio = 1.00, 95% CI = 1.00 to 1.00) or violent recidivism (odds ratio = 0.93, 95% CI = 0.54 to 1.59). Cubed length of incarceration was also not significantly associated with sexual recidivism (odds ratio = 1.00, 95% CI = 1.00 to 1.00) or violent recidivism (odds ratio = 0.93, 95% CI = 0.54 to 1.59). The odds ratios and hazard ratios for these terms were virtually identical to those found with the linear term. These results indicate that there was not a significant non-linear association between incarceration and recidivism.

## Discussion

In the present study, we examined the association between incarceration and recidivism in a sample of sex offenders. No significant association between incarceration and recidivism was found regardless of how incarceration was operationally defined, whether sexual or violent (including sexual) recidivism was examined, whether risk was controlled, and whether time at risk was controlled. Thus, we found no evidence to support either the deterrence or school of crime positions. In addition, our findings were at odds with the notion that the relationship between incarceration and recidivism is moderated by risk for sexual recidivism, at least as measured by the RRASOR-M. Moreover, the results were inconsistent with a U-shaped distribution of recidivism rates across lengths of incarceration (Orsagh & Chen, 1988). More generally, our findings do not suggest that there is some optimal length of incarceration for sexual offenders that maximally reduces recidivism compared to shorter or longer periods of incarceration.

Consistent with meta-analyses on both sexual (Hanson & Bussière, 1998) and general offenders (Gendreau et al., 1999; Smith et al., 2002), our results are most in line with the notion that incarceration has little, if any, impact on recidivism (e.g., Moffitt, 1983). In contrast, there is evidence that recent treatment programs for sexual offenders are effective at reducing sexual recidivism (Hanson et al., 2002; but for a more cautious interpretation of the treatment effectiveness literature see Rice & Harris, 2003). These findings support the routine use of alternatives to incarceration with sexual offenders who fall below some minimally acceptable risk level (e.g., Berliner et al., 1995). The benefits of such an approach in terms of cost-saving are obvious (Public Safety and Emergency Preparedness Portfolio Corrections Statistics Committee, 2004). Based on the current results, this money would benefit the community more if it were spent on effective treatment programs or on other public services, such as education and health care (cf. Gendreau et al., 1999).

Contrary to the evidence, many judges believe that incarceration does deter recidivism (Bonta et al., 2005). It is important to convey to judges and law- and policy-makers that the available evidence does not support this belief. Incarceration may still be justifiable, however, for very high-risk sex offenders to prevent reoffending through incapacitation; that is, their opportunities for sexual offending are greatly limited during their period of incarceration (at least against people outside correctional institutions). Given the relatively low official rates of sexual recidivism (Harris & Hanson, 2004), incapacitation would not be required for the majority of sex offenders.

Of course, risk management is not the only issue judges must consider in their sentencing decisions (Cole & Angus, 2003). In Canada, for example, the fundamental principle of sentencing is that "a sentence must be proportionate to the gravity of the offence and the degree of responsibility of the offender" (C.C.C., s. 718.1). Thus, regardless of a particular offender's risk for recidivism, incarceration may be desirable to the extent that the community wishes to exact retribution from sexual offenders for their crimes (but see Gendreau et al., 1999 for a caution against pursuing this goal in sentencing). Exacting retribution through incarceration, however, is very costly. In light of the fact that resources are limited, the community must balance its desire

Law Hum Behav (2007) 31:305–318

for retribution with its need for more effective sex offender management strategies and essential services.

Not addressed by the current research is the possibility that the threat of incarceration may deter many people from committing their first sexual offense (i.e., general deterrence) even though it does not appear to deter recidivism (i.e., specific deterrence). If, however, the evidence from research concerning non-sexual crimes is any indication (Kleck, Sever, Li, & Gertz, 2005), we would expect incarceration to be as ineffective at general deterrence as it is at specific deterrence among sexual offenders.

Although we attempted to address various alternate explanations for the lack of association between incarceration and recidivism in sex offenders by examining the relationship with numerous statistical approaches, there are limitations of the current study that we were unable to address. Most obviously, the use of a non-random design raises the possibility that the groups differed on any number of variables of which we were not aware and for which we did not statistically control (Shadish, Cook, & Campbell, 2002). By necessity, however, almost all researchers have used such a design to study the association between incarceration and recidivism (Gendreau et al., 1999).

Another limitation concerns the absence of information about the conditions of incarceration for the offenders in the current study (Smith et al., 2002). It was unknown, for example, whether the incarcerated offenders were housed in "no frills" institutions or more "comfortable" institutions. For example, perhaps incarceration does deter sexual recidivism but only when the conditions are at their worst. We do not think this is likely to be the case, but greater confidence in the findings would be warranted had the conditions of incarceration been known and taken into account. In addition, we did not have data on participation in sex offender treatment and, therefore, were unable to examine it as a potential moderator of the relationship between incarceration and recidivism.

Third, our modifications to the RRASOR may raise concerns about predictive validity. For example, not distinguishing between convictions and charges and using victim information from only the index sexual offence may have underestimated the actual RRASOR score in some cases (D. Doren, personal communication, April 28, 2006). Despite these modifications, however, the association between the RRASOR-M and sexual recidivism in the current study ($d = 0.59$) was equal to that found for the RRASOR in Hanson and Morton-Bourgon's (2004) meta-analysis (average $d = 0.59$). Thus, the predictive validity of the RRASOR was not unduly compromised by our modifications.

Relatedly, the RRASOR may have a relatively narrow focus compared to some other actuarial instruments for assessing risk for sexual recidivism. Specifically, the RRASOR appears to focus more on sexual deviance, whereas the Static-99 (Hanson & Thornton, 2000) and the Sex Offender Risk Appraisal Guide (SORAG; Quinsey, Harris, Rice, & Cormier, 1998), for example, appear to incorporate more factors reflecting antisocial orientation as well as those indicative of sexual deviance (Hanson & Morton-Bourgon, 2005; Roberts, Doren, & Thornton, 2002). It is possible that different results would have been found had one of these more comprehensive instruments been used to estimate risk for recidivism in the current study. Unfortunately, we did not have sufficient data on these measures to examine them in the study proper. We did, however, have data on modified versions of these measures from a previous study (Nunes et al., 2002) for 216 offenders in the current sample. Even when these more comprehensive measures of risk were used as control and moderator variables, there was still no indication that incarceration was related to recidivism.

A fifth issue may potentially limit the extent to which our finding that incarceration was unrelated to risk generalizes to present day sentencing practices. Specifically, the offenders in the current study were sentenced prior to the availability of validated sexual recidivism risk

assessment instruments, such as the RRASOR. Whereas our findings suggest that high-risk sex offenders were just as likely as low-risk offenders to be sentenced to a term of incarceration, there is evidence from other researchers that some known risk factors for sexual recidivism are associated with incarceration (Berliner et al., 1995; McCormick et al., 1998). In addition, judges do currently appear to be interested in considering assessments of risk for sexual recidivism in their sentencing decisions (Bonta et al., 2005). To the extent that sentencing is now influenced by estimates of risk for sexual recidivism, our findings may not accurately reflect current practices. This is not, however, a threat to the validity of the present study. Our findings suggest that incarceration would not reduce recidivism among sex offenders once they are released regardless of whether or not estimated risk influences the decision to give a sentence of incarceration and the length of such a sentence.

Finally, the recidivism rates reported in the current study are based only on officially detected recidivism, which are undoubtedly an underestimation of the true rates of reoffending (Harris & Hanson, 2004). In addition, we defined recidivism rather narrowly as simple dichotomous variables and did not examine other interesting outcomes, such as severity (e.g., victim injury). Although the presence versus absence of recidivism is arguably one of the most important outcomes in this type of research, there are obviously a number of complementary variables worthy of consideration. Future research should examine a broader range of outcomes (e.g., Harris et al., 2003).

In spite of these limitations, the results of the current study suggest that incarceration has minimal impact on sexual or violent recidivism among sexual offenders. These results remained even when risk was statistically controlled. There was no evidence that the relationship between incarceration and recidivism is confounded or moderated by risk or that length of incarceration and recidivism are non-linearly associated. Sentencing sex offenders to terms of incarceration does not appear to deter sexual recidivism in the long-run. Given that rates of officially detected sexual recidivism are relatively low (Harris & Hanson, 2004), incarceration for the purpose of incapacitation is most justifiable for high risk sex offenders.

**Acknowledgments** This article is based on research presented at the 22nd Annual Research and Treatment Conference of the Association for the Treatment of Sexual Abusers in St. Louis, MO in October of 2003.

## References

Andenaes, J. (1968). Does punishment deter crime? *Criminal Law Quarterly, 11*, 76–93.

Barbaree, H. E., Seto, M. C., Langton, C., & Peacock, E. (2001). Evaluating the predictive accuracy of six risk assessment instruments for adult sex offenders. *Criminal Justice and Behavior, 28*, 490–521.

Berliner, L., Schram, D., Miller, L. L., & Milloy, C. D. (1995). A sentencing alternative for sex offenders: A study of decision making and recidivism. *Journal of Interpersonal Violence, 10*, 487–502.

Bonta, J., Bourgon, G., Jesseman, R., & Yessine, A. K. (2005). *Presentence reports in Canada*. Ottawa: Public Safety and Emergency Preparedness Canada.

Cohen, J. (1992). A power primer. *Psychological Bulletin, 112*, 155–159.

Cole, D. P., & Angus, G. (2003). Using pre-sentence reports to evaluate and respond to risk. *Criminal Law Quarterly, 47*, 302–364.

Cullen, F. T., Lutze, F., Link, B. G., & Wolfe, N. T. (1989). The correctional orientation of prison guards: Do officers support rehabilitation? *Federal Probation, 53*, 33–42.

Cullen, F. T., Latessa, E. J., Burton, Jr., V. S., & Lombardo, L. X. (1993). The correctional orientation of prison wardens: Is the rehabilitative ideal supported? *Criminology, 31*, 62–92.

Dejong, C. (1997). Survival analysis and specific deterrence: Integrating theoretical and empirical models of recidivism. *Criminology, 35*, 561–575.

Firestone, P., Bradford, J. M., McCoy, M., Greenberg, D. M., Curry, S., & Larose, M. R. (1998). Recidivism in convicted rapists. *Journal of the American Academy of Psychiatry and Law, 26*, 185–200.



Firestone, P., Bradford, J. M., McCoy, M., Greenberg, D. M., Larose, M. R., & Curry, S. (1999). Prediction of recidivism in incest offenders. *Journal of Interpersonal Violence, 14*, 511–531.

Firestone, P., Bradford, J. M., McCoy, M., Greenberg, D. M., Curry, S., & Larose, M. R. (2000). Prediction of recidivism in extrafamilial child molesters based on court-related assessments. *Sexual Abuse: Journal of Research and Treatment, 12*, 203–221.

Firestone, P., Bradford, J. M., Greenberg, D. M., & Serran, G. A. (2000). The relationship of deviant sexual arousal and psychopathy in incest offenders, extrafamilial child molesters, and rapists. *Journal of the American Academy of Psychiatry and Law, 28*, 303–308.

Firestone, P., Dixon, K. L., Nunes, K. L., & Bradford, J. M. (2005). A comparison of incest offenders based on victim age. *Journal of the American Academy of Psychiatry and the Law, 33*, 223–232.

Firestone, P., Nunes, K. L., Moulden, H., Broom, I., & Bradford, J. M. (2005). Hostility and recidivism in sexual offenders. *Archives of Sexual Behavior, 34*, 277–283.

Fitch, J. H. (1962). Men convicted of sexual offenses against children: A descriptive follow-up study. *British Journal of Criminology, 3*, 18–37.

Gendreau, P., Goggin, C., & Cullen, F. T. (1999). *The effects of prison sentences on recidivism*. Ottawa: Ministry of Public Safety and Emergency Preparedness Canada.

Greenberg, D., Bradford, J., Firestone, P., & Curry, S. (2000). Recidivism of child molesters: A study of victim relationship with the perpetrator. *Child Abuse and Neglect, 24*, 1485–1494.

Greenberg, D. M., Firestone, P., Nunes, K. L., Bradford, J. M., & Curry, S. (2005). Biological fathers and stepfathers who molest their daughters: Psychological, phallometric and criminal features. *Sexual Abuse: A Journal of Research and Treatment, 17*, 39–46.

Hanson, R. K. (1997). *The development of a brief actuarial risk scale for sexual offense recidivism*. Ottawa: Ministry of Public Safety and Emergency Preparedness Canada.

Hanson, R. K., & Bussière, M. T. (1998). Predicting relapse: A meta-analysis of sexual offender recidivism studies. *Journal of Consulting and Clinical Psychology, 66*, 348–362.

Hanson, R. K., Gordon, A., Harris, A. J. R., Marques, J. K., Murphy, W., Quinsey, V. L., & Seto, M. D. (2002). First report of the collaborative outcome data project on the effectiveness of psychological treatment for sex offenders. *Sexual Abuse: A Journal of Research and Treatment, 14*, 169–194.

Hanson, R. K., & Morton-Bourgon, K. (2004). *Predictors of sexual recidivism: An updated meta-analysis*. Ottawa: Public Safety and Emergency Preparedness Canada.

Hanson, R. K., & Morton-Bourgon, K. (2005). The characteristics of persistent sexual offenders: A meta-analysis of recidivism studies. *Journal of Consulting and Clinical Psychology, 73*, 1154–1163.

Hanson, R. K., & Thornton, D. (2000). Improving risk assessments for sex offenders: A comparison of three actuarial scales. *Law and Human Behavior, 24*, 119–136.

Harris, A. J. R. & Hanson, R. K. (2004). *Sex offender recidivism: A simple queston*. Ottawa: Public Safety and Emergency Preparedness Canada.

Harris, G. T., Rice, M. E., Quinsey, V. L., Lalumiere, M. L., Boer, D., & Lang, C. (2003). A multisite comparison of actuarial risk instruments for sex offenders. *Psychological Assessment, 15*, 413–425.

McCormick, J. S., Maric, A., Seto, M. C., & Barbaree, H. E. (1998). Relationship to victim predicts sentence length in sexual assault cases. *Journal of Interpersonal Violence, 13*, 413–420.

Moffitt, T. E. (1983). The learning theory model of punishment: Implications for delinquency deterrence. *Criminal Justice and Behavior, 10*, 131–158.

Nunes, K. L., Firestone, P., Bradford, J. M., Greenberg, D. M., & Broom, I. (2002). A comparison of the modified versions of the Static-99 and the Sex Offender Risk Appraisal Guide (SORAG). *Sexual Abuse: A Journal of Research and Treatment, 14*, 249–265.

Orsagh, T., & Chen, J.-R. (1988). The effect of time served on recidivism: An interdisciplinary theory. *Journal of Quantitative Criminology, 4*, 155–171.

Public Safety and Emergency Preparedness Portfolio Corrections Statistics Committee (2004). *Correctional and conditional release statistical overview*. Ottawa: Public Safety and Emergency Preparedness Canada.

Quinsey, V. L., Harris, G. T., Rice, M. E., & Cormier, C. A. (1998). *Violent offenders: Appraising and managing risk*. Washington, DC: American Psychological Association.

Rice, M. E., & Harris, G. T. (2003). The size and sign of treatment effects in sex offender therapy. *Annals of the New York Academy of Sciences, 989*, 428–440.

Roberts, C. F., Doren, D. M., & Thornton, D. (2002). Dimensions associated with assessments of sex offender recidivism risk. *Criminal Justice and Behavior, 29*, 569–589.

Shadish, W. R., Cook, T. D., & Campbell, D. T. (2002). *Experimental and quasi-experimental designs for generalized causal inference*. Boston: Houghton Mifflin.

Smith, P., Goggin, C., & Gendreau, P. (2002). *The effects of prison sentences and intermediate sanctions on recidivism: General effects and individual differences*. Ottawa: Public Safety and Emergency Preparedness Canada.

318

Wexler, A. F. (2005). *An examination of sexual recidivism and violent recidivism in a population of Canadian sex offenders*. Unpublished doctoral dissertation, University of Ottawa, Ottawa, Ontario, Canada.

Wexler, A. F., Firestone, P., Nunes, K. L., & Bradford, J. M. (2005). *An examination of recidivism in a Canadian population of extrafamilial child molesters based on court-related assessments*. Manuscript submitted for publication.

Wood, P. B., & Grasmick, H. G. (1999). Toward the development of punishment equivalencies: The severity of alternative sanctions compared to prison. *Justice Quarterly, 16*, 19–50.

Springer

# EXHIBIT I

<u>TRANSLATION</u>

Ludwig Solingen
Hilli Brienza

[Germany]

**Hon. Lewis A. Kaplan, USDC**
US Destrict [sic] Court for the Southern District of New York
**c/o Susan J. Walsh**
Vladeck, Reskin & Clack P.0 565 Fith [sic] Ave., 9th Floor
Ney [sic] York, NY 10017

Constance, 11/03/2017

Dear Judge Kaplan:

I, Ludwig Söhngen, am Oliver's father.

Oliver was a quiet child. I used to play soccer with him, taught him how to ride a bike and built Lego models with him. When painting, I used to do the sketching.

After grammar school he went on to high school. At the beginning, he was a very good student; subsequently, his grades grew worse, so much so that he was left behind one grade. Then he attended boarding school, which was approx. 180 km away from us. He would then come home to us every two weeks on weekends.

After that we came to Constance in 1978. He resumed attending high school there. Learning was not that important to him; friends and music were important to him.

Our divorce had a very big impact on him. I got custody of him after an agreement with Hilli, Oliver's mother, and Oliver himself. He was able to contact his mother any time. To date, Hilli and I are still very close; we operate a small bar together offering small food items. Both our pensions are small.

Oliver was sexually abused in 1979 by an older man. But the legal proceedings "came to nothing." In retrospect, I think this left more of a mark on his development than I was aware of at the time.

After his time in the armed forces he got married very young (1985), and his son ▓▓▓▓▓ was born on ▓▓▓▓▓▓▓▓▓.

Oliver then started his studies at the *Pädagogische Hochschule* (Pedagogical College) in Weingarten. Oliver came to the U.S.A. through a student exchange program.

He was then able, through various arrangements, to study music there, and he chose to study singing. We were proud of him.

Things did not work out so well with women, as I had envisioned. No marriage or relationship was long-lasting. His daughter ▆▆▆▆ was born in 2006.

He founded a music school, since he was no longer able to sing because of health reasons.

Unfortunately, things with Amanda were not that steady.

We were absolutely shattered when we heard of Oliver's arrest. We felt as if the rug had been pulled out from under our feet.

We have been informed of the crime. It grieves us, and we know how serious it is for Oliver. He will assume responsibility for it. We want to support him in this regard, because we love Oliver very much, and he is truly a sensitive, nice guy.

We have spent many sleepless nights brooding; also, we look forward to his telephone call each Sunday and are relieved when he calls.

Unfortunately, because of our age and our health issues we are unable to go to the U.S.A. to be at the court hearing and to visit with Oliver.

Jürgen Derdus, Esq. will be there on our behalf; that is very important to us. We are doing everything for Oliver to rehabilitate himself and for him to undergo therapy.

We dearly love Oliver. We know that a punishment has to follow, but we ask you to please give Oliver a chance to change and rehabilitate himself.

Very truly yours,


(Signed)_____ _
Ludwig Söhngen



Dear Judge Kaplan:

Oliver's father has already said most of it. I am also very worried about Oliver. We stand by him and think a lot about him. Of course, he has to take responsibility for what happened. But I fervently hope that he will still be given a chance and will not be away from us that long.



(Signed)_____
Hilli Brienza

# EXHIBIT J

# ERIK MERCER, L.C.S.W.

381 SPRING STREET, PORTLAND ME 04102
49 WEST 24TH STREET, SUITE 1006, NEW YORK, NY 10010

November 25, 2017

Susan Walsh, Esq.
Vladeck, Raskin & Clark, P.C.
565 Fifth Avenue, 9th Floor
New York, N.Y. 10017

*Re: United States v. Oliver Söhngen*

Dear Ms. Walsh:

This report is respectfully submitted on behalf of Oliver Söhngen in advance of his sentencing before the Court on December 19, 2017. This submission provides detailed information about Mr. Söhngen's developmental and psychosocial history. In preparation for this report, seven interviews were conducted with Oliver Söhngen at the Metropolitan Correctional and Center and the Metropolitan Detention Center. Interviews were also conducted with: Amanda Andries, Patrick Avella, Jan Bruml, Gregory Couba, Will Foley, Jude Karen, James Levin, Jestin Pieper, Rosa Rodriguez, Dalia Stoniene, Aaron Savoury, ▮▮▮▮▮▮▮ Demetrious Tsnoponolos, and Jinny Yoo.

## PERSONAL HISTORY

Oliver was born on ▮▮▮▮ in Siegen, Germany. The only child of the union of Ludwig Söhngen and Hiltrude Brienza, Oliver has two half sisters, Gloria Brienza and Sara Brienza from his mother's second marriage. Oliver's father worked as a mechanical engineer and his mother was a bookkeeper. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1







Without a peer support network, the bullying that Oliver experience in school intensified. Coming home to his parents' apartment did not provide a respite from the torment he experienced at the hands of his peers. Ms. Brienza's anger would erupt without warning often triggered by a narcissistic injury that was wholly out of Oliver's control. In a stark example of both Oliver's isolation and his parents' pathology, Oliver recalls being humiliated during an assignment at school in which he was asked to draw a picture of himself praying in bed. Oliver drew himself praying in a crib, oblivious to the peculiarity of being forced to sleep in a crib at eight years old. Lacking a peer group with which to compare and establish age appropriate norms, Oliver recalls being caught completely off guard by the reactions of his peers.

### Late Childhood and Adolescence

When Oliver was ten years old, his family moved to a small town called Kirchseifen. Oliver does not recall the exact reason for the move, but remembers that he always felt as though the family was "fleeing" from something – . Oliver remained in Kirchseifen with his parents for two years and completed fifth and sixth grade there. While Oliver remembers being happy to leave Gebhardshein, the change in environment did not offer a reprieve from the isolation he experienced there. Oliver continued to be the object of relentless teasing by his peers and he was unable to make friends in his new home. By the time he was in seventh grade, the emotional and psychological strain he was under began to manifest in his academic work. When Oliver received a poor report card, his parents abruptly decided to send him to boarding school. Oliver describes the process of finding a boarding school as fast and chaotic, and remembers that he was alone on a train to boarding school within a week of being told that he was being sent away.

Oliver remembers being "shocked" when his parents informed him of their intention to send him to boarding school. Oliver says,

4

"I was so sad. I felt like they were sending me away because I wasn't good enough."

Oliver's entire boarding school experience was devastating to his self-esteem. Any hopes that boarding school might be an improvement over his home circumstances were quickly dashed. After spending his childhood in a family milieu that was insular, controlling and objectifying, Oliver was completely unprepared to function in a peer living environment. Oliver was housed in a dormitory room with six boys who ruthlessly mocked him for everything from his clothing to the small size of his penis. ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████

Oliver remained in boarding school for a year before convincing his parents to allow him to return home to the town of Konstanz where they had moved. ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ Oliver recalls his hurt and confusion when his parents sent him to a local youth hostel because they felt their apartment was too small. At fourteen years old, Oliver moved between the local youth hostel and various rented rooms for a year. Oliver remembers that he sometimes went home for dinner but often ate alone at a local restaurant.

Without friends or parental oversight, Oliver spent much of his time alone. Oliver describes feeling unmoored and recalls that he spent his afternoons lingering in the downtown area of Konstanz because he did not know his way around. One evening, when Oliver was wandering in the center of town, a man approached and requested assistance pulling his boat out of the water. Oliver agreed to help and got into the stranger's car. He remembers his mounting fear as he realized that he was being driven to a remote location. When they arrived at the edge of the lake, the man walked Oliver to his boat and molested him. Oliver says about the experience,

"As soon as I got in the van, I knew something was wrong. I was in shock. He fondled me and masturbated but I don't remember the details. I was so scared and I just wanted it to be over."

5

After the incident, the perpetrator drove Oliver back to Konstanz and told him to stay silent about the assault. And while Oliver did report the incident to the police, no investigation was done and no arrest was made. Despite their knowledge of the assault Oliver's parents did not invite him to return home to live with them and they offered no counseling or treatment.

As Oliver tried to manage independently, the situation in his parents' home was deteriorating. An affair that Ms. Brienza began with the landlord of the building where they lived ultimately resulted in her divorce from Mr. Söhngen.  After his separation from Ms. Brienza, Mr. Söhngen found a new apartment and invited Oliver to live with him full-time. Oliver describes the year that he spent with his father as a happy one. The absence of his mother's obsessive-compulsive behavior allowed Oliver to spend time in the home playing music and engaging with friends. For the first time in his life, Oliver began to establish a peer group.

*Young Adulthood*

In 1990, Oliver received a scholarship to attend the music, art and literature program at Cleveland State University (CSU) in Cleveland, Ohio. Oliver's success in the program resulted in another scholarship offer from CSU and Oliver remained in the United States to continue the program. Oliver ultimately received a Masters degree from the Cleveland Institute of Music in 1995. During Oliver's ten years in Cleveland, he established himself as a sought after musical tenor, scene designer, composer, director and teacher. James Levin, Founder of the Cleveland Public Theater and The Bordan Square Arts District, describes Oliver as "highly esteemed for his artistry" and says that his reputation in the arts community was exceptional. In 2000, Oliver received the Northern Ohio LIVE Achievement Award, the highest arts award given in Ohio, for his set design and performance in Der Kaiser von Atlantis, an opera composed in the concentration camp of Teresienstadt. Keith Joseph, a Cleveland theater critic, recognized Oliver's skill and recalls pushing him to pursue it further. Mr. Joseph says,

"I told him [Oliver] what we in Cleveland tell all our young talent, 'You ought to go to New York.'"

In 2000, Oliver heeded the advice and moved to Long Island City, Queens. Working as a waiter to support himself, Oliver began singing as a tenor soloist in several New York City churches and synagogues. He began teaching voice, guitar and bass at Queens New York School of Music – a job he held for ten years – and taught children for two years at the Piano School of New York City.

6

In 2003, Oliver was awarded the E-1 Visa for aliens of extraordinary ability. Oliver's visa application states,

> Oliver Söhngen demonstrates extraordinary ability in many different aspects of Operatic performance; he is equally masterful and sought after as a classically trained tenor singer, a scenic designer, a musical composer, a graphic designer, a music director, producer and teacher. It is his mastery of all these aspects that makes him a unique and extraordinary talent in his native Germany, Austria and the United States.

Oliver continued to perform, design sets and teach over the next several years. During this period he began a relationship with Amanda Andries and their daughter ▬▬▬ was born in 2006. In 2010, Oliver founded the Long Island City Academy of Music (LICAM). LICAM was conceived as a music school that would bring together high caliber music professionals to offer music instruction and coaching to anyone, regardless of their ability. Oliver's reputation and talent drew exceptional musicians to the faculty and he developed a wide-ranging schedule of classes. LICAM had students from the age of three to the age of seventy-three and offered students a place to explore a range of musical programs. LICAM students and parents of LICAM students interviewed for this report unanimously describe the school environment as extraordinarily supportive. Oliver was known for the individualized attention he gave to students and for his commitment to finding each student's unique gifts. Jestin Peiper was a LICAM staff member and a student of Oliver's. Mr. Peiper says about Oliver,

> "He championed everyone at the school – teachers and students. He was consistently super-supportive of all of us. He gave students amazing opportunities without a concern about financial compensation."

Jinny Yoo is the parent of a former LICAM student and part-time LICAM employee. Ms. Yoo describes a pervasive enthusiasm and positivity in the school that existed because of Oliver's passion for teaching and his belief that everyone could sing if they had the desire. Ms. Yoo says,

> "He was a tireless teacher. He put so much emotion into it. He would teach a student forever if they were excited about it. He would go for over an hour on a thirty-minute lesson because he got so into it. He loved teaching and bringing the students out. When I started working there, I had to be the regulator and get him to stick to thirty minutes because he wouldn't do it himself."

7

As LICAM continued to grow, Oliver also taught at two local New York City Public Schools, P.S/I.S. 49 in Middle Village, Queens and East Elmhurst Community School. In both schools he coordinated afterschool music programs using that he taught himself with other staff from LICAM.

Immediately prior to his arrest, Oliver had been invited perform and set design at the Mediterranean Opera Festival in Sicily.

HISTORY OF OFFENSE BEHAVIOR

Oliver's adulthood has been characterized by periods of normative functioning (i.e. Oliver's role as a parent, teacher, husband and professional) that were interrupted by periods of impaired functioning in which Oliver became obsessively fixated on pornography and sex with prostitutes. There is a correlation between Oliver's obsessional behavior with prostitutes and his experience of feeling loved and cared for. Oliver says,

> "There is a pattern. My relationships start quickly. If someone expresses an interest in me, I am all in very fast and feel I that this is THE person for the rest of my life. During this time, I am not interested in prostitutes. But as soon as there is a bump in the road, I drift and begin seeking out prostitutes and on-line sex."

Oliver began seeking out prostitutes in Cleveland during his late twenties while involved in a primarily non-sexual romantic relationship with a woman for whom he cared deeply. The lack of sexual activity created insecurity and feelings of rejection that led Oliver to begin traveling to neighborhoods where prostitution activity was present and observing prostitutes from his car. ██████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ But while Oliver fantasized about underage girls, the prostitutes he sought out were of legal age until he "gave in to curiosity" and engaged in the instant offense. Oliver says about his obsession with prostitutes,

> "It didn't feel good to me. It felt like I just had to get it over with. Sex always felt dirty to me. And sometimes it wasn't even about sex. It was just about being with someone who said they were attracted to me."

When Oliver moved to New York and met Ms. Andries, he moved into another period of normative functioning; he experienced some professional and artistic success

and, initially, he felt secure and loved in his relationship with Ms. Andries. But the relationship between Oliver and Ms. Andries quickly became unstable. Ms. Andries' infidelity and Oliver's absorption in his work led to a tumultuous pattern of rupture and reconciliation. Over time, even Oliver's periods of connection with Ms. Andries were characterized by feelings of insecurity and shame. ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

████████

Oliver's feelings of shame and rejection led him back to the same obsessive patterns that emerged in Cleveland. Oliver's compulsivity initially found expression through a pornography addiction and eventually led him to seek out prostitutes and sex on-line. At the time of the instant offense, the instability between Oliver and Ms. Andries had reached a breaking point. ███████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

## MITIGATING CIRCUMSTANCES

████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

9



Oliver's parents also controlled his access to a peer group, which, in normal development, provides a bridge from childhood to adulthood and further shapes social behavior. But Oliver had no friends and remained completely isolated within a perverse family system. His judgment developed in a family realm defined by distorted boundaries and exploitation. Oliver's description of being humiliated by classmates after drawing himself in a crib is a stark example of the distortion and isolation that formed the backdrop for his identity formation.

Jan Bruml was Oliver's housemate for three years in Cleveland and witnessed the consequences of his childhood trauma exposure. Ms. Bruml recalls that an experience of rejection would often cause Oliver to completely fall apart. Ms. Bruml says,

> "When he felt abandoned, he would shrivel up into a ball of angst and shame and he would do something self destructive. There were several times when I came into the kitchen and found him crunched up on the floor in a fetal position because a woman he liked didn't reciprocate – or something like that."

Ms. Bruml remembers that Oliver hated his physical appearance and, in particular, his nose. During his moments of emotional collapse, she recalls that Oliver talked about the fact this his mother felt he was ugly and that he believed himself to be unlovable because of his physical imperfections.





### Sexual Abuse

Oliver also experienced sexual victimization by a stranger. The literature on sexual abuse of boys demonstrates an established correlation between men who were sexually abused as children and those who experience sexually related problems in adulthood. A comprehensive review of 166 studies representing 149 sexual abuse samples of boys concludes that sexually abused men, compared with non-abused men, report greater difficulty controlling sexual feelings and exhibit hypersexual symptoms.[2] The men in this cohort were also found to engage more frequently in high-risk behaviors such as sex with prostitutes. Paradoxically, the subset of men who experienced less severe forms of

---

[1] Mark F. Schwartz Sc.D. (1996) Reenactments related to bonding and hypersexuality, Sexual Addiction & Compulsivity, 3:3, 195-212.

[2] Holmes, W.C., Slap, G.B., *Sexual Abuse of Boys: Definition, Prevalence, Correlates, Sequelae, and Management*, JAMA, December 2, 1988. Vol 280, No. 21.

11

abuse (shorter duration, perpetrated by a non-family member, later age of onset) displayed the highest level of sexual preoccupation

> Because the abuse may have been deemed "mild" and participants may have presented as asymptomatic, initial intensive treatment may not have been received to the degree necessary to combat later distortion. Sexual preoccupation may constitute a "sleeper effect" that is triggered as issues of sexual identity become more salient. Participants in this subgroup also experienced the onset of abuse at older ages than did other abused participants. This onset of abuse may likely have coincided with the very beginnings of sexual identity formation thus contributing to the repetition compulsion of sexual preoccupation.[3]

There is a correlation between Oliver's experience of childhood sexual abuse and the outcomes describes in the literature. While Oliver reported the abuse, it was not pursued and he received no treatment following the assault. Also consistent with cohort described above, Oliver was molested at a later age that coincided with the beginning of his sexual identity formation.

*Neglect*

A growing body of scientific data suggests that the neglect that Oliver experienced can be a distinct threat to a child's health and wellbeing that should be considered independently from overt verbal and physical abuse. A caregiving system that breaks down and fails to provide a strong foundation and responsive environment can permanently alter a developing child's brain circuitry and have serious implications for his or her emerging capabilities.[4] The "serve and return" relationship between children and their caregivers, in which the adult responds to the child's facial expressions, sounds and words, is a critical component in developing the architecture of the brain.

> When compared with children who have been victimized by overt physical maltreatment, young children who experienced prolonged periods of neglect, exhibit more severe cognitive impairments, language deficits, academic problems, withdrawn behavior and problems with peer interaction.[5]

---

[3] Briere, J. (1992). Child Abuse Trauma: Theory and Treatment of the Lasting Effects. Newbury Park: Sage.
[4] Center on the Developing Child at Harvard University (2012). *The Science of Neglect: The Persistent Absence of Responsive Care Disrupts the Developing Brain: Working Paper No. 12.*
[5] Erickson, M., Egeland, B., & Pianta, R.(1989).The effects of maltreatment on the development of young children. In D. Cicchetti & V. Carlson (Eds.), *Child maltreatment: Theory and research on the causes and consequences of child abuse and neglect* (pp. 647-684). New York: Cambridge University Press.



*Community Contributions and Support*

Oliver's role as the founder of the Long Island City Academy of Music (LICAM) established him as leader in music education in New York and earned him great respect and admiration from his community. Oliver established LICAM out of a passion for music and a deep commitment to making engagement with music available to everyone. Oliver is described by most who know him as a "musical genius," an assessment that is supported by his receipt of the E-1 visa for Aliens of Extraordinary Ability in 2003. And while Oliver's talent and professional accomplishments are exceptional, it is the passion for helping students find their voice

13

that endears him to his community. Oliver was known for his willingness to work with anyone with a genuine desire to learn, regardless of natural ability. When students ran into financial difficulty, Oliver frequently taught them for free and he had a reputation for teaching well beyond the time limits of his lessons to be sure that students mastered what they were working on. The following excerpts are drawn from interviews conducted with Oliver's former students, and parents of his younger students.

"Oliver is a fantastic teacher. He is irreplaceable. He believes everyone can sing and he worked hard for every kid he taught. My daughter has tremendous confidence and I attribute that partly to Oliver."

*Dalia Stoniene – parent of former student*

"Oliver was so passionate about teaching. He found what was special in me. He built confidence and he was genuinely excited about my progress. He used to tell everyone in the school how well I was doing...I found confidence because of him."

*Rosa Rodriguez – former student*

"I was depressed for a really long time. I was working as an accountant, but all I wanted to do was sing. Oliver was so encouraging and he really made me feel like I could do it - even though I was thirty-four and everyone else said I was too old. He was the only person who encouraged me. When I had my first performance, I remember that he cried."

*Doug Scibelli – former student*

"My daughter took lessons from Oliver starting at eight years old. He really believed in her. He loved to teach and he found what was positive in every student. When others might say, 'no talent,' Oliver saw talent. Meeting Oliver was a life-changing event for my daughter. He helped bring music into her life and he helped her find confidence."

*Jinny Yoo – parent of former student*

"Oliver gave me my voice. I had other teachers before, but no one like Oliver. He was my biggest cheerleader. He told me my voice was great and he believed in me - it is hard to overstate how important that was. I have a great debt of gratitude to him."

*Greg Couba – former student*

Oliver received numerous letters of support from former students and members of his artistic and professional communities. The following are excerpts from two letters of support:

14

"Oliver is one of the most selfless people I have ever met. His energetic motivation for others to succeed in the arts was a sight to see. He would motivate and charge a person to follow their dreams with his kind words and compliments."

*Patrick Avella – former co-worker*

"My daughter was a student of Oliver's from age 5...I've always found him to be professional and my child's skills and abilities. Accordingly, if he were released today, I would have no problem with him living next to me or teaching my child."

*Christopher Lynn – parent of former student*

CONCLUSION

Oliver's offense behavior is the result of a cascade of risk factors that occurred throughout his development: Oliver was the object of manipulation and exploitation by his mother; he was a victim of childhood sexual abuse; he grew up in a home where boundaries between appropriate and inappropriate sexual and erotic engagement were non-existent; the abuse and neglect he experienced left him with a deeply degraded sense of self; he internalized his mother's compulsive and addictive norms; and he was denied the critical developmental experience of a peer group within which to develop age-appropriate norms. Despite the preponderance of risk factors, Oliver was able to overcome the adversity he experienced as a child and adolescent and achieve notable artistic and professional success.

The respect and admiration that Oliver earned within his community is deep and many of his former students, colleagues and parents of former students have stood by him since his offense behavior became public.

Thank you for your consideration of this report.

Sincerely,

Erik Mercer, LCSW

15

EXHIBIT K

Honored Judge,

I am the sister of Oliver. I live in Germany, near Baden-Baden and I am 36 years old. As far as my profession is concerned I work for a tax consultant.

I am happily married since 1999, and we have a 13 year old daughter that studies at an English secondary school.

I know Oliver since I was born, since he is a few years older than me. We have different fathers. We did not grow up together in the long run, but that didn't have a negative influence on our brother and sister relationship. What Oliver has done, doesn't seem right in my eyes, but I know that he regrets it deeply ! He is a very kindhearted person and wouldn't hurt a fly. Everybody loved him for his cordial and pleasant manner !

I think that he would perhaps need some psychological help.

His childhood wasn't easy, I know that much. He was left to his own devices many times. Our mother had met my father at some point and separated from Oliver's father. I think this was very difficult for Oliver !

From that point on, Oliver was raised essentially only by his father! As far as I know the separation between my mother and his father was amicable. I know Oliver suffered a lot because of the separation, this

is always very difficult for a child. Probably also because later on my mother became pregnant with me and my sister. And in spite of all that his high school graduation was excellent, nobody could have done better. He even received a scholarship to the USA.

He married very early and had a child, unfortunately that relationship didn't last. I think all of this had a deep impact on Oliver ! He is a fighter but also very sensitive. Please believe me that he had some very difficult times to go through, I am certain of that....

Of course all of this is no excuse for what he did, I hope however this will make you understand that he is a good and decent human being ! He is extremely intelligent. In my view much went wrong in his childhood.  Moreover, maybe he got involved with some of the wrong people in New York.

I felt that the world was crushing down on me when I turned 16 and my parents decided to leave Baden-Baden to move back to Konstanz.  I wanted to remain close to my future husband and finish my education, I accomplished this against the will of my parents. It was difficult but I managed to do it!

██████████████ from depressions since she was ██████. She has been in treatment ████████████████████ and ████████████

I'm not a doctor, but I think Oliver suffers from depressions as well and would need help in this regard.

Already, when I visited Oliver a few years ago in NY I noticed somewhat of a difference in him. He seemed to be very tense and nervous.

Somehow different than usual. I don't see him very often, mostly just on Face Time or Messenger but we have a good relationship in spite of the distance.

More than anything I feel sorry for his little daughter, she loves and misses him very much. Naturally she can't understand any of these things. I know that Oliver loves his little girl more than anything. He does everything and anything for her.

I hope that I was able to give you a little insight into Oliver's life and hopefully you can understand that he truly is a wonderful human being who is beloved by everybody !!!

I am convinced that he deeply regrets what he has done and that you will be able to acknowledge that in him. Because his family, in particular his father and mother suffer greatly, they are both elderly and fear that they might not see him again. Due to this possibility my mother is extremely distressed.

Please give Oliver a chance to get his life back on track, don't be too hard on him, he really doesn't deserve that.

We love Oliver and we will always stand by his side.

Thank you very much.

Gloria Brienza-Rrukiqi

# EXHIBIT L

Dear Judge Kaplan

I met Oliver for the first time in 1985. At that time, I recorded a Christmas musical I composed ("Der König kommt") for a christian publisher. In the search for musicians the drummer Mike Severloh brought along Oliver as bassist (bass / double bass). And I liked his creative ideas during the studio recordings. I still listen to this music cassette.

Later we started making more classical music: I accompanied him both as a singer (lessons with Regina Fazler / Music School Konstanz) and as a double bass player (lessons with Robert Gabor / Südwestdeutsche Philharmonie) at the piano.

During this time Oliver married his girlfriend Astrid, who also became pregnant relatively soon and his first son Jonathan was born. They were living in the Gartenstrasse in Konstanz.

In 1987 I studied for a semester at the Pädagogische Hochschule (College of Education) in Weingarten (Music / Theology / German), together with Oliver. In theology, we even made a credit together at a seminary of Prof. Dr. Berg. I then switched to the Staatliche Musikhochschule Trossingen (University of Music), Oliver stayed in Weingarten. We kept in touch and I heard about his plans to study music in the USA. At the time, I did not think he was sufficiently good enough.

One of his first rock bands in Konstanz (together with Mike Severloh) was called "Achat" at that time and was well-known regionally. Later he played in the Big Band of the music school Konstanz (Conductor: Curdin Janett) and also in the Jazz Combo "Tempus Fugit" of the Music School. With "Tempus Fugit" Oliver 1987 was a winner of a talent competition in Friedrichshafen. The enclosed CD

for the book* "History of Jazz in Konstanz" includes the 11th CD title of Tempus Fugit, a live recording of the competition at the time (which also apeared on a vinyl LP on Rail Records "The Stars of Tomorrow ").

*Uwe Ladwig: History of Jazz in Konstanz, Verlag Stadler, Konstanz September 2017 (181 pages, 98 pictures, discography, detailed keyword and name index with more than 2,000 index entries) ISBN 978-3-7977-0738-3

In 1996, our paths met again in Konstanz at the performance of the opera "Arianna" (Alexander Goehr*) by musical director Peter Bauer ("Rathaus Oper Produktion"). In the opera I played in the orchestra as a keyboardist (sample piano), Oliver sang a lead role. I was very surprised by his vocal development including his Master's Degree in Vocal Percormance from the Cleveland Institute of Music (1991-96).

* http://www.rathausoper.de/
1996 Alexander Goehr - Arianna (Deutsche Erstaufführung)
Besetzung: Mauro Guindani, Marcel Zaba, Consuela Sanudo, Suzanne McLeod, Christine Pabst, Joachim Diessner, Hans Jörg Mammel, Davide Ragus, Oliver Söhngen, Stefan Röttig, Dimitri Ivátschenko

Retrospectively I have to conclude, that some musician colleagues considered him as arrogant. Especially when he showed up in his cool black woolen coat, his blond parted hairstyle and the homemade wooden case (in which his double-bass bow was) under his arm somewhere. But those who knew him better quickly realized that Oliver was more of a quiet, timid musician.
He built very good own electric basses, on whose designs allegedly his father as a technical engineer had helped him.
Oliver was double bass player from 1986-1990 at Young Chamber Orchestra Konstanz / Concerto Constanz (Conductor: Wolfgang Mettler, my old music teacher on high school). Within the orchestra, he had an affair with a young female musician, which led to the breaking of his marriage. His ex-wife later married Helmut Brandl, a man from my circle of friends in Konstanz.

That's why Mike Severloh once said about Oliver: "he can build good basses, but he has no idea about women".

In any case, he must have suffered deeply from the separation and divorce of his parents. His mother left his father because of an Italian when he was young.

At some point we found each other on facebook and stayed connected and in good contact via this platform.

I was very interested in his work and career as music school director (Long Island City Academy of Music) in NYC, and I don't begrudge him his success. He would never have been so successful in Germany.

Surprisingly he visited me 2014 in Konstanz with his new wife from the USA. We planned 2016 to meet in New York, but unfortunately it did not happen.

I was very shocked by what I had to read on Facebook and in the news on the 18th of May this year. It was unbelievable how the media destroyed a person from one moment to the next. Apart from the fact that there is no comparable criminal law in Germany for what he has done, I believe that a sensitive artist like him will perish by a longer prison term. I am aware that Oliver has admitted his guilt to some of the crimes and I regardless support him and are confident in his rehabilitation. Luckily, his wife and daughter are supporting him, too. I hope he gets a fair trial considering the prejudice by the press. And I think that a relocation to a prison in Germany would be absolute necessary for his mental health and a good rehabilitation.

_____ 15.11.2017_
Gotthart M. Hugle
███████████████████████
██████████████████ Germany
www.gotthart-hugle.de








„Tempus Fugit" 1987 im Großen Saal der Musikschule Konstanz: Stephan Frommer (as),
Uwe Bensler (tp, flh), Patrick Manzecchi (dr), Oliver Soehngen (b), Olaf Stölzler (g)
[Foto: Archiv Patrick Manzecchi]

1987 wird „Tempus Fugit", eine Jazz-Combo der Musikschule KN mit Uwe Bensler (tp, *1965), Stephan Frommer (sax), Olaf Stölzler[57] (g), Oliver Soehngen (b) und Patrick Manzecchi (dr) Preisträger des ersten Musiker-Nachwuchs-Festivals in Friedrichshafen aus über 60 Bewerbungen vor „Bellybutton & The Knockwells" (Rock'n'Roll, Friedrichshafen), „Midnight Groove" (Funk, Ravensburg), „Noko Band" (Hard Rock, Isny), „Candid Anger" (Heavy Metal, Kressbronn) und Hans-

Jürgen Lipsius (Folk, Friedrichshafen). Der Live-Mitschnitt des Preisträgerkonzerts vom 6.9.1987 im Graf Zeppelin-Haus Friedrichshafen wird als Schallplatte (Rail Recording Studio) veröffentlicht. Das Quintett spielt am 11.4.1987 erstmals öffentlich in Fischkopf und löst sich im Februar 1988 wieder auf. Beim letzten Termin spielt Steffen Schorn (brs) für Frommer.

➔ CD: Titel 11

Im Sommer 1987 lernen sich Stefan Gansewig und Mats Müller kennen und gründen das Akustik-Gitarren-Duo „Con Fuoco".

---

[57] Heute Manager der HR-Bigband