

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

December 12, 2017

**BY ECF and E-MAIL**

Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

>    Re:    *United States* v. *Oliver Sohngen, a/k/a "Stephan Weierbach,"*
>           *a/k/a "Helmuth Moss," 17 Cr. 500 (LAK)*

Dear Judge Kaplan:

The Government submits this letter in advance of the December 19, 2017 sentencing of Oliver Sohngen, a/k/a "Stephan Weierbach," a/k/a "Helmuth Moss" (the "defendant"), and in response to the defendant's sentencing submission, dated December 5, 2017 ("Def.'s Mem."). As explained below, the Government respectfully submits that a sentence of 168 months' imprisonment—the high end of the applicable range under the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.")—should be imposed in this case.

## I.    Offense Conduct and Other Relevant Conduct

Between at least March 2013 and November 2013—while working as a children's music teacher at the music school he founded and directed—the defendant used the alias "Helmuth Moss" to communicate regularly with a pimp ("CC-1") in the Bronx, New York.  In these communications, the defendant and CC-1 arranged for the defendant to meet and engage in commercial sex acts with at least two minor girls—one who was fifteen years old ("Minor Victim-3"), one who was seventeen years old ("Minor Victim-1").  CC-1 had recruited Minor Victims-1 and -3 on the Internet, and he caused them to travel to his apartment, take sexually explicit photographs, disseminate those photographs to potential customers (on Backpage.com, in the case of Minor Victim-1; and via text message, in the case of Minor Victim-3), and then have sex in exchange for money.  The defendant engaged in sex acts with both Minor Victim-1 and Minor Victim-3 on separate occasions, despite knowing and having reason to know that they were underage.  Afterwards, the defendant paid CC-1 for his role in arranging the encounters.

During that same period, the defendant and CC-1 exchanged coded text messages about arranging for the defendant to meet and have sexual contact with girls as young as eight years old.  Inverting the girls' ages (so "21" would refer to a twelve-year-old girl), the defendant and CC-1 participated in multiple text exchanges about "The 41," "21 for you . . . 11. Too," "a 80 and 31," "The 31," and "15 white and Spanish."  *See* Exhibit 1 at 7-24, ¶ 14(c) (transcripts of

December 12, 2017
Page 2

text message exchanges between defendant and CC-1, transcribed in Complaint).  In the same conversations, the defendant attempted to negotiate the prices he would pay and the sex acts he could perform on the teen, pre-teen, and pre-pubescent girls—for example:

- complaining that $3,000 for an eleven-year-old girl was "pretty steep";

- proposing that CC-1 arrange for him to meet with eight- and thirteen-year-old girls in exchange for $2,000 total;

- accepting that he "cant have sex with 80 [the eight-year-old girl]" but "can [have sex] with 31 [the thirteen-year-old girl]," and he can "get Head [from] and . . . can eat" the eight-year-old girl (the defendant's response: "Eat is fine");

- discussing the need to drop off the eight- and thirteen-year-old girls at a Chuck-E-Cheese after the defendant had sexual contact with them, because the girls' families thought they would be at the restaurant/arcade; and

- telling CC-1 that he "had 31 [a thirteen-year-old girl] before for much less" than $800, and asking for a lower price because he "need[ed] to save up for 80 [the eight-year-old girl]."

*Id.*  There is no evidence that the defendant and CC-1 completed these transactions or that the defendant ever paid for sex with any victim younger than fifteen.

Finally, between November 2015 and January 2016, the defendant exchanged text messages and phone calls with an undercover NYPD officer (the "UC"), who had repeatedly held herself out to the defendant as a fifteen-year-old girl.  In recorded phone calls, the defendant requested the UC send him a picture of herself; he inquired about her interest in a particular sexual fetish; and he asked whether she "like[s] to be licked."  *See* Ex. 1 at 29-32, ¶¶ 20(b)-(c) (call transcripts in Complaint).  He also said to her, among other things: "You're making me horny," "I would love to lick your ass," and "I want you to cum on me."  *Id.*

## II.    The Defendant's Plea and Applicable Guidelines Range

Pursuant to an agreement with the Government, on August 10, 2017, the defendant pled guilty before the Honorable Ronald L. Ellis to two counts of sex trafficking of eight- and seventeen-year-old minor victims, in violation of Title 18, United States Code, Sections 1951(a)(1) and (b)(2), and 2.  *See* United States Probation Office's Presentence Investigation Report ("PSR") ¶¶ 2-4.  On October 4, 2017, this Court continued the guilty plea allocution and then accepted the defendant's plea.[1]  In the plea agreement, the parties stipulated that these offenses carry mandatory minimum sentences of ten years' imprisonment and that the advisory Guidelines range is 135 to 168 months' imprisonment, based on an offense level of 33 and a Criminal History Category of I.  *Id.* ¶ 4.  The Probation Office agrees with this calculation.  *Id.*

---

[1] The PSR mistakenly reports that the Court accepted the plea on August 25, 2017, which was the date the Government filed a letter motion asking the Court to enter the plea.  *See* Dkt. #12.

December 12, 2017
Page 3

¶¶ 33-59, 96.  In the plea agreement, the parties agreed "not to seek a sentence outside of the Stipulated Guidelines Range, or suggest in any way that . . . the Court consider a sentence outside of the Stipulated Guidelines Range"; but they reserved their rights "to make any arguments regarding where within the Stipulated Guidelines Range . . . the defendant should be sentenced."  Plea Agreement at 4.

## III.    Discussion

### A.    Applicable Law

Although *United States* v. *Booker*, 543 U.S. 220, 264 (2005), held that the Guidelines are no longer mandatory, it also held that district courts must "consult" the Guidelines and "take them into account" when sentencing.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After performing that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," (2) the four legitimate purposes of sentencing, as set forth below, (3) "the kinds of sentences available," (4) the Guidelines range itself, (5) any relevant policy statement by the Sentencing Commission, (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," and (7) "the need to provide restitution to any victims."  18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)  to afford adequate deterrence to criminal conduct;
>
> (C)  to protect the public from further crimes of the defendant; and
>
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

December 12, 2017
Page 4

### B.  Analysis

1. <u>The Applicable Sentencing Factors Support a Sentence at the Top of the Guidelines Range (168 Months' Imprisonment)</u>

The Government respectfully submits that a sentence of 168 months' imprisonment is appropriate in light of all of the sentencing factors set forth above, and would be sufficient but not greater than necessary to accomplish the goals of sentencing in this case.

*First*, the defendant's conduct is obviously and extremely serious, and it warrants equivalently severe punishment.  The defendant paid to engage in sex acts with two girls he knew to be underage—one as young as fifteen years old—and he repeatedly exchanged text messages with a pimp (CC-1) about finding even younger girls with whom he could have sex for money.  The defendant and CC-1 exchanged dozens of messages about the availability of eight-, eleven-, twelve-, thirteen-, and fourteen-year-old girls.  They discussed hotels and other locations where CC-1 could have the young girls secretly delivered to the defendant.  They talked about which sex acts the children could perform, including that the defendant could not have sex with an eight-year-old girl but that she could give and receive oral sex.  They aggressively negotiated prices, with the defendant once haggling, "I had 31 [a thirteen-year-old girl] before for much less…," Ex. 1 at 20, suggesting that his contacts with CC-1 may not have been his only times procuring sex with children.  In short, the defendant's conduct is offensive and vile, and the Government submits that harsh punishment is needed to reflect the seriousness of the offense.

*Second*, the defendant's history and characteristics also counsel in favor of the longest sentence contemplated by the Guidelines.  The offense itself demonstrates that the defendant had a callous disregard for the short- or long-term well-being of the children whom the defendant victimized and attempted to victimize.  As described in the victim-impact statement in the PSR, *see* PSR ¶ 30, the defendant's conduct caused significant harm to Minor Victim-3, and presumably did the same to Minor Victim-1.  It is hard even to imagine the effects that such sexual contact with the defendant would have had on eight-, eleven-, twelve-, or thirteen-year-old girls.  The defendant was willing to cause these injuries for no better reason than to satisfy his own sexual desires.  His cold selfishness and depraved indifference to consequences of his actions on young children is a clear indication of his character.

Moreover, looking beyond the immediate victims, the defendant's commission of these crimes while working as a music teacher required a level of deceit and duplicity beyond the norm, even for criminals.  The defendant held himself out as an elite musical professional who could be responsible for the care and custody of hundreds of children.  He worked in schools.  He convinced parents in his community to leave their kids with him in the small instruction rooms at his music academy.  He used his purported expertise to gain access to minors on a daily basis for years.  And throughout that time—at least in 2013, late-2015, and early-2016—the defendant was also actively pursuing sex with children.  In so doing, the defendant breached an important trust and thus caused serious and lasting harms to his students' families, as described in the victim-impact letter attached hereto as Exhibit 2.[2]  For all of the damage the defendant has

---

[2] An unredacted copy will be provided to the Court and defense counsel by e-mail.

December 12, 2017
Page 5

wrought on his direct and collateral victims, a 168-month sentence is necessary to provide just punishment.

*Finally*, a sentence at the high end of the applicable Guidelines range is necessary to accomplish the goals of protecting the public from the defendant, deterring the defendant and others from committing similar crimes in the future, and providing the defendant with necessary treatment in an environment where he cannot pose a danger to any children. The Government agrees with Probation's belief that the defendant's "risk to reoffend is high" because "the defendant committed a hands-on offense against minors in this case." PSR ¶ 78. Moreover, the defendant went to outstanding lengths to hide what he was doing, using aliases backed by a web of email addresses and phone numbers that would obscure his identity. *See* Ex. 1 at 24-26, ¶ 15. The defendant's many text messages with CC-1 and his conversations with the UC in January 2016 show that his hands-on acts with Minor Victims-1 and -3 were not passing indiscretions or isolated mistakes. They confirm that the defendant posed, and continues to pose, a threat to innocent children and young teenagers. In addition, this case received significant attention in the defendant's community because he was a highly regarded teacher of children. The defendant's sentence must be sufficient to deter the defendant and any other potential offenders who might believe that the risk of punishment is worth their sexual gratification. Lastly, the Government agrees that the defendant needs significant treatment, but submits that he should get it in a setting where he cannot have contact with children and where he will experience the punitive consequences of his conduct. A 168-month sentence would be sufficient but not greater than needed to achieve all of these purposes of sentencing.

## 2. The Defendant's Sentencing Arguments Are Unpersuasive

It bears noting at the outset that the defendant's plea agreement includes a provision in which the parties agreed "not to seek a sentence outside of the Stipulated Guidelines Range, or suggest in any way that the Probation Office or the Court consider a sentence outside of the Stipulated Guidelines Range." Plea Agmt. at 4. Accordingly, none of the defendant's arguments should be read as advocating in any way for a sentence below 135 months' imprisonment. For the reasons that follow, the Government submits that none of the defendant's arguments support a sentence lower than 168 months' imprisonment.

*First*, the defendant seeks leniency based on his acceptance of responsibility and other considerations that are already accounted for in his statutory and Guidelines sentencing range. Had the defendant not accepted the consequences of his actions by pleading guilty, *see* Def.'s Mem. at 1, his offense level would be three points higher. *See* U.S.S.G. § 3E1.1. Had he not waived indictment and pled guilty, *see* Def.'s Mem. at 1, the Government would have sought to charge him—as it did in the Complaint in this case—with attempted sex trafficking of eight-, eleven-, and thirteen-year-old girls, counts that would have carried mandatory minimum sentences of fifteen years' imprisonment and significantly increased Guidelines offense levels for an offense involving a minor under twelve years old. *See* 18 U.S.C. §§ 1594(a), 1591(a)(1) and (b)(1); U.S.S.G. § 2G1.3(b)(5) (*eight point* increase for an offense involving a minor under twelve years old). Had the defendant abused a position of trust by victimizing one of his students (*i.e.*, a child in his custody, care, or supervisory control), *see* Def.'s Mem. at 4, his offense level would have been two points higher, as the defendant himself notes. *See* U.S.S.G.

December 12, 2017
Page 6

§ 2G1.3(b)(1); Def.'s Mem. at 17 & n.9.  To give him leniency within his Guidelines range based on these facts would be to double-count the same factors that already resulted in a lower Guidelines range than might have otherwise applied.

*Second*, while it is clear that many people believe the defendant to be a skilled musician and an asset to the community, it can't be overlooked that the defendant also intentionally and methodically deceived everyone he knew by living a double-life—in one moment teaching music to child students; in the next moment, text messaging a pimp about how much he would have to pay for oral sex with an eight-year-old girl.  The defendant was careful about hiding the latter side of his life, using an alias, different phone numbers, and alternate email addresses, all to pursue criminal sexual contact with children.  As discussed above, the disposition of this case already accounts for some degree of leniency in both the mandatory minimum sentence and the applicable Guidelines range.  The defendant's artistic résumé, operation of a small business, social success, and sometimes-good character do not justify leniency for the horrible conduct that regularly consumed parts of his daily thoughts and actions.

*Third*, in a perverse twist of logic, the defendant cites the deep and profound harms and sense of loss that his actions have caused to his family, his former students, and others in the community as if they should somehow weigh in his favor at sentencing.  *See* Def.'s Mem. at 2, 4, 6, 14, 20.  The Government absolutely agrees that the Court should seriously consider the suffering that so many people—including the defendant's children, their mother, the defendant's other relatives, and everyone associated with the defendant's music school—have endured and will continue to endure.  And the Government submits that all of those injuries should weigh *against* the defendant and in favor of a more severe sentence.  Sympathy for the defendant's daughter and the community that he betrayed should not spill over into unwarranted sympathy for the defendant, who, at bottom, is the lone cause of all of the hurt that has resulted from his conduct.

*Fourth*, the defendant's calculation of the sentence he would be facing in state court is grossly inaccurate and misleading.  *See* Def.'s Mem. at 17-18.  The defendant begins his analysis by assuming that the state would have accepted a guilty plea to—or only won conviction for— the defendant's third-degree rape of one victim, ignoring all of the other relevant conduct that the federal complaint alleged and that the state (and this Office) could have proven beyond a reasonable doubt.  *Id.*  Under New York Penal Law § 130.50(3), oral sex with an eight-year-old girl constitutes first-degree criminal sexual act, a class B felony, and the defendant's attempt to commit that offense would constitute a class C felony, subject to a determinate sentence of 3.5 to 15 years' imprisonment.  *See* N.Y. Penal Law § 70.00(2)(c) (statutory maximum for class C felony is 15 years); § 70.02(3)(b) (mandatory minimum for class C felony is 3.5 years); § 70.02(1)(b) (attempting to commit a class B felony is a class C felony); § 70.80(3) (sentences for felony sex offenses are determinate).  Likewise, sex with an eleven-year-old girl constitutes the class B felony offense of first-degree rape under New York Penal Law § 130.35(4), and the defendant's attempt to commit that offense would be a class C felony subject to the same penalties noted above.  There is no reason whatsoever to believe that state prosecutors would have accepted a guilty plea to the same conduct to which the defendant pled guilty in this case, given the lesser penalties that would have applied.  Instead, the state could have secured convictions relating to additional victims, which would have allowed the state court to impose

December 12, 2017
Page 7

multiple fifteen-year sentences, and run them consecutively to one another, resulting in potential sentencing exposure well above the 168-month sentence the Government seeks here.  And because any sentence for a felony sex offense must be determinate, *see* N.Y. Penal Law § 70.80(3), the defendant would *not* have been eligible for parole after serving a statutory minimum period of incarceration.[3]

*Finally*, the defendant now expresses disgust and remorse for his actions, *see* Def.'s Mem. at 2, Ex. A; however, prior to his arrest, the defendant never addressed his urges to engage in sexual contact with minors or any of his other sexual dysfunctions, including his history of "periods . . . in which [he] became obsessively fixated on . . . sex with prostitutes."  Def.'s Mem. Ex. J at 8.  Rather, as recently as January 2016, well after he stopped communicating with CC-1, the defendant eagerly participated in a sexual conversation with an undercover officer who he believed was a fifteen-year-old girl interested in meeting him to engage in a sexual fetish.  To the extent the defendant and his psychiatric evaluator now point to a host of factors that may have lef to his offense conduct—like the pervasiveness of the internet and electronic communications, *see* Def.'s Mem. at 17; or several deeply troubling but decades-old events in the defendant's childhood, *see* Def.'s Mem. at 6-8, 15-16, Ex. J (*e.g.*, his parents' divorce, his mother's compulsiveness and sexual behavior)—those things will not be any different when the defendant is released from prison and again finds himself in a position to hurt children.  The Court should not assume, based on hope alone, that the defendant will be able to rehabilitate and cease posing a danger to the community, nor should the Court credit the defendant for realizing he needs to change his life and behavior only *after* he was arrested for that conduct.[4]

---

[3] For the same reason, the defendant's proffered sentencing calculation is wrong, even in the unlikely event that he had been convicted only of third-degree rape.  As a matter of law, the state court could *not* have imposed an indeterminate sentence for a sex offense conviction and the sentence could *not* have included parole because a New York state sentence for a sex offense must be determinate (rather than an indeterminate range) and must also include a period of post-release supervision.  *See* N.Y. Penal Law §§ 70.80(3), 70.80(9).  Although the court is statutorily permitted in the case of class D or E felony sex offenses to make a finding that such a determinate sentence would be unduly harsh based on the nature and circumstances of the crime, *see* N.Y. Penal Law § 70.00(4)(c), it is highly unlikely that the defendant's paying for sex with a trafficked fifteen-year-old girl would warrant such a finding, especially in light of all of the other vile conduct at issue in this case.

[4] The defendant asserts that he "certainly will be deported."  Def.'s Mem. at 20.  Although the Government currently expects (and hopes) that he will be, there can be no certainty about what the United States' immigration laws will be in eleven to fourteen years.  The Government thus submits that the Court should not consider likely deportation to be an effective assurance that the defendant will not reoffend in this country.  Nor should the Court take solace that if the defendant reoffends following deportation, his victims will be German children and young teenagers, rather than American.  Instead, the Court should consider the safety of any community in which the defendant may someday reside.

December 12, 2017
Page 8

## IV.     Conclusion

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence of 168 months' imprisonment.[5]

Respectfully submitted,

JOON H. KIM
Acting United States Attorney for the
Southern District of New York

By: _____
Frank J. Balsamello / Michael Krouse
Assistant United States Attorneys
(212) 637-2325 / -2279

Meagan Powers
Special Assistant United States Attorney
(718) 838-7669

cc:     Susan Walsh, Esq., *counsel for defendant Oliver Sohngen* (by ECF)

---

[5] The Government submits that the defendant should also be ordered to pay the additional $5,000 special assessment on each count—a total of $10,000—that applies under Title 18, United States Code, Section 3014(a)(1).  The defendant is not indigent, and contrary to the defendant's assertion, *see* PSR ¶ 92, the Government has not seized any of his bank accounts or other assets.

Exhibit 1

Approved: _____
FRANK BALSAMELLO / MICHAEL KROUSE
Assistant United States Attorneys

Before:    THE HONORABLE KATHARINE H. PARKER
           United States Magistrate Judge
           Southern District of New York

**17 MAG    3547**

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA          :    **SEALED COMPLAINT**
                                  :
        - v. -                    :    Violation of 18 U.S.C.
                                  :    §§ 1591(a)(1), (b)(1),
                                  :    and (b)(2); 1594(a) and
OLIVER SOHNGEN,                   :    (c); 2422(b), and 2
     a/k/a "Helmuth Moss,"        :
     a/k/a "Stephan Weierbach,"   :
                                  :    COUNTY OF OFFENSE:
                                  :    BRONX
                Defendant.        :

- - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        MIGUEL COLLAZO, being duly sworn, deposes and says that
he is Special Agent with Homeland Security Investigations and
charges as follows:

<u>COUNT ONE</u>
(Conspiracy to Engage in Sex Trafficking of Minors)

        1.    Between at least in or about March 2013 and at least
in or about November 2013, in the Southern District of New York
and elsewhere, OLIVER SOHNGEN, a/k/a "Helmuth Moss," a/k/a
"Stephan Weierbach," the defendant, and others known and
unknown, conspired and agreed with each other to knowingly, in
and affecting interstate and foreign commerce, recruit, entice,
harbor, transport, provide, obtain, advertise, maintain,
patronize, and solicit by any means persons who had not attained
the age of 18 years at the time (collectively, the "Minor
Victims"), knowing, having had a reasonable opportunity to
observe, and in reckless disregard of the fact that the Minor
Victims had not attained the age of 18 years, and knowing that
the Minor Victims would be caused to engage in commercial sex
acts.

        (Title 18, United States Code, Sections
   1594(c), 1591(a)(1), (b)(1), and (b)(2), and 2.)

**COUNT TWO**
(Sex Trafficking of Minor Victim-1)

2.   Between at least in or about March 2013 and at least
in or about April 2013, in the Southern District of New York and
elsewhere, OLIVER SOHNGEN, a/k/a "Helmuth Moss," a/k/a "Stephan
Weierbach," the defendant, in or affecting interstate and
foreign commerce, recruited, enticed, harbored, transported,
provided, obtained, advertised, maintained, patronized, and
solicited a person who had attained the age of 14 years but had
not attained the age of 18 years at the time ("Minor Victim-1"),
knowing, having had a reasonable opportunity to observe, and in
reckless disregard of the fact that Minor Victim-1 had not
attained the age of 18 years, and knowing that Minor Victim-1
would be caused to engage in commercial sex acts, to wit,
SOHNGEN engaged in commercial sex acts with Minor Victim-1, a
seventeen-year-old girl.

(Title 18, United States Code,
Sections 1591(a)(1) and (b)(2), and 2.)

**COUNT THREE**
(Sex Trafficking of Minor Victim-3)

3.   At least in or about November 2013, in the Southern
District of New York and elsewhere, OLIVER SOHNGEN, a/k/a
"Helmuth Moss," a/k/a "Stephan Weierbach," the defendant, in or
affecting interstate and foreign commerce, recruited, enticed,
harbored, transported, provided, obtained, advertised,
maintained, patronized, and solicited a person who had attained
the age of 14 years but had not attained the age of 18 years at
the time ("Minor Victim-3"), knowing, having had a reasonable
opportunity to observe, and in reckless disregard of the fact
that Minor Victim-3 had not attained the age of 18 years, and
knowing that Minor Victim-3 would be caused to engage in
commercial sex acts, to wit, SOHNGEN engaged in commercial sex
acts with Minor Victim-3, a fifteen-year-old girl.

(Title 18, United States Code,
Sections 1591(a)(1) and (b)(2), and 2.)

**COUNT FOUR**
(Attempted Sex Trafficking of Minor Victim-4)

4.   At least in or about September 2013, in the Southern
District of New York and elsewhere, OLIVER SOHNGEN, a/k/a
"Helmuth Moss," a/k/a "Stephan Weierbach," the defendant, in or

2

affecting interstate and foreign commerce, attempted to recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, and solicit a person who had not attained the age of 14 years at the time ("Minor Victim-4"), knowing, having had a reasonable opportunity to observe, and in reckless disregard of the fact that Minor Victim-4 had not attained the age of 14 years, and knowing that Minor Victim-4 would be caused to engage in commercial sex acts, to wit, SOHNGEN attempted to engage in commercial sex acts with Minor Victim-4, an eleven-year-old girl.

(Title 18, United States Code,
Sections 1594(a), 1591(a)(1) and (b)(1), and 2.)

**COUNT FIVE**
(Attempted Sex Trafficking of Minor Victim-5)

5.    At least in or about October 2013, in the Southern District of New York and elsewhere, OLIVER SOHNGEN, a/k/a "Helmuth Moss," a/k/a "Stephan Weierbach," the defendant, in or affecting interstate and foreign commerce, attempted to recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, and solicit a person who had not attained the age of 14 years at the time ("Minor Victim-5"), knowing, having had a reasonable opportunity to observe, and in reckless disregard of the fact that Minor Victim-5 had not attained the age of 14 years, and knowing that Minor Victim-5 would be caused to engage in commercial sex acts, to wit, SOHNGEN attempted to engage in commercial sex acts with Minor Victim-5, an eight-year-old girl.

(Title 18, United States Code,
Sections 1594(a), 1591(a)(1) and (b)(1), and 2.)

**COUNT SIX**
(Attempted Sex Trafficking of Minor Victim-6)

6.    At least in or about October 2013, in the Southern District of New York and elsewhere, OLIVER SOHNGEN, a/k/a "Helmuth Moss," a/k/a "Stephan Weierbach," the defendant, in or affecting interstate and foreign commerce, attempted to recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, and solicit a person who had not attained the age of 14 years at the time ("Minor Victim-6"), knowing, having had a reasonable opportunity to observe, and in reckless disregard of the fact that Minor Victim-6 had not attained the age of 14 years, and knowing that Minor Victim-6 would be caused to engage in commercial sex acts, to wit, SOHNGEN attempted to engage in

commercial sex acts with Minor Victim-6, a thirteen-year-old girl.

(Title 18, United States Code,
Sections 1594(a), 1591(a)(1) and (b)(1), and 2.)

### COUNT SEVEN
(Attempted Inducement of a Minor to Engage in Sexual Activity)

7.    Between at least in or about March 2013 and in or about November 2013, in the Southern District of New York and elsewhere, OLIVER SOHNGEN, a/k/a "Helmuth Moss," a/k/a "Stephan Weierbach," the defendant, used facilities and means of interstate commerce to knowingly persuade, induce, entice, and coerce individuals who had not attained the age of 18 years to engage in prostitution and sexual activity for which a person can be charged with a criminal offense, and attempted to do the same, to wit, SOHNGEN used a cellphone to communicate with a sex trafficker about arranging to have sexual intercourse, oral sex, and other sexual contact with girls ages eight to sixteen years old, in violation of New York Penal Code Sections 130.25(2), 130.30(1), 130.35(4), 130.40(2), 130.45(1), 130.50(3) and (4), 130.55, 130.60(2), and 130.65(3) and (4).

(Title 18, United States Code, Sections 2422(b) and 2.)

### COUNT EIGHT
(Attempted Inducement of a Minor to Engage in Sexual Activity)

8.    Between at least in or about November 2015 and in or about January 2016, in the Southern District of New York and elsewhere, OLIVER SOHNGEN, a/k/a "Helmuth Moss," a/k/a "Stephan Weierbach," the defendant, used facilities and means of interstate commerce to knowingly persuade, induce, entice, and coerce an individual who had not attained the age of 18 years to engage in prostitution and sexual activity for which a person can be charged with a criminal offense, and attempted to do the same, to wit, SOHNGEN used a cellphone to communicate with an undercover officer working for the New York City Police Department ("NYPD"), whom SOHNGEN understood to be a fifteen-year-old girl, and attempted to meet with the purported fifteen-year-old girl to engage in oral sex and other sexual contact, in violation of New York Penal Code Sections 130.25(2), 130.40(2), and 130.55.

(Title 18, United States Code, Sections 2422(b) and 2.)

4

The bases for my knowledge and for the foregoing charges, are, in part, as follows:

9.    I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI") and have been so employed for approximately seven years. During this time, I have conducted numerous investigations into offenses involving the sex trafficking and abuse of minors, including prostitution-related crimes, and I am familiar with the some of the ways in which such crimes are often committed. I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement officers and other individuals. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### Overview

10.    As described in greater detail below, based on my involvement in this investigation, I have learned the following, among other things.  OLIVER SOHNGEN, a/k/a "Helmuth Moss," a/k/a "Stephan Weierbach," the defendant, is the founder and director of a New York City music school.  From in or about March 2013 to in or about November 2013, SOHNGEN appears to have exchanged text messages with an individual ("CC-1") for the purpose of purchasing commercial sex acts with minor girls ranging in age from eight to seventeen.  Moreover, on at least two occasions, SOHNGEN engaged in various forms of sexual contact with fifteen- and seventeen-year-old girls, both times arranged by CC-1.  I have also learned that, between in or about November 2015 and in or about January 2016, SOHNGEN appears to have used a cellular phone to communicate with an undercover NYPD officer who he understood to be a fifteen-year-old girl.  SOHNGEN attempted to meet with the purported fifteen-year-old girl in order to engage in oral sex and other sexual contact.

### March 2013 – November 2013:  Sex Trafficking and Attempted Inducement of Minors

11.    In or about November 2013, the NYPD arrested CC-1 on charges related to sex trafficking of minors and other offenses. Through subsequent investigation, NYPD detectives learned that

CC-1 had engaged in prostitution-related offenses with several girls under the age of 18 (the "Minor Victims").

12.    Following CC-1's November 2013 arrest, investigators executed a search warrant for a cellphone used by CC-1 ("CC-1's Cellphone"). In CC-1's Cellphone they found contact information for — and text message exchanges with — several individuals who appeared to be clients of CC-1's illegal prostitution business, including one listed as "$$$$ Helmuth Moss Any," with notes "[An Alias For Minor Victim-1 ("Minor Victim-1's Alias")]. 160" ("CC-1's Cellphone Entry for Moss"). As explained in paragraph 15, *infra*, it appears that "Moss" is in fact OLIVER SOHNGEN, a/k/a "Helmuth Moss," a/k/a "Stephan Weierbach," the defendant.

13.    I have spoken with Minor Victim-1 and two other minor victims ("Minor Victim-2" and "Minor Victim-3"), who told me the following, among other things:

      a.    Both Minor Victim-1 and Minor Victim-2 stated, in substance and in part, that in or about March 2013, CC-1 caused them to travel from their homes in New Jersey to CC-1's apartment on Davidson Avenue in the Bronx, New York (the "Davidson Avenue Apartment"), where CC-1 took sexually suggestive photographs of them and posted ads on Backpage.com with their photographs offering to sell them for sex acts.[1] Based on the dates of birth listed on their driver's licenses, both Minor Victim-1 and Minor Victim-2 were seventeen years old at the time.

      b.    Minor Victim-1 stated, in substance and in part, that in Backpage.com advertisements and in communications with CC-1's clients, she was known by Minor Victim-1's Alias. Between in or about March 2013 and in or about April 2013, CC-1 prostituted Minor Victim-1 and caused her to engage in sexual intercourse and other sex acts with multiple men in return for money, a percentage of which CC-1 kept for his own profit. I showed Minor Victim-1 a database photograph of OLIVER SOHNGEN, a/k/a "Helmuth Moss," a/k/a "Stephan Weierbach," the defendant (the "SOHNGEN Photograph"), among other photographs, and she stated that SOHNGEN appeared to be an individual with whom she engaged in a sex act inside the Davidson Avenue Apartment.

      c.    Minor Victim-2 stated, in substance and in part, that between in or about March 2013 and in or about April 2013,

---

[1] I have learned through training and research, among other things, that Backpage.com is headquartered and maintains its servers outside of New York State.

CC-1 prostituted Minor Victim-2 and caused her to engage in sexual intercourse and other sex acts with multiple men in return for money, a percentage of which CC-1 kept for his own profit. I showed Minor Victim-2 the SOHNGEN Photograph, among other photographs, and she stated, in substance and in part, that SOHNGEN looked familiar and that she believed he was one of Minor Victim-1's clients.

d.    Minor Victim-3 stated, in substance and in part, that she had met CC-1 online and subsequently traveled to the Davidson Avenue Apartment, where CC-1 took photographs of her. From the text messages in CC-1's Cellphone described below, I know that this occurred on or about November 2, 2013. Minor Victim-3 identified multiple photographs of herself found on CC-1's Cellphone and other electronic devices, including two in which she is pictured kneeling on a bed ("Minor Victim-3 Photograph-1" and "Minor Victim-3 Photograph-2"). The same day as the photographs were taken, CC-1 arranged for a man to come to the Davidson Avenue Apartment, where the man paid to have sex with Minor Victim-3. I showed Minor Victim-3 the SOHNGEN Photograph, among other photographs, and she stated, in substance and in part, that SOHNGEN looked like the person who had paid to have sex with her at the Davidson Avenue Apartment. Based on the date of birth on her driver's license, Minor Victim-3 was fifteen years old at the time SOHNGEN paid to have sex with her.

14.    I have reviewed the contents of CC-1's Cellphone, including its text message history, and I have observed the following, among other things, in substance and in part:

a.    CC-1's Cellphone Entry for Moss, described above, listed a particular phone number for "Moss" beginning with the area code "347" (the "347 Phone Number") and a particular email address for "Moss" (the "Moss Gmail Account"). It also included the note "2000."

b.    On or about August 2, 2013, CC-1's Phone received a text message from a particular phone number with a "917" area code (the "917 Phone Number"), which said, in sum and substance, "Hi its [347 Phone Number]. Cant use this phone. Can u email [the Moss Gmail Account]?"

c.    Between on or about August 17, 2013 and on or about November 2, 2013, the 347 Phone Number and CC-1's Phone exchanged numerous text messages relating to SOHNGEN's and CC-1's efforts to arrange and negotiate payment for sexual encounters between SOHNGEN and girls under the age of 18,

7

including the following text messages, in substance and in part
(the "Moss Text Messages"):

i. Beginning on or about August 17, 2013:

| 8/17/13 6:13 PM | CC-1 | Hi |
|---|---|---|
| 8/17/13 10:39 PM | SOHNGEN | Hi |
| 8/17/13 10:40 PM | CC-1 | It's too late |
| 8/17/13 10:40 PM | SOHNGEN | For who? |
| 8/17/13 10:41 PM | CC-1 | The 41 |
| 8/17/13 10:41 PM | SOHNGEN | She actually exists? |
| 8/17/13 10:42 PM | CC-1 | Yes |
| 8/17/13 10:42 PM | CC-1 | Not the sane one |
| 8/17/13 10:42 PM | SOHNGEN | Never saw a pic... |
| 8/17/13 10:44 PM | CC-1 | I know. |

Based on my training and experience, as well as the context
and content of the messages transcribed herein and other
information I have learned in the course of this investigation,
it appears that SOHNGEN and CC-1 used coded language in their
text messages, whereby they inverted the order of the numbers in
girls' ages. For example, a twelve-year-old girl would be "21,"
and an eight-year-old girl would be "80."[2]  Accordingly, it
appears that in this exchange, CC-1 told SOHNGEN, in substance

---

[2] This understanding appears to be supported by the fact
that SOHNGEN and CC-1 discuss girls being at "chuck e cheese,"
*see infra* ¶ 14(c)(iv), which I believe to be a reference to the
Chuck E. Cheese's children's restaurant and arcade. Moreover, in
one of the September 7, 2013 messages transcribed below, *see
infra* ¶ 14(c)(iii), CC-1 refers to "11," and SOHNGEN later
responds by mentioning "Ii." This appears to be an instance in
which the code broke down because "11" cannot be inverted.
Nevertheless, SOHNGEN appears to have attempted to obscure the
true meaning of their conversation by using letters instead of
numbers.

8

and in part, that it was too late for SOHNGEN to purchase sex with a fourteen-year-old girl ("[t]he 41").

ii. Beginning on or about August 21, 2013:

| 8/21/13 4:54 PM | CC-1 | Hi. |
|---|---|---|
| 8/21/13 4:54 PM | CC-1 | Are you busy |
| 8/21/13 10:42 PM | SOHNGEN | Why? |
| 8/21/13 11:33 PM | CC-1 | I had something for you. Too late |
| 8/21/13 11:36 PM | SOHNGEN | What? |
| 8/22/13 10:04 AM | CC-1 | It's too late. She had to go home. |

Based on my training and experience, as well as the context and content of the messages, it appears that in this exchange, CC-1 told SOHNGEN, in substance and in part, about a girl who SOHNGEN could purchase for sex (*i.e.*, "something for you"), but who "had to go home" before SOHNGEN replied.

iii. Beginning on or about September 7, 2013:

| 9/7/13 1:16 AM | CC-1 | 21 for you. |
|---|---|---|
| 9/7/13 2:16 AM | CC-1 | 11. Too |
| 9/7/13 7:13 AM | SOHNGEN | For real? |
| 9/7/13 12:41 PM | CC-1 | Yes. |
| 9/7/13 12:49 PM | CC-1 | But you have to come right away you we say. They are two. |
| 9/7/13 3:06 PM | CC-1 | Don't have a lot of time. |
| 9/7/13 9:26 PM | SOHNGEN | Don't know when u sent this. Phone was off. |
| 9/7/13 9:26 PM | CC-1 | It's too late. But we can make a new time. |
| 9/7/13 9:27 PM | SOHNGEN | How much? |
| 9/7/13 9:27 PM | CC-1 | Which on. |

| 9/7/13 9:28 PM | CC-1 | Which one |
|---|---|---|
| 9/7/13 9:28 PM | SOHNGEN | Ii |
| 9/7/13 9:29 PM | CC-1 | 3000. |
| 9/7/13 9:30 PM | SOHNGEN | I think we had that discussion before... |
| 9/7/13 7:03 PM | CC-1 | Wait until you see the pic. |
| 9/7/13 9:56 PM | SOHNGEN | Ok... |
| 9/8/13 7:34 PM | SOHNGEN | Hi |
| 9/8/13 8:20 PM | CC-1 | Hi |
| 9/8/13 8:24 PM | SOHNGEN | So. That's pretty steep |
| 9/8/13 8:26 PM | CC-1 | Ii is a lot and its really cute |
| 9/8/13 8:28 PM | SOHNGEN | Haven't won the lottery to my information. .. |
| 9/8/13 8:37 PM | SOHNGEN | Pic? |
| 9/8/13 8:40 PM | CC-1 | I don't have them yet |

Based on my training and experience, as well as the context and content of the messages, it appears that in this exchange, CC-1 told SOHNGEN, in substance and in part, that CC-1 had twelve-year-old and eleven-year-old girls that SOHNGEN could purchase for sex ("21 for you. 11. Too"), if he could get to them quickly ("you have to come right away . . . . Don't have a lot of time."). SOHNGEN responded, in sum and substance, that he had not received the message promptly because his "[p]hone was off." CC-1 then stated that they could "make a new time," and SOHNGEN began to negotiate the price for the eleven-year-old girl ("Minor Victim-4"). CC-1 said that it would cost "3000," which refers to $3,000. SOHNGEN responded, in substance and in part, that the price was too high ("That's pretty steep"), and CC-1 assured SOHNGEN that Minor Victim-4 was "really cute." SOHNGEN then asked for a picture of Minor Victim-4.

iv. Beginning on or about October 15, 2013:

| | | |
|---|---|---|
| 10/15/2013 9:15 PM | CC-1 | Hey |
| 10/18/2013 11:03 AM | SOHNGEN | Who's this? |
| 10/18/2013 11:04 AM | CC-1 | Your friends on davidson ave. |
| 10/18/2013 11:04 AM | CC-1 | I found a 80 and 31 |
| 10/18/2013 11:05 AM | CC-1 | No joke. |
| 10/18/2013 11:06 AM | SOHNGEN | Ok |
| 10/18/2013 11:07 AM | SOHNGEN | Tell |
| 10/18/2013 11:10 AM | CC-1 | The only this is we cant use the place on davidson. Any ideas |
| 10/18/2013 11:12 AM | SOHNGEN | How much? |
| 10/18/2013 11:13 AM | CC-1 | What good for the 80 |
| 10/18/2013 11:14 AM | SOHNGEN | 800 |
| 10/18/2013 11:14 AM | CC-1 | :( |
| 10/18/2013 11:18 AM | CC-1 | I thought 2000 was ok. |
| 10/18/2013 11:21 AM | CC-1 | How about both for that. |
| 10/18/2013 11:22 AM | CC-1 | You cant have sex with 80. You get Head and you can eat |
| 10/18/2013 11:24 AM | SOHNGEN | No. Meet me in the middle |
| 10/18/2013 11:24 AM | SOHNGEN | Eat is fine |
| 10/18/2013 11:24 AM | CC-1 | But you can with 31 |
| 10/18/2013 11:24 AM | CC-1 | Do you want both. |
| 10/18/2013 11:25 AM | CC-1 | Both for 1600 |
| 10/18/2013 11:25 AM | CC-1 | Do you have a place |

| | | |
|---|---|---|
| 10/18/2013 11:31 AM | CC-1 | We cant bring the 80 to davidson |
| 10/18/2013 11:32 AM | SOHNGEN | Not necessarily |
| 10/18/2013 11:32 AM | SOHNGEN | Can't do it there |
| 10/18/2013 11:32 AM | SOHNGEN | I understand. No wheelchair access |
| 10/18/2013 11:37 AM | CC-1 | Ok. Hotel |
| 10/18/2013 11:39 AM | SOHNGEN | Sure. But how get her in? |
| 10/18/2013 11:40 AM | CC-1 | Do you drive? Im look for a place with an outside room door. Or maybe you know one already |
| 10/18/2013 11:41 AM | SOHNGEN | I drive |
| 10/18/2013 11:42 AM | CC-1 | Great. |
| 10/18/2013 11:42 AM | SOHNGEN | When |
| 10/18/2013 11:43 AM | CC-1 | Let me get them. |
| 10/18/2013 11:43 AM | CC-1 | You want both? |
| 10/18/2013 11:44 AM | SOHNGEN | Ok. When |
| 10/18/2013 11:50 AM | SOHNGEN | Where |
| 10/18/2013 11:50 AM | CC-1 | Hold on. Brb |
| 10/18/2013 11:55 AM | CC-1 | She is the other girl is getting them |
| 10/18/2013 12:01 PM | CC-1 | They are in school. After school |
| 10/18/2013 12:03 PM | CC-1 | Can you look up a hotel |
| 10/18/2013 12:08 PM | SOHNGEN | Can't do that late. Would have to be now. Need about 30 to get to bx |
| 10/18/2013 12:10 PM | SOHNGEN | I know a hotel but she needs to dress |
| 10/18/2013 12:10 PM | CC-1 | Dress how. |

12

| 10/18/2013 12:11 PM | SOHNGEN | Old |
|---|---|---|
| 10/18/2013 12:11 PM | CC-1 | No tits. Lol |
| 10/18/2013 12:11 PM | CC-1 | She is small. |
| 10/18/2013 12:12 PM | CC-1 | What the name of the hotel |
| 10/18/2013 12:12 PM | SOHNGEN | I mean for getting in inconspicuously |
| 10/18/2013 12:12 PM | CC-1 | They going |
| 10/18/2013 12:13 PM | CC-1 | What the name of the hotel |
| 10/18/2013 12:24 PM | SOHNGEN | [Hotel-1] |
| 10/18/2013 12:25 PM | CC-1 | Where is that. I want to look it up |
| 10/18/2013 12:26 PM | SOHNGEN | [Location of Hotel-1 in the Bronx, New York] |
| 10/18/2013 12:34 PM | CC-1 | Ok |
| 10/18/2013 12:37 PM | CC-1 | Thats great. They have the outside doors. Let them sit in the car while you get the room. |
| 10/18/2013 12:37 PM | CC-1 | Then park in front of the door. |
| 10/18/2013 12:38 PM | CC-1 | When your done. Can you drop them off at chuck e cheese. That where the family thinks they are going. |
| 10/18/2013 12:39 PM | SOHNGEN | Which chucks chs? |
| 10/18/2013 12:40 PM | CC-1 | Harlem |
| 10/18/2013 12:41 PM | SOHNGEN | Where do I pick them up? |
| 10/18/2013 12:42 PM | CC-1 | Not sure yet. Cant let anyone see them get into a car |
| 10/18/2013 12:43 PM | SOHNGEN | When |
| 10/18/2013 12:43 PM | CC-1 | After your done |
| 10/18/2013 12:44 PM | SOHNGEN | I'm driving now |

13

| 10/18/2013 12:44 PM | CC-1 | How about at the chuck e cheese |
|---|---|---|
| 10/18/2013 12:45 PM | CC-1 | They still in school |
| 10/18/2013 12:46 PM | SOHNGEN | Till when |
| 10/18/2013 12:46 PM | CC-1 | 430 |
| 10/18/2013 12:47 PM | CC-1 | They don't know they ate going yet. |
| 10/18/2013 12:47 PM | SOHNGEN | Not gonna work today… |
| 10/18/2013 12:48 PM | CC-1 | It can if you still can |
| 10/18/2013 12:49 PM | SOHNGEN | Has to be much earlier |
| 10/18/2013 12:49 PM | CC-1 | What time |
| 10/18/2013 12:49 PM | SOHNGEN | I can pick them up in 30-40 min |
| 10/18/2013 12:59 PM | CC-1 | They are still in school. |
| 10/18/2013 12:59 PM | CC-1 | Hold up. Brb |
| 10/18/2013 1:11 PM | CC-1 | We might have to make it on saturday. |
| 10/18/2013 1:13 PM | SOHNGEN | What time? |
| 10/18/2013 1:13 PM | CC-1 | What time is good for you. |
| 10/18/2013 1:15 PM | SOHNGEN | Also. Aren't ppl gonna miss them? |
| 10/18/2013 1:15 PM | CC-1 | That's why the 16 is tell ppl they are going to chuch E cheese. |
| 10/18/2013 1:16 PM | SOHNGEN | After 5 |
| 10/18/2013 1:16 PM | SOHNGEN | And how would they be there that long without supervision |
| 10/18/2013 1:17 PM | CC-1 | The 61 is gong to take others to chuck. Where you are going to pick up from. And bring back there. |
| 10/18/2013 1:18 PM | CC-1 | Thats covered. They are not going in. They are going to be out front. |

| 10/18/2013 1:18 PM | CC-1 | But you have to brongbthem back there. Thats importan. |
| 10/18/2013 1:25 PM | SOHNGEN | Ok |
| 10/18/2013 1:25 PM | SOHNGEN | Pics? |
| 10/18/2013 1:29 PM | CC-1 | Nope |
| 10/18/2013 1:29 PM | CC-1 | Its good tho |

Based on my training and experience, as well as the context and content of the messages, it appears that in this exchange, CC-1 identified himself as one of SOHNGEN's "friends on davidson ave.," which I believe to be a reference to CC-1's Davidson Avenue Apartment, where CC-1's clients often engaged in sex acts with girls working for CC-1. CC-1 then said, in substance and in part, that he "found a 80 and 31," which, as explained above, I believe to refer to an eight-year old girl ("Minor Victim-5") and a thirteen-year-old girl ("Minor Victim-6"). SOHNGEN responded with an offer of "800," meaning $800. CC-1 replied, in substance and in part, with a counter-offer: "I thought 2000 was ok." CC-1 then cautioned SOHNGEN, in substance and in part, that he cannot have sex with Minor Victim-5, but can "get Head" and "can eat," which I understand to be references to oral sex. SOHNGEN responded, in substance and in part, "Eat is fine." CC-1 also stated, in substance and in part, that SOHNGEN could have sex with Minor Victim-6 ("But you can [have sex] with 31."). CC-1 and SOHNGEN then continued their negotiation of a price and discussed logistics regarding possible locations (e.g., "cant bring the 80 to Davidson," "Im look for a place with an outside room door," "That [proposed location is] great. They have the outside doors. Let them sit in the car while you get the room."). CC-1 also said to SOHNGEN, in substance and in part: "When your done. Can you drop them off at chuck e cheese. That where the family thinks they are going." Based on the context, it appears that this means that Minor Victim-5 and Minor Victim-6's relatives believed they would be at a Chuck E. Cheese's children's restaurant when, in fact, SOHNGEN would be engaged in sexual acts with them at a nearby hotel. Finally, during this exchange, CC-1 referenced a sixteen-year-old he was using to help procure the younger girls, and in one message, it appears that CC-1 briefly failed to use the usual code, referring to "the 16" who was "tell[ing] ppl they are going to chuch E cheese." In his next message, CC-1 returned to calling that person "[t]he 61."

v. Beginning on or about October 19, 2013:

| | | |
|---|---|---|
| 10/19/2013 1:42 PM | CC-1 | Im still working on iy |
| 10/19/2013 2:11 PM | SOHNGEN | K |
| 10/19/2013 2:13 PM | CC-1 | It got alittle hared. 80 is hard to get out. 31 might. Let me work on it. Its hard work. Just be ready. |
| 10/19/2013 6:02 PM | SOHNGEN | Ok… |
| 10/19/2013 6:04 PM | CC-1 | I might be able to get the 31 tonight only |
| 10/19/2013 6:05 PM | SOHNGEN | How much? |
| 10/19/2013 6:09 PM | CC-1 | What good for you. I was good for you. |
| 10/19/2013 6:11 PM | SOHNGEN | So what happened to 80? |
| 10/19/2013 6:11 PM | CC-1 | Cant get 80 alone |
| 10/19/2013 6:12 PM | SOHNGEN | So bring them together |
| 10/19/2013 6:13 PM | CC-1 | That cant work. |
| 10/19/2013 6:13 PM | SOHNGEN | What happened |
| 10/19/2013 6:20 PM | SOHNGEN | ? |
| 10/19/2013 6:29 PM | CC-1 | Nothing. Its always been like that. I text when they were here but it was hard ti get you. |
| 10/19/2013 6:30 PM | CC-1 | Now the 31 is saying no. |
| 10/19/2013 6:30 PM | SOHNGEN | Hm |
| 10/19/2013 6:32 PM | CC-1 | Yeah. |
| 10/19/2013 6:33 PM | SOHNGEN | I was ready to come yesterday and today |
| 10/19/2013 6:33 PM | CC-1 | I think i might be able to get the 80 only. Stiil not sure. |
| 10/19/2013 6:34 PM | CC-1 | Yeah, but they where here last week. Do worry. Im going to keep trying. |

16

| | | |
|---|---|---|
| 10/19/2013 6:35 PM | SOHNGEN | I thought they can't be on davidson |
| 10/19/2013 6:37 PM | CC-1 | No. They don't live around here. |
| 10/19/2013 6:38 PM | SOHNGEN | But u said they were there… |
| 10/19/2013 6:39 PM | CC-1 | That was last week. |
| 10/19/2013 6:40 PM | SOHNGEN | The 80 experienced? |
| 10/19/2013 6:40 PM | CC-1 | When they was here. We could bot donit here because they can ot come out in the day. I do not want people to see you come in in the day. Night is good. Day time is bad. |
| 10/19/2013 6:41 PM | CC-1 | Or we can wait them them to have a sleep over here. But i dint know when. |
| 10/19/2013 6:42 PM | SOHNGEN | The 80 has done it before? |
| 10/19/2013 6:53 PM | CC-1 | Nope |
| 10/19/2013 6:53 PM | CC-1 | But she will. Its just getting her out |
| 10/19/2013 6:54 PM | SOHNGEN | So nothing tonite. Right? |
| 10/19/2013 6:55 PM | CC-1 | Im not sure. If it is. Its going to be last minute. |
| 10/19/2013 7:28 PM | CC-1 | Ok. The 61 when to see if she can get them. But still not sure |
| 10/19/2013 7:29 PM | SOHNGEN | K |
| 10/19/2013 7:39 PM | CC-1 | The plan is for you to pick them you by the post office on 149th in the bx. That's only if they come out. |
| 10/19/2013 7:41 PM | SOHNGEN | But it's late. Nobody gonna miss them? |
| 10/19/2013 7:43 PM | CC-1 | No. Not tonight. Dint worry about anything |
| 10/19/2013 7:43 PM | SOHNGEN | So when? |
| 10/19/2013 9:02 PM | SOHNGEN | ? |

17

| 10/19/2013 9:02 PM | CC-1 | Nothing yet |
|---|---|---|
| 10/19/2013 9:12 PM | SOHNGEN | Ok. I wait |
| 10/19/2013 9:19 PM | CC-1 | Not looking good. |
| 10/19/2013 9:21 PM | SOHNGEN | So calling it off? |
| 10/19/2013 9:21 PM | CC-1 | Just for tonight. Im going to still try |
| 10/19/2013 9:22 PM | SOHNGEN | Ok. Gn |
| 10/19/2013 9:23 PM | CC-1 | Ok. Im going to text you if i find anything out |
| 10/19/2013 9:24 PM | SOHNGEN | But nothing tonite for sure? Because then I'm going to sleep. |
| 10/19/2013 9:25 PM | CC-1 | Ok. |
| 10/20/2013 3:21 AM | SOHNGEN | Just woke up. Anything? |
| 10/20/2013 3:27 AM | CC-1 | Nope. I might have a 61 |
| 10/20/2013 3:28 AM | SOHNGEN | No. I wait. Thx |
| 10/20/2013 3:42 AM | CC-1 | Ok |

      Based on my training and experience, as well as the context
and content of the messages, it appears that in this exchange,
CC-1 told SOHNGEN, in substance and in part, that he was still
trying to arrange for SOHNGEN to pay for sex with Minor Victim-5
and Minor Victim-6 ("Im still working on iy . . . 80 us hard to
get out. 31 might. Let me work on it."). SOHNGEN responded,
simply, "Ok." CC-1 then added, in substance and in part, that he
"might be able to get the 31 tonight only," indicating that
Minor Victim-6 (the thirteen-year-old) might be available soon,
and SOHNGEN asked about price ("How much?"). SOHNGEN and CC-1
then discussed the challenges in arranging SOHNGEN's purchase of
sex from the Minor Victims being offered by CC-1 ("Now the 31 is
saying no." . . . "I thought they can't be on Davidson." . . .
"They don't live around here."). SOHNGEN then asked, in sum and
substance whether Minor Victim-5 (the eight-year-old) was
"experienced" and whether she "has done it before." CC-1
responded, in substance and in part, "Nope," but assured SOHNGEN
that "she will." Later, CC-1 told SOHNGEN, in substance and in

18

part, that he might have a sixteen-year-old available ("I might have a 61."), but SOHNGEN declined, in favor of waiting for the younger girls ("No. I wait.").

      vi. Beginning on or about October 21, 2013:

| | | |
|---|---|---|
| 10/21/2013<br>7:49 AM | CC-1 | Hey |
| 10/21/2013<br>8:32 AM | CC-1 | Hey |
| 10/21/2013<br>8:35 AM | SOHNGEN | Was sleeping |
| 10/21/2013<br>8:35 AM | CC-1 | Sorry. The 31 is around |
| 10/21/2013<br>8:37 AM | SOHNGEN | Is now? |
| 10/21/2013<br>8:42 AM | SOHNGEN | ? |
| 10/21/2013<br>8:42 AM | CC-1 | Not yet. |
| 10/21/2013<br>8:42 AM | SOHNGEN | What time? |
| 10/21/2013<br>8:44 AM | CC-1 | Im waiting for a call back |
| 10/21/2013<br>9:31 AM | SOHNGEN | Could meet at 1230. Later will be hard |
| 10/21/2013<br>10:16 AM | SOHNGEN | Actually 1130 is possible |
| 10/21/2013<br>11:11 AM | SOHNGEN | Ready to come now |
| 10/21/2013<br>11:29 AM | SOHNGEN | ? |
| 10/21/2013<br>11:37 AM | CC-1 | No |
| 10/21/2013<br>11:38 AM | SOHNGEN | What no? |
| 10/21/2013<br>11:43 AM | CC-1 | They never called me bsck. Holf up |
| 10/21/2013<br>11:44 AM | SOHNGEN | Hold up? |
| 10/21/2013<br>11:44 AM | CC-1 | Yes |
| 10/21/2013<br>12:00 PM | CC-1 | Lets make new plan. Whats a goog time for you in the morning |

| | | |
|---|---|---|
| 10/21/2013 12:01 PM | SOHNGEN | Depends on the day. But 930 is good |
| 10/21/2013 12:03 PM | CC-1 | Ok. Im going to text you at 700 to let you now if they are at the spot. The new spot is 161. Its going to be 31 only. |
| 10/21/2013 12:04 PM | CC-1 | 31 might be ready after school. |
| 10/21/2013 12:08 PM | SOHNGEN | 7am tomorrow? And whats161? |
| 10/21/2013 12:10 PM | CC-1 | Yankee stadium on the 4 stop. |
| 10/21/2013 12:11 PM | SOHNGEN | It's a new place? |
| 10/21/2013 12:12 PM | CC-1 | No. Its yankee stadium. |
| 10/21/2013 12:12 PM | CC-1 | Whats a good rate for you. |
| 10/21/2013 12:13 PM | SOHNGEN | U tell me |
| 10/21/2013 12:14 PM | CC-1 | Im thinking 800 |
| 10/21/2013 12:14 PM | SOHNGEN | This was a lot of work |
| 10/21/2013 12:15 PM | SOHNGEN | I had 31 before for much less… |
| 10/21/2013 12:15 PM | CC-1 | Who |
| 10/21/2013 12:15 PM | SOHNGEN | Somewhere else |
| 10/21/2013 12:16 PM | CC-1 | Oh |
| 10/21/2013 12:29 PM | SOHNGEN | Also need to save up for 80 |
| 10/21/2013 12:29 PM | CC-1 | 80 may never work. |
| 10/21/2013 12:32 PM | SOHNGEN | Well send me a pic of 31 |
| 10/21/2013 12:32 PM | CC-1 | Cant |
| 10/21/2013 12:33 PM | SOHNGEN | Describe |
| 10/21/2013 12:33 PM | CC-1 | Short. Spanish |

| | | |
|---|---|---|
| 10/21/2013 12:34 PM | SOHNGEN | Tits? |
| 10/21/2013 12:42 PM | SOHNGEN | Small big none? |
| 10/21/2013 12:43 PM | CC-1 | In the middle |
| 10/21/2013 12:43 PM | SOHNGEN | Skinny? |
| 10/21/2013 12:44 PM | CC-1 | Not really |
| 10/21/2013 12:44 PM | SOHNGEN | Fat??? |
| 10/21/2013 12:44 PM | CC-1 | No |
| 10/21/2013 12:45 PM | SOHNGEN | 600 |
| 10/21/2013 12:45 PM | CC-1 | 700. |
| 10/21/2013 12:46 PM | CC-1 | It's a lot of work for me. |
| 10/21/2013 12:46 PM | SOHNGEN | Where? |
| 10/21/2013 12:47 PM | CC-1 | Huh |
| 10/21/2013 12:47 PM | SOHNGEN | Do I have to take her somewhere? |
| 10/21/2013 12:48 PM | CC-1 | Nope. Just the room |
| 10/21/2013 12:49 PM | SOHNGEN | What do u mean? What room? |
| 10/21/2013 12:49 PM | CC-1 | Hotel |
| 10/21/2013 12:50 PM | SOHNGEN | So when? |
| 10/21/2013 12:50 PM | CC-1 | In the morning. |
| 10/21/2013 12:51 PM | SOHNGEN | Tomorrow for sure? |
| 10/21/2013 12:51 PM | CC-1 | No. Not for sure. |
| 10/21/2013 12:52 PM | CC-1 | That's why i said i will txt you at 7 when there are there. They can wait there until nine. |
| 10/21/2013 12:53 PM | SOHNGEN | 9 Is too early. 930 |

21

| 10/21/2013 12:53 PM | CC-1 | Ok. 930. They can wait. |
|---|---|---|
| 10/21/2013 12:54 PM | SOHNGEN | Who is they? Also is she pretty? |
| 10/21/2013 12:55 PM | CC-1 | Yes she is. |
| 10/21/2013 12:55 PM | CC-1 | The 61 baby sitter. |
| 10/21/2013 10:24 PM | CC-1 | New plans. Wednesday at 700 |
| 10/22/2013 7:11 AM | SOHNGEN | Ok |
| 10/22/2013 7:26 AM | CC-1 | 7am |
| 10/22/2013 2:50 PM | CC-1 | They are going ti be at the post office in 149th. |
| 10/22/2013 2:50 PM | CC-1 | [(###) ###-]9413. Thats the number. Only call it when they are read |
| 10/22/2013 8:19 PM | SOHNGEN | Ok. Lmk at 7 |
| 10/23/2013 7:23 AM | SOHNGEN | ? |
| 10/23/2013 7:42 AM | SOHNGEN | Hello |
| 10/23/2013 7:54 AM | CC-1 | Hey. |
| 10/23/2013 8:02 AM | CC-1 | No wirking. She keeps chaanging her mind |

Based on my training and experience, as well as the context and content of the messages, it appears that in this exchange, CC-1 told SOHNGEN that he expected Minor Victim-6 (the thirteen-year-old) to be available ("The 31 is around. . . . Im waiting for a call back."). SOHNGEN and CC-1 then talked about availability and timing (e.g., "Could meet at 1230. Later will be hard." "Actually 1130 is possible" "What a goog [sic] time for you in the morning[?]"). CC-1 then told SOHNGEN that it would be Minor Victim-6 coming after school ("Its going to be 31 only. . . . 31 might be ready after school."), and that SOHNGEN could pick up Minor Victim-6 near 161st Street in the Bronx near Yankee Stadium ("The new spot is 161. . . . Yankee stadium on the 4 stop."). CC-1 then proposed a price of $800, and SOHNGEN said, in substance and in part, "I had 31 before for much less . . . Somewhere else," and that he did not want to pay too much

for Minor Victim-6 because he "need[ed] to save up for 80,"
meaning that he had paid less than $800 for sex with a thirteen-
year-old before, and that he needed to save his money to pay for
sex with Minor Victim-5 (the eight-year old). SOHNGEN and CC-1
turned to a discussion of Minor Victim-6's physical appearance –
including SOHNGEN's question "Tits?" – and then the location and
the price.

vii. Beginning on or about November 2, 2013:

| 11/2/2013 6:02 PM | CC-1 | Hey |
|---|---|---|
| 11/2/2013 6:03 PM | CC-1 | Found a very good one |
| 11/2/2013 7:20 PM | SOHNGEN | Ok? |
| 11/2/2013 7:24 PM | CC-1 | 15 white and Spanish |
| 11/2/2013 7:24 PM | CC-1 | You have to come soon |
| 11/2/2013 7:25 PM | SOHNGEN | Pic? |
| 11/2/2013 7:26 PM | CC-1 | Im trying to get her to take them she is shy |
| 11/2/2013 7:38 PM | CC-1 | Can you come tonight |
| 11/2/2013 7:40 PM | SOHNGEN | How much? |
| 11/2/2013 7:49 PM | CC-1 | 300. Taking the pics now |
| 11/2/2013 7:58 PM | CC-1 | [Minor Victim-3 Photograph-1] |
| 11/2/2013 7:59 PM | CC-1 | [Minor Victim-3 Photograph-2] |
| 11/2/2013 8:01 PM | SOHNGEN | Ok. Can we do 250? |
| 11/2/2013 8:03 PM | CC-1 | She wants 300 |
| 11/2/2013 8:04 PM | SOHNGEN | Ok. How long is she going to be there? |
| 11/2/2013 8:05 PM | CC-1 | Tonight. What time you come |
| 11/2/2013 8:08 PM | SOHNGEN | All night? |
| 11/2/2013 8:09 PM | CC-1 | Yes |

| 11/2/2013 8:09 PM | CC-1 | Do you know what time |
|---|---|---|
| 11/2/2013 8:12 PM | SOHNGEN | Have to charge my phone. What about 930? |
| 11/2/2013 8:15 PM | CC-1 | Sure |
| 11/2/2013 8:24 PM | CC-1 | She might need vodka. Can u get a small one. |
| 11/2/2013 9:33 PM | CC-1 | How far are you |
| 11/2/2013 9:53 PM | SOHNGEN | Almost there. Trains were messed up |
| 11/2/2013 9:57 PM | CC-1 | Ok |
| 11/2/2013 9:58 PM | SOHNGEN | I'm here |
| 11/2/2013 9:58 PM | CC-1 | Ok |
| 11/2/2013 9:59 PM | SOHNGEN | Lots of ppl milling around |
| 11/2/2013 9:59 PM | CC-1 | Ok. Hold. On. Dont go |
| 11/2/2013 10:01 PM | SOHNGEN | So what shall I do? |

Based on my training and experience, as well as the context
and content of the messages, it appears that in this exchange,
CC-1 told SOHNGEN, in substance and in part, that he had
identified a fifteen-year-old girl ("Minor Victim-3") with whom
SOHNGEN could have sex with if he came quickly ("Found a very
good one. . . . 15 white and Spanish. You have to come soon.").
CC-1 then said it would cost $300 and sent SOHNGEN two
photographs of Minor Victim-3. SOHNGEN and CC-1 talked about the
time at which SOHNGEN should arrive, and CC-1 advised that Minor
Victim-3 "might need vodka." Later, SOHNGEN said, in substance
and in part, that he had arrived ("I'm here"), but that there
were people outside or near the Davidson Avenue Apartment ("Lots
of ppl milling around."). CC-1 encouraged SOHNGEN not to leave
("Ok. Hold. On. Dont go.").

    15.  I have reviewed business records relating to the 917
Phone Number, the 347 Phone Number, the Moss Gmail Account, and
other electronic accounts and profiles. Based on my review of
those materials, including the specific items described below,
among others, as well as my training and experience, it appears
that the user of those phones and accounts, purported to be

24

"Moss," was in fact OLIVER SOHNGEN, a/k/a "Helmuth Moss," a/k/a "Stephan Weierbach," the defendant.

     a.    With respect to the 917 Phone Number, I have learned the following, among other things:

     i. Records obtained from T-Mobile show, among other things, that the 917 Phone Number was established in February 2004 and subscribed in the name "Oliver Sohngen."

     ii. The website for a music school located in New York City (the "Music School"), displays the 917 Phone Number as Music School's contact number, and it identifies SOHNGEN as the Music School's "founder and director" and one of its vocal instructors. It also displays a particular physical address for the Music School (the "Music School's Address").

     b.    With respect to the 347 Phone Number, I have learned the following, among other things:

     i. Records obtained from MetroPCS show, among other things, that the account for the 347 Phone Number was opened in the name "Helmuth Moss" on or about August 10, 2013 – approximately seven days before the first of the Moss Text Messages transcribed above. In addition, the mobile equipment identifier ("MEID") for one of the devices associated with the accountholder of the 347 Phone Number was a specific 15-digit number ending in "1266" (the "347 Phone Number MEID"). I have learned through training, experience, and education that an MEID number is a unique serial number assigned to a mobile device, such as a cellular phone, and that only one cellular phone is assigned a particular MEID at any given time.

     ii. Records obtained from Google show, among other things, that a particular Gmail account (the "Weierbach Gmail Account") was the email account linked to the Google-brand phone associated with the 347 Phone Number MEID. Records from Google also show, among other things, that the Weierbach Gmail Account was created on or about November 28, 2013 and that between January and July 2014, the Weierbach Gmail Account frequently connected to the Internet from a specific IP address ending in ".171" (the "Weierbach IP Address").

     iii. Records obtained from Verizon Broadband show, among other things, that beginning in or about March 2011, the Weierbach IP Address was associated with a business ("Business-1") sharing the same address as Music School's Address. Based on my research, it appears that Business-1 and

the Music School are located in different suites within the same
building.

            iv. Records obtained from Match.com show, among
other things, that on or about January 26, 2014, a Match.com
profile (the "SOHNGEN Match Profile") was created using the
Weierbach Gmail Account, the user ID "weierbach," and the
accountholder name "Oliver sohngen."

           c.    Finally, regarding the Moss Gmail Account, I have
learned the following, among other things:

            i. Records obtained from PayPal show, among
other things, that on or about March 7, 2012, a PayPal account
in the name of "Helmuth Moss" was created with the Moss Gmail
Account, 347 Phone Number, a particular American Express
("AMEX") credit card number (the "Moss AMEX Card Number"), and a
particular Citibank account number (the "Moss Citibank Account
Number").

            ii. Records obtained from AMEX show, among other
things, that on or about September 19, 2009, an account was
opened in the name "Oliver M. Sohngen" with the Moss AMEX Card
Number.

            iii. Records obtained from Citibank show, among
other things, that on or about October 21, 2011, SOHNGEN applied
to open a business deposit account in the name of the Music
School. Where asked to list his phone number, SOHNGEN provided
the 917 Phone Number, and where asked for his personal Citibank
account number, SOHNGEN provided the Moss Citibank Account
Number. Throughout 2013, checks made out to the Music School and
to SOHNGEN were deposited into this account.

      16.    Based on all of the foregoing, it appears that OLIVER
SOHNGEN, a/k/a "Helmuth Moss," a/k/a "Stephan Weierbach," the
defendant, used the aforementioned phone numbers and e-mail
addresses to communicate with CC-1, and that he did so in order
to engage in and attempt to engage in commercial sex acts with
minors.

**November 2015 – January 2016:  Attempted Inducement of a Minor**

      17.    In or about October 2015, agents identified multiple
posts on Craigslist.com (the "Craigslist Posts"), which had been
published by an individual using the Weierbach Gmail Account and
the 917 Phone Number, who identified himself as European, 5 feet
and 11 inches tall, and thin – a description consistent with the

appearance of OLIVER SOHNGEN, a/k/a "Helmuth Moss," a/k/a "Stephan Weierbach," the defendant, on the Music School's website and on the SOHNGEN Match Profile. Accordingly, and based on the information set forth above linking the Weierbach Gmail Account and 917 Phone Number to SOHNGEN, it appears that SOHNGEN authored the posts.

18.    From my review of the Craigslist Posts, I know that, with slight differences in wording, all of the Craigslist Posts sought "casual encounters" with other individuals to engage in fetish activity.

19.    On or about November 10, 2015, an undercover NYPD officer (the "UC") responded to one of these ads, posing as a fifteen-year-old girl. I have reviewed the subsequent correspondence between the UC and SOHNGEN. Those emails, which were sent between on or about November 10 and November 13, 2015, say the following, in substance and in part:

    a. On or about November 10, 2015:

| | |
|---|---|
| UC | Your ad sounds like fun. I am looking to [engage in the fetish activity] you like to get and I like to get pleased! Blonde and light skin. Tall and thin with curves. |
| "Weierbach" | That sounds like a plan. I love to please a woman especially orally... |
| "Weierbach" | [picture of SOHNGEN attached] |

    b. On or about November 11, 2015:

| | |
|---|---|
| UC | Hot pic! I like it. Do you have a place? Do you like young girls? You looks lots older than me and cute lol. |
| "Weierbach" | Yes I have a place. You have a pic? |
| "Weierbach" | Hello. Are you still interested? I have a place, a car and actually time tonight... |

c. On or about November 12, 2015:

| | |
|---|---|
| UC | Sorry I couldn't get back on my computer yesterday. I have soccer practice almost every day now. Not on Monday tho. I can see you after school if you are around. You didn't say how young you like btw. I like older, just want to make sure you like younger :). |

d. On or about November 13, 2015:

| | |
|---|---|
| "Weierbach" | I can't answer that in writing. Lets agree ure 18… |
| UC | Umm haha ok, Im 15. But you want me to say 18. Got it wink wink. So u around Monday.[3] |
| "Weierbach" | This sounds like entrapment by police… |
| "Weierbach" | So youre 18 right. |
| "Weierbach" | Also send me a pic. |

e. On or about November 16, 2015:

| | |
|---|---|
| "Weierbach" | Hey |

20.  The UC subsequently told "Weierbach" that it would be easier for the UC to communicate by phone, and on or about January 5, 2016, the 917 Phone Number (used by OLIVER SOHNGEN, a/k/a "Helmuth Moss," a/k/a "Stephan Weierbach," the defendant) initiated text messaging with the UC. Thereafter, the UC and SOHNGEN corresponded by text message and engaged in two voice calls. From reviewing screenshots of those text messages and listening to audio recordings of those calls, I have learned the following, among other things:

a.    On or about January 6, 2016, the UC received a call from SOHNGEN, using the 917 Phone Number, which the UC did not answer. At approximately 8:00 p.m., the UC called SOHNGEN back and engaged in a conversation lasting approximately nine

---

[3] Based on my training and experience, it appears that "Weierbach" wanted the UC to "agree" that she was 18 in order to avoid possible legal consequences for engaging in sexual contact with an underage girl.

minutes, which the UC recorded, and which included the following
exchanges, in substance and in part:

| 917 Phone | OK, so, um, I mean, um, you know, the whole, uh, thing about uh, how old you are. |
|-----------|-----------------------------------------------------------------------------------|
| UC | Yeah. |
| 917 Phone | You're 18, right? |
| UC | No. [laughs] You said that last time.  I'm 15. |
| 917 Phone | I don't want to know that. |
| UC | What? |
| 917 Phone | I don't want to know that. |
| UC | Why? |
| 917 Phone | Because it's a legal problem. |
| UC | Oh, so it's not that you don't like, ok.  I see.  So, like, if anyone asks me, I have to say I'm 18. |
| 917 Phone | Well, you are 18, right? |
| UC | You're funny. |
| 917 Phone | I mean, it makes sense right? |
| UC | Yeah, I see, like, because you have to be 18 not to get in trouble. |

     The two then continued to talk for approximately seven more
minutes, during which SOHNGEN asked about the UC's appearance
(e.g., hair color, eye color, and ethnicity) and her interest in
fetish activity, among other topics.  As the call was ending,
SOHNGEN said, in substance and in part, "I want to stay longer
on the phone with you," and asked, in substance and in part,
"Can you send me a picture?"

          b.    About an hour later, at approximately 9:00 p.m.,
SOHNGEN and the UC engaged in the following text message
exchange, in substance and in part:

| 917 Phone | Wyd[4] |
|-----------|--------|
| UC | Homework...boring |
| 917 Phone | Oh ok |
| 917 Phone | U never sent me a pic |

---

     [4] I know from experience that "Wyd" is a common text message
abbreviation for "What [are] you doing?"

| UC | I know I didn't want to send it on the Craigs list stuff |
|---|---|
| 917 Phone | Oh ok |
| UC | U still looking for [fetish activity] hun? |
| 917 Phone | Sure |
| UC | Ok let's meet up real soon... u said early in the day right? |
| 917 Phone | Yes. Or now... |
| UC | Can't now :( |
| UC | But nice to kno ur up for it anytime! |
| 917 Phone | ... |
| UC | U said you very oral... |
| 917 Phone | Yea |
| UC | That mean you give? |
| UC | Or want? |
| 917 Phone | Yea |
| UC | Both? |
| 917 Phone | Sure |
| UC | Ok me too |
| UC | My fav |
| 917 Phone | Mine too |
| UC | Then we will be good match hehe |
| 917 Phone | Good |
| UC | You don't like younger girls tho right? I'm afraid you won't like me :( |
| 917 Phone | Nice talking to you |
| UC | U too |
| 917 Phone | Send me a pic |
| 917 Phone | Wish we could've talked longer |
| UC | Want me to call back? |
| 917 Phone | Sure |

  c. At approximately 10:45 p.m., the UC called
SOHNGEN back on the 917 Phone Number, and they engaged in a
conversation lasting approximately fourteen minutes, which the
UC recorded. Approximately one minute into the call, SOHNGEN
again requested a picture from the UC, who responded, in
substance and in part, "I'm trying to find a cute one." SOHNGEN
answered, in substance and in part, "They're probably all cute."
SOHNGEN also asked again about the UC's appearance (e.g., hair
color, eye color, and freckles), then said, in substance and in
part, "I can't wait to see you." SOHNGEN then inquired into the

UC's interest in older men. After the UC answered, SOHNGEN
initiated the following exchange:

| 917 Phone | So you like getting really dirty and stuff? |
|---|---|
| UC | What? |
| 917 Phone | You like it really dirty and stuff? |
| UC | Yeah, I do.  [laughs]  You do, too? |
| 917 Phone | Mmhmm. |

SOHNGEN and the UC then discussed the difficulty in finding
others who are interested in the same fetish.  SOHNGEN and the
UC then engaged in a specific conversation about fetish
activity. The conversation continued:

| UC | Do you, um, like, I don't know, like, with um, oral. Is it, like, do you like it [oral sex] before or after [fetish activity]?  Like, what would you want? I don't know how that goes.  [laughs] |
|---|---|
| 917 Phone | Hmm, like um, like to lick you and stuff, at the same time. |
| UC | Oh, at the same time. |
| 917 Phone | Mmhmm. |
| UC | Oh, wow. |
| 917 Phone | You like to be licked? |
| UC | What? |
| 917 Phone | You like to be licked? |
| UC | Yes, of course.  Who would say no? [laughs] |
| 917 Phone | Oh, can I lick [unclear]? |
| UC | Yes.  Of course. |
| 917 Phone | [chuckle]  Wow, you're making me horny. |
| UC | [laughs] So you would really, like, want to meet to do all of this [fetish activity and oral sex]? |
| 917 Phone | Now? What about you? |
| UC | Yeah, I would.  Mmhmm. |
| 917 Phone | OK.  Wow, I wish I could meet you right now. |
| UC | [laughs]  Well, then, I guess we have to pick a time.  [laughs] |

31

| 917 Phone | Mmhmm.   Wow.   You're for real right? I'm not going to get in trouble and stuff, right? |
| UC | Oh, no, I'm interested in it . . . |

SOHNGEN and the UC then go back to discussing what forms of fetish activity the UC had seen in videos but never tried.  A few moments later, they engaged in the following exchange:

| 917 Phone | I would love to lick your ass. |
| UC | [laughs] |
| 917 Phone | [unclear] cum on me [unclear]. |
| UC | What? |
| 917 Phone | I want you to cum on me.  What do you want to do to me? |
| UC | I'm trying to, hold on, I can't really talk too much right now. |

d.    At approximately 12:10 a.m. on or about January 7, 2016, the UC sent a text message to SOHNGEN with a photograph of the face and upper body of a clothed blonde girl wearing sunglasses, accompanied by the message "Gnite." SOHNGEN responded, "Beautiful. Gn."

e.    Over the following days, SOHNGEN and the UC exchanged further text messages, including the following, in substance and in part, on or about January 19, 2016:

| UC | Hi |
| 917 Phone | Hi |
| UC | What's up |
| 917 Phone | Not much |
| UC | Oh cool. |
| UC | U seem to be the only cool person I talk to lol |
| 917 Phone | Ok... |
| UC | U were serious about hanging out? |
| UC | My dad is home |
| UC | I don't want him to hear us |
| UC | Hello |
| 917 Phone | Yes |
| UC | So you do want to? |
| 917 Phone | You're 18. Right? |
| UC | You said so lol |
| UC | You testing if I remembered?? |

| UC | I don't think anyone else likes the things I like but you |
|---|---|
| 917 Phone | Well I guess I could get you lunch or see a movie |
| UC | Ok I'm excited to meet you |

WHEREFORE, the deponent respectfully requests that a warrant be issued for the arrest of OLIVER SOHNGEN, a/k/a "Helmuth Moss," a/k/a "Stephan Weierbach," the defendant, and that SOHNGEN be arrested and imprisoned, or bailed, as the case may be.

_____
MIGUEL COLLAZO
Special Agent
Homeland Security Investigations

Sworn to before me this
11 day of May, 2017

_____
THE HONORABLE KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

Exhibit 2

Via email to ▬▬▬▬@usdoj.gov

November 20, 2017

Hon. Lewis A. Kaplan
U.S. District Judge, S.D.N.Y.
500 Pearl Street
New York, NY 10007

      Re:     United States v. Oliver Sohngen
               1:17-cr-00500-LAK

Dear Judge Kaplan,

We write as parents of former students of the Long Island City Academy of Music ("LICAM") to urge Your Honor to issue the strictest possible sentence to Oliver Sohngen.

Mr. Sohngen partnered with our school, P.S./I.S. 49 in Middle Village, Queens, to bring LICAM instruction to our children on Saturdays from the Fall of 2012 to the Spring of 2016. We write this letter based on our first-hand experience with Sohngen in his roles as music instructor and/or as the Director of LICAM. Sohngen was a frequent presence at our school on Saturdays, overseeing the program, interacting with the children, and providing direct instruction. Sohngen promoted himself to us as a gifted musician and teacher, and took every opportunity to point out how fortunate we were that he was willing to come to our neighborhood to run his music program.

Now, it is with deep sadness and anger that we look back at the partnership our school had with LICAM. Furthermore, we believe it is no coincidence that Sohngen arranged his livelihood so that he would always be around children.

Sohngen's arrest and subsequent plea shocked our community. We are sad for his victims, the vulnerable girls whom he dehumanized. The idea that we welcomed a predator into our school is tremendously unsettling. It will have a lasting impact on us as parents. It has changed the way we look at others in relation to our children; it has made us distrustful and wary. We have a duty to protect our children from harm, yet we unsuspectingly exposed them to a man who admitted to engaging in deeply disturbing acts. We continue to struggle with how and whether to explain the abrupt discontinuance of LICAM music lessons to our children, who range in age from 6 to 12.

While we know that the impact of Sohngen's crimes on us pales in comparison to the damage he did to his victims, we would be remiss if we did not direct Your Honor's attention to the ripple effect that Sohngen's depraved behavior had on our community. We ask that Your Honor show him no leniency.

Sincerely,




**1:17-cr-00500-LAK**

